UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————x

UNITED STATES OF AMERICA,    :
:
     *Plaintiff,*    :
:
     *v.*    :
:
MOSHE LAX, individually, as an executor of    :
the Chaim Lax Estate, as a trustee of the Chaim    :
Lax Family Trust, and as a trustee of the GAMA    :
Trust; ZLATY SCHWARTZ, individually, as    :    No. 1:18-cv-04061
executor of the Chaim Lax Estate, as trustee of the    :
Chaim Lax Family Trust, and as a trustee of the    :
GAMA Trust; SHAINDY LAX; JUDITH LAX;    :
J.L., a minor; 299 HEWES STREET REALTY    :
CORP; 307 HEWES STREET REALTY CORP;    :
JBAM REALTY LLC, a/k/a JBAM REALTY 2    :
LLC; BEN ZION JACOBOWITZ; TOBY    :
JACOBOWITZ; SL HOLDINGS I, LLC;    :
SL HOLDINGS II, LLC; SL HOLDINGS III, LLC;    :
SL HOLDINGS IV, LLC; SL HOLDINGS V, LLC;    :
DIAMOND DYNAMICS LLC; KGK JEWELRY    :
LLC; CONGREGATION BAIS YEHUDAH    :
D'GANITCH; LX HOLDINGS LLC;    :
MORRIS SCHLAGER; GITTY SCHLAGER;    :
JOSEPH GREEN; HANNAH GREEN;    :
HENNY GREEN; and HERSHI GREEN    :
:
     *Defendants.*    :

———————————————————————x

## AMENDED COMPLAINT

The plaintiff United States of America, pursuant to the provisions of 26 U.S.C. §§ 7401,

7402, and 7403, with the authorization of the Secretary of the Treasury and at the direction of the

Attorney General, brings this action to (1) collect certain unpaid federal income and estate tax

liabilities owed by the Estate of Chaim Lax (the "Estate"); (2) obtain a money judgment against

Moshe Lax and Zlaty Schwartz under 31 U.S.C. § 3713 for distributing Estate assets without first

paying the claims of the United States; (3) obtain money judgments for the Estate's unpaid

federal income and estate tax against Moshe Lax and Zlaty Schwartz as distributees of the Estate pursuant to N.Y. Est. Powers & Trusts Law § 12–1.1; (4) obtain judgment against Moshe Lax for breach of fiduciary duty under New York law; (5) obtain a money judgment against Moshe Lax and Zlaty Schwartz, pursuant to 26 U.S.C. § 6324(a)(2), to the extent of the value of all of the assets they received that were included in Chaim Lax's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042; (6) set aside certain fraudulent transfers by Moshe Lax and Zlaty Schwartz pursuant to N.Y. Debt. & Cred. Law §§ 273 and 276, or alternatively, obtain money judgments against the transferees and/or participants in and beneficiaries of such fraudulent transfers; (7) set aside the fraudulent transfer by Chaim Lax of LX Holdings LLC to the Chaim Lax Family Trust pursuant to N.Y. Debt. & Cred. Law §§ 273 and 276, or alternatively, obtain money judgments against the transferees and/or participants in and beneficiaries of such fraudulent transfers; (8) obtain a money judgment against Judith Lax and J.L., a minor, pursuant to 26 U.S.C. § 6324(a)(2), to the extent of the value of all of the assets they received that were included in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042; (9) to enforce federal tax liens against certain property of the Estate, including by appointing a receiver to liquidate the Estate's interest in Madison Avenue Diamonds; and (10) temporarily freeze all of the assets of defendants Moshe Lax, Zlaty Schwartz, and Shaindy Lax and the entities managed and controlled by them to prevent them from frustrating the relief sought herein.  For its complaint, the United States alleges the following:

## I.    Jurisdiction and Venue

1.      Jurisdiction over this action is conferred upon this Court under 28 U.S.C. §§ 1331, 1340, and 1345 as well as 26 U.S.C. §§ 7402 and 7403.

2.      Venue is proper in this District under 28 U.S.C. § 1392(b)(2) as a substantial part of the events giving rise to the claims occurred in this District.

## II.   Parties

3.      Moshe Lax resides in Brooklyn, New York.

4.      Zlaty Schwartz resides in Brooklyn, New York.

5.      Shaindy Lax resides in Brooklyn, New York.

6.      Judith Lax resides in Brooklyn, New York.

7.      J.L., a minor, resides in Brooklyn, New York.

8.      Diamond Dynamics LLC is a limited liability company incorporated under the laws of the State of New York.

9.      SL Holdings I, LLC is a limited liability company incorporated under the laws of the State of New York.

10.     SL Holdings II, LLC is a limited liability company incorporated under the laws of the State of New York.

11.     SL Holdings III, LLC is a limited liability company incorporated under the laws of the State of New York.

12.     SL Holdings IV, LLC is a limited liability company incorporated under the laws of the State of New York.

13.     SL Holdings V, LLC is a limited liability company incorporated under the laws of the State of New York.

14.     JBAM Realty LLC, a/k/a JBAM Realty LLC 2, a limited liability company incorporated under the laws of the State of New York, is named in accordance with 26 U.S.C. § 7403, as it has or may claim an interest in the property upon which the United States seeks to enforce its liens.

15. 299 Hewes Street Realty Corp., incorporated under the laws of the State of New York, is named in accordance with 26 U.S.C. § 7403, as it has or may claim an interest in the property upon which the United States seeks to enforce its liens.

16. 307 Hewes Street Realty Corporation LLC, a limited liability company incorporated under the laws of the State of New York, is named in accordance with 26 U.S.C. § 7403, as it has or may claim an interest in the property upon which the United States seeks to enforce its liens.

17. Ben Zion Jacobowitz and Toby Jacobowitz are named in accordance with 26 U.S.C. § 7403, as they have or may claim an interest in the property upon which the United States seeks to enforce its liens.

18. KGK Jewelry LLC is named in accordance with 26 U.S.C. § 7403, as it has or may claim an interest in the property upon which the United States seeks to enforce its liens.

19. Congregation Bais Yehudah D'ganitch is named in accordance with 26 U.S.C. § 7403, as it has or may claim an interest in the property upon which the United States seeks to enforce its liens.

20. LX Holdings LLC is named in accordance with 26 U.S.C. § 7403, as it has or may claim an interest in the property upon which the United States seeks to enforce its liens.

21. Morris Schlager is named in accordance with 26 U.S.C. § 7403 as he has or may claim an interest in the property upon which the United States seeks to enforce its liens.

22. Gitty Schlager is named in accordance with 26 U.S.C. § 7403 as she has or may claim an interest in the property upon which the United States seeks to enforce its liens.

23. Joseph Green is named in accordance with 26 U.S.C. § 7403 as he has or may claim an interest in the property upon which the United States seeks to enforce its liens.

24.     Hannah Green is named in accordance with 26 U.S.C. § 7403 as she has or may claim an interest in the property upon which the United States seeks to enforce its liens.

25.     Henny Green is named in accordance with 26 U.S.C. § 7403 as s/he has or may claim an interest in the property upon which the United States seeks to enforce its liens.

26.     Hershi Green is named in accordance with 26 U.S.C. § 7403 as s/he has or may claim an interest in the property upon which the United States seeks to enforce its liens.

### III.  Introduction

27.     Chaim Lax ("Chaim") was a diamond merchant and real estate developer, who through numerous business entities, owned parcels of real estate throughout Kings County, New York.

28.     Chaim's diamond businesses operated under the names Dynamic Diamond Corp., Dynamic Diamond Management LLC, Madison Avenue Diamonds LLC, Madison Avenue Diamond Holdings LLC, and Favorite Diamond LLC, among others.

29.     In the final years of his life, Chaim resided in Brooklyn with his wife, Judith Lax ("Judith").

30.     Between October 2005 and May 2006, the Internal Revenue Service began audits on Chaim and Judith's jointly filed federal income tax returns for the 2002, 2003, and 2004 tax years, which resulted in large income tax assessments.

31.     In or around November 2006, Chaim was diagnosed with stomach cancer.

32.     Knowing of his negative health prognosis, and that he owed millions in income taxes and would owe millions more upon his death, Chaim undertook a series of sham transactions designed to shield his assets from collection by the Internal Revenue Service. Chaim's heirs continued that effort after his death in order to avoid paying the taxes he owed.

## IV.   Background

### A.  The Estate of Chaim Lax

33.      On or around April 16, 2008, Chaim signed a document titled Last Will and Testament of Chaim Lax (the "Will").

34.      Upon information and belief, Chaim signed the Will in his hospital room at Memorial Sloan Kettering Hospital in Manhattan, New York, while being treated for metastatic stomach cancer.

35.      On or around November 3, 2008, Chaim died testate in New York County, New York.

36.      After Chaim's death, a surrogate court case styled *In the Matter of Proving the Last Will and Testament of the Estate of Chaim Lax*, File No. 2009-000456, Surrogate's Court of the State of New York, Kings County was established (the "Surrogate's Court Action").

37.      The executors of the Chaim Lax Estate (the "Estate") are Chaim's son, defendant Moshe Lax, and daughter, defendant Zlaty Schwartz.

38.      The Will directs the executors to pay any estate taxes owed using the Estate's assets.

39.      Instead of paying the Estate's tax debts, however, Moshe and Zlaty engaged in a series of schemes, described below, in an effort to shield the Lax business empire and extensive property holdings from the Estate's creditors, including the IRS.

40.      On October 13, 2009, Moshe and Zlaty represented to the Surrogate that the Estate's debts exceeded its assets by more than $30,000,000.

**B.  The Estate's Federal Tax Liabilities**

41.     The Estate has unpaid federal tax liabilities, as of April 25, 2018, of $61,559,044.81, consisting of unpaid estate tax and Chaim's unpaid pre-death income taxes, as described more fully below.

1.   Income Tax Liabilities

42.     The IRS opened audits of Chaim and Judith's jointly-filed federal income tax returns (Forms 1040) for the 2002, 2003, 2004 tax years on or about October 20, 2005, September 7, 2006, and May 11, 2006, respectively.  Chaim was aware of these income tax audits because the IRS notified him by letter that the returns had been selected for audit.

43.     On June 17, 2009, the IRS issued Chaim and Judith Notices of Deficiency advising them that they owed income taxes for 2002, 2003, and 2004.

44.     On September 16, 2009, Moshe and Zlaty, as representatives of the Estate, and Judith filed a petition in the United States Tax Court contesting the proposed tax liabilities for Chaim and Judith's jointly-filed Forms 1040 for the 2002, 2003, and 2004 tax years.  The matter was styled *Estate of Chaim Lax, deceased, Moshe Leib Lax, Executor, Zlaty Schwartz, Executor, and Juidth Lax A.K.A. Judith Steif v. Commissioner of Internal Revenue*, Docket No. 22208-09.

45.     On November 9, 2009, the IRS opened an audit of Chaim and Judith's jointly filed income tax returns for the 2007 tax year.

46.     On February 1, 2010, the IRS issued Chaim and Judith Notices of Deficiency advising them that they owed income taxes for the 2007 tax year.

47.      On May 10, 2010, the Estate and Judith filed a second petition in the United States Tax Court contesting their proposed tax liabilities for their 2007 Form 1040.  The matter was styled as *Estate of Chaim Lax, deceased, Moshe Lax, Executor, and Judith Steif v. Commissioner of Internal Revenue*, Docket No. 10587-10.

48.     Judith[1] and the Estate entered into stipulated agreements with the IRS as to Chaim and Judith's 2002, 2003, 2004, and 2007 income tax liabilities, pursuant to which the U.S. Tax Court entered judgments in favor of the United States on the dates and in the amounts shown below:

| Tax Year | Date | Tax | Penalty | Total Judgment |
|---|---|---|---|---|
| 2002 | 11/22/2010 | $6,277,961.00 | $1,255,592.20 | $7,533,553.20 |
| 2003 | 11/22/2010 | $7,802,857.00 | $1,560,571.40 | $9,363,428.40 |
| 2004 | 11/22/2010 | $6,052,688.00 | $1,526,510.25 | $7,579,198.25 |
| 2007 | 12/4/2012 | $ 273,309.00 | $ 54,662.00 | $327,971.00 |

49.     A delegate of the Secretary of the Treasury made assessments against the Estate and Judith for those amounts on March 28, 2011 (2002, 2003, and 2004); and February 19, 2013 (2007).

50.     Chaim failed to file an income tax return for 2006 during his life.  On April 6, 2011, after the IRS had opened an audit on that unfiled return, Moshe and Zlaty filed a 2006 Form 1040 on Chaim's behalf.

51.     On September 17, 2012, the audit of Chaim's 2006 income tax return concluded, resulting in an uncontested adjustment of $7,563,539.05 in income tax and penalties owed.  A delegate of the Secretary of the Treasury made an assessment in that amount on or about September 20, 2012.

52.     As of April 25, 2018, the Estate owes $54,351,138.41 in unpaid income taxes, penalties, and interest for 2002 through 2005, and 2007.

## 2.  Estate Tax Liabilities

53.     On February 9, 2010, Moshe and Zlaty, as executors of the Estate, filed an Estate Tax Return (the "Form 706") reporting no estate tax due.

---

[1] As of August 19, 2016, Judith had no outstanding Form 1040 liabilities for tax periods at issue, as the IRS granted her various forms of innocent spouse relief.

54.     On March 18, 2010, the IRS began an examination of the Estate's Form 706 (the "Form 706 Audit").

55.     Following the Form 706 Audit, the IRS concluded, as discussed below in "Scheme 1," that Chaim's purported transfer of his interest in various real estate holding companies to a family trust was not a bona fide, arms-length transaction, and determined that assets valued at $39,988,591 should be included in the Estate for estate tax purposes as a result.

56.     The Form 706 Audit resulted in an assessment of $4,456,718 in estate tax liabilities against the Estate.

57.     On or about December 3, 2012, the Moshe and Zlaty signed a Form 890, Waiver of Restrictions on Assessment and Collection of Deficiency and Acceptance of Overassessment — Estate, Gift, and Generation-Skipping Transfer Tax ("Agreement Form") that allowed the IRS to assess its proposed estate tax audit deficiencies.

### C.  The Schemes

58.     Chaim, during his life, and Moshe and Zlaty, after Chaim's death, engaged in a series of fraudulent transfers and other artificial transactions designed to hide the Lax family assets from the IRS and other creditors and make it appear as though the Estate was insolvent. These activities can be categorized into ten separate schemes, described as follows:

### Scheme 1: Chaim's Purported Transfer of Assets to the Lax Family Trust

59.     On or about February 1, 2007, after the IRS had begun auditing Chaim's income tax returns and after he was diagnosed with stomach cancer, Chaim transferred his interests in twenty-two real property holding companies to an entity named LX Holdings LLC ("LX Holdings").  The real property holding companies (together, the "Holding Companies") are: 301 Hooper, LLC, 13 Hooper LLC, 104 Sanford Associates LLC, 12 12 Lorimer Realty LLC, 386 Development LLC, South 4th Street Condos LLC, 242 South 1 Dev Realty LLC, 139 Middleton

LLC, West Wing Group LLC, CHL Realty LLC, The Peace Park LLC, 61-75 Taaffe Realty LLC, 790 Bedford LLC, 385 South 5th Realty LLC, 20 Bayard Views LLC, Favorite Properties LLC, 41 Harrison LLC, The Messorle Project LLC, Flatbush Extension LLC, Nassau Condos LLC, 168 Franklin Avenue LLC, Dynamic Management LLC, 307 Hewes Realty Corp, Kent Wythe 9th Street LLC, Kent Wythe Mezz LLC.

60.     At the time of the transfer, Chaim was effectively the sole owner of LX Holdings. While Chaim owned LX Holdings jointly with an entity called Favorite Enterprises LLC, Chaim also owned and controlled Favorite Enterprises LLC.  Favorite Enterprises LLC was owned by an offshore trust (the "GAMA Trust").  Chaim served as sole trustee and beneficiary of the GAMA Trust.  Upon Chaim's death, Moshe and Zlaty succeeded him as trustees for the GAMA Trust.

61.     On May 7, 2007, Chaim purported to assign his ownership interest in LX Holdings to the Chaim Lax Family Trust (the "Lax Family Trust"), an irrevocable trust that Chaim had established in 2003.

62.     Moshe and Zlaty were the trustees and beneficiaries of the Lax Family Trust. Additionally, Moshe and Zlaty, along with Chaim's other children and his grandchildren, were the named beneficiaries of the Lax Family Trust.

63.     As of May 7, 2007, Chaim's ownership interest in LX Holdings consisted of his interests in the Holding Companies, which had at least the following values as of Chaim's death:

| Property | Net value | Ownership Interest | Value of Interest |
|---|---|---|---|
| 301 Hooper, LLC | $2,000,000 | 100% | $2,000,000 |
| 13 Hooper LLC | $5,600,000 | 22.50% | $819,000 |
| 104 Sanford Associates LLC | $2,942,000 | 100% | $2,942,000 |
| 12 12 Lorimer Realty LLC | $185,000 | 100% | $185,000 |
| 139 Middleton LLC | $2,913,869.86 | 100% | $2,913,869.86 |
| CHL Realty LLC | $1,556,000 | 100% | $1,556,000 |

| | | | |
|---|---|---|---|
| The Peace Park LLC | $1,308,904.11 | 100% | $1,308,904.11 |
| 790 Bedford LLC | $1,499,488 | 100% | $1,499,488 |
| 61-75 Taaffe Realty LLC | $327,226.03 | 100% | $327,226.03 |
| 385 South 5th Realty LLC, | $3,686,632.78 | 100% | $3,686,632.78 |
| Favorite Properties LLC, | $9,108,428.20 | 100% | $9,108,428.20 |
| The Messorle Project LLC, | $679,772.50 | 50% | $254,914.69 |
| Flatbush Extension LLC | $11,615,320.57 | 55% | $4,471,898.42 |
| Nassau Condos LLC | $7,818,000 | 43% | $2,353,218 |
| 41 Harrison LLC | $727,000 | 100% | $727,000 |
| 168 Franklin Avenue LLC | $6,586,000 | 100% | $6,586,000 |
| Dynamic Management | $230,000 | 100% | $230,000 |
| 307 Hewes Realty Corp | $775,000 | 50% | $290,625 |
| | **Total:** | | **$41,260,205.09** |

64.     As alleged consideration for the purported transfer from LX Holdings to the Lax Family Trust, Moshe and Zlaty, as trustees of the Lax Family Trust, signed a Self-Cancelling Installment Note (the "SCIN").

65.     Under the terms of the SCIN, the Lax Family Trust was to pay a total of $40,750,000 directly to Chaim, in semiannual payments of $3,887,360, at an interest rate of 7.24% per annum.  By its terms, the SCIN would 'self-cancel' upon Chaim's death, at which point no further payments would be due.

66.     By the terms of the SCIN, two payments were due before Chaim's death, on November 30, 2007 and May 31, 2008, of $3,887,360 each, but no such payments were made. Moshe and Zlaty made no attempt as executors of the Estate to collect those payments from themselves as trustees of the Lax Family Trust, so that the Estate could pay its tax debts.  Moshe and Zlaty did not report the payments owed under the SCIN as an asset of the Estate on the Form 706.  Nor did Moshe and Zlaty report the alleged transfer of assets to the Lax Family Trust in exchange for the SCIN to the IRS as a gift or file a gift tax return for that transfer on behalf of the Estate.

67.     Prior to the transfer of LX Holdings to the Lax Family Trust, the Trust held only life insurance policies purchased by Chaim, on which Chaim paid all premiums during his life.

68.     The Lax Family Trust lacked sufficient assets to repay the SCIN prior to the transfer of LX Holdings.

69.     There was never any expectation that the Lax Family Trust would make any payments on the SCIN.  Rather, the purported transfer of LX Holdings to the Lax Family Trust was a transfer for no consideration.

70.     Chaim continued to use his interest in the Holding Companies for his own pecuniary benefit after the purported transfer to the Lax Family Trust.  For example, on or about March 31, 2008, nearly a year after the purported transfer, Chaim provided third parties with statements of net worth representing that he still owned the Holding Companies and their assets, in order to obtain credit.  Chaim obtained loans based on his ownership of the Holding Companies.

71.     On its face, the purported transfer of Chaim's interest in the Holding Companies to the Lax Family Trust through LX Holdings created an annuity payable to Chaim that was includible in his gross estate (for estate tax purposes) under 26 U.S.C. § 2039.  In the alternative, Chaim retained possession or enjoyment of his interest in the Holding Companies during his life, notwithstanding the purported sale of the Holding Companies to the Lax Family Trust through LX Holdings, such that those assets were includible in his gross estate pursuant to 26 U.S.C. § 2036.  In the alternative, Chaim's transfer of his interest in the Holding Companies to the Lax Family Trust through LX Holdings was a sham and should be disregarded, and accordingly the Holding Companies are included in his gross estate pursuant to 26 U.S.C. § 2033.

**Scheme 2: Transferring the Holding Companies to the SL Companies for No Consideration**

72.     Following Chaim's death, Moshe and Zlaty made further transfers of several of the Holding Companies and their assets to entities that they personally owned and/or controlled, for no consideration.

73.     Between 2009 and 2010, Moshe and/or Zlaty created five entities bearing the moniker "SL Holdings": SL Holdings I, LLC; SL Holdings II, LLC; SL Holdings III, LLC; SL Holdings IV, LLC; and SL Holdings V, LLC (collectively the "SL Companies").

74.     The SL Companies have the same sole member and 100% owner: Chana Weisz, the wife of defendant Moshe Lax.

75.     Chana Weisz is also known as Shaindy Lax and Shaindy Weisz (hereinafter, "Shaindy").

76.     The SL Companies are Moshe's alter-egos and/or nominees.

77.     Upon information and belief, Moshe maintains control over the SL Companies, but placed titular ownership in Shaindy's name.

78.     Upon information and belief, Moshe capitalized the SL Companies by transferring funds from the Lax Family Trust or another entity under his control.

79.     Moshe exercises dominion and control over the SL Companies, including by signing checks on its behalf.

80.     Upon information and belief, Shaindy nominally operates the SL Companies under the direction of Moshe.

81.     Upon information and belief, Moshe instructed or directed Shaindy to act as sole member and owner of the SL Companies with the expectation that he would retain control over the assets held by the SL Companies.

82.     To obscure his relationship to the SL Companies, Moshe directed his wife to use a former name, Chana Weisz, in conducting business on behalf of the SL Companies.

83.     In 2014, Shaindy testified under oath that, notwithstanding that she is sole owner of all five SL Companies, she was only aware of SL Holdings I.

84.     Upon information and belief, Shaindy's primary occupation is as a stay-at-home-mother and homemaker.

85.     The SL Companies operate from an address associated with Moshe's other business entities.

86.     The SL Companies have never filed any tax returns.

87.     Between 2009 and 2010, Moshe and Zlaty—as trustees of the Lax Family Trust, which purportedly owned LX Holdings as a result of Scheme 1—caused LX Holdings to transfer several of the Holding Companies to the SL Companies for no consideration, including 12 12 Lorimer Realty LLC, The Peace Park LLC, 385 South 5th Realty LLC, CHL Realty LLC, 301 Hooper Realty LLC, and 307 Hewes Street Realty Corp.

88.     Moshe and Zlaty attempted to create the appearance of consideration for these transfers by engineering an artificial loan transaction between entities they owned, controlled, and funded.

89.     First, on or about October 9, 2009, SL Holdings I purportedly advanced LX Holdings a line of credit of approximately $3,000,000.

90.     Moshe signed the line of credit agreement on behalf of LX Holdings.

91.     Since Moshe had financed SL Holdings I with funds from the Lax Family Trust, and LX Holdings was owned by the Lax Family Trust, the loan from SL Holdings I to LX

Holdings was essentially a loan by the Lax Family Trust to itself using Moshe's alter-ego, SL Holdings I, as a conduit.

92.     Next, even though LX Holdings' assets enabled it to repay the line of credit, Moshe and Zlaty, who controlled LX Holdings through the Lax Family Trust, caused LX Holdings to default on the line of credit.

93.     Finally, Moshe, acting on behalf of SL Holdings I, then engaged in negotiations with LX Holdings for repayment of the loan, resulting in an agreement that LX Holdings would repay SL Holdings I by transferring the membership interests listed in paragraph 81, above, to SL Holdings I.

94.     The transfer was executed by a Membership Interest and Stock Transfer Agreement, dated November 2, 2010, which is signed by Zlaty Schwartz—Moshe's sister and co-executor—on behalf of LX Holdings, and countersigned by Shaindy Lax—Moshe's wife—on behalf of SL Holdings I.

95.     SL Holdings I went on to distribute these assets to other of the SL Companies. For example, on or about June 14, 2011, SL Holdings I transferred ownership of The Peace Park LLC to SL Holdings III.  At some time between November 2, 2010 and July 2011, SL Holdings I transferred ownership of 385 South 5th Realty LLC to SL Holdings III for no consideration.

96.     Moshe's and Zlaty's transfer of these assets to the SL Companies was a continuation of the effort to render the Estate and the Lax Family Trust insolvent by placing assets outside the Estate and the Trust—but still within their personal control—for less than adequate consideration.

**Scheme 3: Appropriating the Assets of Dynamic Diamond Corp. from the Estate Using a Sham Restructuring**

97.     Dynamic Diamond Corp. was one of several companies through which Chaim operated his business wholesaling high-end, loose diamonds during his lifetime.

98.     At the time of his death, Chaim was the sole owner of Dynamic Diamond Corp., either outright or through one or more wholly-owned entities.

99.     Moshe and Zlaty, as executors of the Estate, listed Chaim's interest in Dynamic Diamond Corp. as an Estate asset on the Form 706, valued at $10,280,000 as of the date of Chaim's death.

100.     On February 26, 2010, Dynamic Diamond Corp. changed its name to White Coat, Inc. via a filing with the New York Secretary of State, Division of Corporations.

101.     Upon information and belief, White Coat, Inc. never applied for an Employer Identification Number ("EIN"), nor received an EIN from the IRS.

102.     Less than one week after the name change, on March 4, 2010, White Coat executed a Deed of Assignment for the Benefit of Creditors (the "ABC Deed"), which provided that White Coat would transfer its assets to an attorney to hold in trust, for the purpose of selling or disposing of its assets to the satisfaction of its creditors.

103.     Mordechai Ehrenheld, Moshe's cousin, executed the ABC Deed on behalf of White Coat, as "Martin Ehrenheld, Chief Restructuring Officer."

104.     The ABC Deed was submitted to the New York Supreme Court in a special proceeding styled as *Matter of the General Assignment for the Benefit of Creditors of White Coat, Inc., Assignor, to Tracy L. Klestadt*, Assignee, Index No. 510001/2010 (Sup. Ct., NY County) (the "ABC Action"), in which White Coat, Inc. assigned its assets and liabilities to Tracy L. Klestadt of Klestadt & Winters, LLP.

105.    On March 4, 2010, Tracy L. Klestadt submitted a motion requesting the entry of an order approving the sale of substantially all of White Coat Inc.'s assets to Diamond Dynamics LLC, a newly-formed corporation with a very similar name to Dynamic Diamond Corp.

106.    On March 10, 2010, the Hon. Marylin G. Diamond of the Supreme Court of the State of New York, New York County, issued an order to show cause directing that all of White Coat's known creditors be given notice of the plan to transfer White Coat, Inc.'s assets to Diamond Dynamics LLC.

107.    The Internal Revenue Service was a known creditor of Diamond Dynamics LLC.

108.    Stephanie Fraser of Klestadt & Winters, LLP mailed written notice to the Internal Revenue Service at P.O. Box 21126, Philadelphia, PA 19114, an address designated at the time for bankruptcy trustees and debtors-in-possession to send requests for determinations of unpaid tax liabilities to the IRS.  Even if this were the proper address to send notice of an ABC proceeding, such requests were required to include a valid tax return, or they would be returned as incomplete.  *See* IRS Rev. Proc. 2006-24, 2006-1 C.B. 943 (2006).

109.    An Assignment for the Benefit of Creditors is not among the types of action provided for in 28 U.S.C. § 2410, and accordingly the United States' liens cannot be affected by such a proceeding.

110.    On or about March 26, 2010, Judge Diamond entered a Sale Order approving the sale of substantially all of the assets of White Coat, Inc. to Diamond Dynamic LLC for $3,826,258 in cash and assumption of $3,116,668 of White Coats' debts and liabilities.  The sole member of Diamond Dynamic LLC was Shaindy Lax, Moshe's wife.

111.    Upon information and belief, Moshe and Zlaty changed the name of Dynamic Diamond Corp. to White Coat and engineered the ABC Action in order to defraud the Estate's creditors, particularly the IRS.

112.    The New York State Supreme Court subsequently determined that Moshe and Zlaty "changed the name of the Company in the hope [creditors] would not realize that 'White Coat' was really Dynamic Diamond." *Brunner v. Estate of Lax*, 47 Misc. 3d 1206(A), at *7, 15 N.Y.S.3d 710 (N.Y. Sup. Ct. 2015), *aff'd*, 137 A.D.3d 553, 27 N.Y.S.3d 148 (N.Y. App. Div. 2016). That court concluded that the fraudulent intent of the transaction's architects was evident "based on the circumstances of the ABC alone, but also because the badges of fraud are prominently on display." *Id.* at *11.

113.    Upon information and belief, $2,000,000 of Dynamic Diamond Corp.'s total debts and liabilities at the time of sale were purportedly owed to Moshe.

114.    Upon information and belief, the consideration paid for Dynamic Diamond Corp.'s assets was inadequate and based on artificially low valuations and appraisals that Moshe obtained to defraud the creditors of Dynamic Diamond Corp. and the Estate, including the IRS.

115.    Diamond Dynamics LLC is the successor to Dynamic Diamond Corp.

116.    Diamond Dynamics LLC is Moshe's alter-ego and/or nominee.

117.    Upon information and belief, Moshe created Diamond Dynamics LLC, but placed titular ownership in Shaindy's name, with the expectation that he would retain control over the assets held by Diamond Dynamics LLC.

118.    To obscure his relationship to Diamond Dynamics LLC, Moshe directed his wife to use a former name, Chana Weisz, when conducting business on behalf of Diamond Dynamics LLC.

119.     Upon information and belief, Shaindy nominally operates Diamond Dynamics LLC under the direction of Moshe.

120.     Upon information and belief, Shaindy has no experience operating a diamond business, unlike Moshe, who has operated several such businesses.

121.     Diamond Dynamics LLC operates from an address associated with Moshe's other businesses.

122.     Upon information and belief, Moshe capitalized Diamond Dynamics LLC by transferring funds from the Lax Family Trust or another entity under his control.

123.     Moshe and Zlaty distributed or transferred the Estate's interest in Dynamic Diamond Corp. to Diamond Dynamics LLC for less than adequate consideration.

124.     Moshe and Zlaty failed to use the proceeds of the sale of Dynamic Diamond Corp. to Diamond Dynamics LLC to pay the Estate's federal tax liabilities.

**Scheme 4: Transferring Madison Avenue Diamonds LLC to SL Holdings I for No Consideration**

125.     At the time of his death, Chaim owned a 50 percent interest in Madison Avenue Diamonds LLC, a retail jewelry business that was formed on or about September 15, 2005. Moshe Lax owned the other 50 percent interest.

126.     Moshe and Zlaty listed Chaim's ownership interest in Madison Avenue Diamonds LLC as an Estate asset on the Form 706, although they incorrectly asserted his interest to be 33% at the time of death.

127.     As of March 31, 2008, seven months prior to his death, Chaim's accountant valued his interest in Madison Avenue Diamonds LLC at $21,342,826.

128.     On information and belief, at some point between 2008 and 2012, Moshe caused the Estate to transfer its interest in Madison Avenue Diamonds LLC to SL Holdings I for no

consideration.  By 2012, Madison Avenue Diamonds LLC reported on its partnership income tax returns that SL Holdings I owned 100% of Madison Avenue Diamonds LLC.

**Scheme 5: Transferring Assets from the Original SL Holdings LLC to JBAM**

129.    At the time of his death, Chaim was the sole member of SL Holdings LLC ("Original SL Holdings"), a limited liability company unrelated to the SL Companies described above.

130.    In 2008, Chaim transferred the following interests in the following companies to Original SL Holdings:

| Entity | Transferred Interest | Value of Interest on Date of Death as disclosed on Form 706 |
|---|---|---|
| Tennessee Holdings LLC | 20.56% | $3,407,820 |
| Realty Kentucky LLC | 19.04% | $   606,607 |
| Rochester Properties B LLC | 5.45% | $   110,538 |
| Worthington Warehouse LLC | 43.91% | $1,193,660 |
| New Wild Wood LLC | 5.05% | $     96,019 |
| Wildwood Pierrepont LLC | 7.47% | $     95,622 |
| | **Total value:** | **$5,510,266** |

(collectively referred to as the "Original SL Holdings Assets").

131.    Moshe and Zlaty, as executors of the Estate, listed the Original SL Holdings Assets as Estate assets on the Form 706, acknowledging Chaim's ownership of these assets at death and their status as Estate assets.

132.    In 2011, Moshe and Zlaty transferred the Original SL Holdings Assets to JBAM Realty 2 LLC ("JBAM").

133.    Upon information and belief, Moshe and Zlaty transferred these assets to JBAM to repay an unsecured debt, which was junior to the interest of the United States.

134.    At the time of the transfer of the Original SL Holdings Assets to JBAM, the Estate was insolvent.

## Scheme 6: Liquidating Chaja Kessler 2002-C Irrevocable Trust

135.    On July 7, 2002, Chaja Kessler 2002-C Irrevocable Trust (the "Chaja Trust")

acquired title to a $1,000,000 life insurance policy with Canada Life, #XXXX112, which insured

the life of Chaja Kessler (the "Canada Life Policy").  The Chaja Trust's sole asset was the

Canada Life Policy, of which the Chaja Trust was the sole beneficiary.

136.    In July 2002, Chaim became the trustee of the Chaja Trust.

137.    On or about October 6, 2008, approximately one month before his death, Chaim

resigned as trustee of the Chaja Trust and Moshe and Zlaty became the successor trustees.

138.    At the time of his death, Chaim was a 90% beneficiary of the Chaja Trust. Upon

Chaim's death, Moshe succeeded Chaim as 90% beneficiary of the Chaja Trust.

139.    Moshe and Zlaty listed Chaim's 90% interest in the Chaja Trust corpus on the

Form 706 as an Estate asset.

140.    Chaim's 90% interest in the Chaja Trust corpus was included in his gross estate

pursuant to 26 U.S.C. § 2033.

141.    On September 18, 2009, the Chaja Trust sold the Canada Life Policy for

$500,000.

142.    The sale proceeds were provided to the Chaja Trust by check made payable to

"Chaja Kessler 2000C Irrevocable Life Insurance Trust C/O Dynamic Diamonds" at Dynamic

Diamond's address.

143.    The proceeds of the sale of the Canada Life Policy were deposited in a JP Morgan

Chase Bank Account opened by Moshe and Zlaty in their personal capacities.  None of the sale

proceeds were conveyed to the Estate.

144.    At the time of the transfer, the Estate was insolvent, or the transfer rendered the

Estate insolvent.

145.    Moshe and Zlaty did not use the sale proceeds to pay the Estate's federal tax liabilities.

## Scheme 7: Liquidating the Deluxe Properties

146.    Deluxe Development Inc. ("Deluxe") is a New York corporation that Chaim formed to develop real property.

147.    At the time of his death, Chaim held a 100% ownership interest in Deluxe.

148.    Moshe and Zlaty listed Chaim's ownership interest in Deluxe on the Form 706 as an Estate asset at a value of $1,125,858.

149.    At the time of Chaim's death, Deluxe owned 262 Skillman Street, Units 1A and 1B, Brooklyn, New York (together, the "Deluxe Properties").

150.    On September 29, 2009, Deluxe sold 262 Skillman Street, Unit 1A to Shloma and Chanie Lieberman for $520,000.

151.    Zlaty's husband, Joel Schwartz, executed the deed on behalf of Deluxe.

152.    On April 7, 2009, Deluxe sold 262 Skillman Street, Unit 1B to Joel and Malky Mandelovic for $605,858.

153.    The funds received by Deluxe, approximately $1,094,879, were not used to pay the Estate's federal tax liabilities.

154.    At the time of the sales of the Deluxe Properties, the Estate was insolvent, or the transactions rendered the Estate insolvent.

## Scheme 8: Moshe's Failure to Collect His Own Indebtedness to the Estate

155.    On July 16, 1996, Chaim acquired the real property located at 264 Forest Road, Monroe, Orange County, New York (the "Forest Road Property").

156.    In September 2002, Chaim sold the Forest Road Property to Moshe for $600,000. Through Dynamic Management LLC ("Dynamic Management"), Chaim issued a $500,000 loan to Moshe, secured by a mortgage on the Forest Road Property (the "Forest Road Mortgage").

157.    Prior to transferring his interests in the Holding Companies to the Lax Family Trust, a fraudulent transfer which is void as to the United States, Chaim was the sole member and 100% owner of Dynamic Management.

158.    Under the Forest Road Mortgage, all principal and interest would be due on September 12, 2032.

159.    No payments were made on the Forest Road Mortgage.

160.    By document dated January 13, 2009, Dynamic Management released the Forest Road Mortgage.  Zlaty signed the release of mortgage on behalf of Dynamic Management.  The release of mortgage was recorded with the Orange County Clerk's Office.

161.    Moshe and Zlaty, in their capacities as executors of the Estate, failed to collect Moshe's personal indebtedness to Dynamic Management, and instead released the Forest Road Mortgage without receiving any payments.

162.    In the alternative, if payments were made to the Estate on the loan secured by the Forest Road Mortgage, Moshe and Zlaty failed to use those payments to pay the Estate's federal tax liabilities.

163.    At the time that Moshe and Zlaty released the Forest Road Mortgage, the Estate was insolvent.

### Scheme 9: Liquidating Chaim's Bank Accounts

164.     During his life, Chaim held two bank accounts at Signature Bank: Signature Bank Account #XXXXXXX249 (the "First Account"); and Signature Bank Account #XXXXXXXX087 (the "Second Account").

165.    When Chaim died on November 3, 2008, the First Account had a balance of $2,203,225.

166.    On November 13, 2008, Moshe transferred $2,100,000 from the First Account to a separate bank account under his control.

167.    Moshe commingled Estate and personal funds in the First Account until it was closed in October 2011.

168.    When Chaim died on November 3, 2008, the Second Account had a balance of $9,957.

169.    In June 2010, Zlaty Schwartz liquidated the Second Account.

170.    On March 19, 2010, Moshe and Zlaty opened a third account at Signature Bank in the Estate's name, Signature Bank Account #XXXXXXX858 ("Third Bank Account").

171.    On March 24, 2010, the IRS deposited a refund check of $166,383 associated with Chaim's 2007 Form 1040, Individual Income Tax Return in the Third Bank Account.

172.    Moshe and Zlaty withdrew and distributed at least $165,745 in funds from the Third Account.

173.    The funds held in the First, Second, and Third Bank Accounts, approximately $2,379,565, were not used to pay the Estate's federal tax liabilities.

174.    The Estate was insolvent at the time that Moshe and Zlaty withdrew the funds in the First, Second, and Third Bank Accounts, or such actions rendered the Estate insolvent.

**Scheme 10: Selling the Nassau Condos**

175.    Prior to transferring his interests in the Holding Companies to the Lax Family Trust, Chaim was a member and 43% owner of Nassau Condos LLC.  Alternatively, Chaim owned a 43% interest in Nassau Condos LLC at the time of his death.

176.     On or about September 27, 2005, Nassau Condos LLC acquired the real property located at 168 Nassau Street, Brooklyn, New York for $3,000,000; on or about February 7, 2006, Nassau Condos LLC acquired the real properties located at 174 Nassau Street and 180 Nassau Street, Brooklyn, New York for $4,600,000 each (collectively, the "Nassau Properties").

177.     On February 14, 2012, Nassau Condos LLC sold the Nassau Properties to MICA GABE Brooklyn LLC for $11,289,725. Notwithstanding that in 2007, Chaim's interest in Nassau Condos LLC had purportedly been transferred to LX Holdings, which was purportedly transferred to the Lax Family Trust, Moshe and Zlaty participated in the sale on behalf of the Estate, indicating that the Estate, rather than the Lax Family Trust, owned an interest in Nassau Condos LLC.

178.     On information and belief, after assumption of outstanding mortgages, Nassau Condos LLC received approximately $900,000 in sale proceeds.  The Estate was entitled to 43% of that amount, or $387,000.

179.     The proceeds of the sale of the Estate's interest in the Nassau Properties LLC were not used to pay the Estate's federal tax liabilities.

## V.   Claims

### Count I: Reduce Estate's Tax Liabilities to Judgment

180.     The United States incorporates paragraphs 1 through 173, above.

181.     On the following dates and in the amounts set forth below, a delegate of the Secretary of the Treasury made the following assessments against Chaim Lax or his estate, for unpaid taxes, penalties, and interest, which have a balance due after accounting for all accruals, payments, credits, costs, and abatements as of April 25, 2018, as follows:

| Tax Year | Type of Tax | Assessment Date | Amount Due |
|---|---|---|---|
| N/A | Form  706 | 12/21/2012 | $ 7,207,906.40 |

| 12/31/2002 | Form 1040 | 03/28/2011 | $12,759,068.24 |
| 12/31/2003 | Form 1040 | 03/28/2011 | $16,176,659.01 |
| 12/31/2004 | Form 1040 | 03/28/2011 | $12,044,593.75 |
| 12/31/2006 | Form 1040 | 09/05/2011 09/20/2012 | $12,832,424.12 |
| 12/31/2007 | Form 1040 | 02/19/2013 | $     538,393.29 |
| | | **Total** | **$61,559,044.81** |

182.    A delegate of the Secretary of the Treasury properly gave notice of the tax liabilities described in paragraph 175, above, to, and made demand for payment upon, Moshe and Zlaty as executors of the Estate.

183.    Despite such notice and demand, the Estate has failed, neglected, or refused to fully pay the liabilities described in paragraph 175, above, and, as of April 25, 2018, and remains indebted to the United States for those liabilities, after taking into account all payments, credits, abatements, accruals, and costs, in the amount of $61,559,044.81, plus statutory additions and interest according to law from April 25, 2018.

184.    The Internal Revenue Service has attempted to collect the taxes due through levies and the filing of Notices of Federal Tax Liens, but such efforts did not yield collections sufficient to satisfy the Estate's outstanding tax liabilities.

185.    The United States is entitled to a judgment against Moshe Lax and Zlaty Schwartz, in their capacities as executors of the Estate, in the amount of $61,559,044.81, plus statutory additions and interest according to law from April 25, 2018.

**Count II: Moshe Lax and Zlaty Schwartz's Personal Liability for Outstanding Income and Estate Taxes Under 31 U.S.C. § 3713 as Executors of the Estate of Chaim Lax**

186.    The United States incorporates paragraphs 1 through 179, above.

187.    The federal priority statute, 31 U.S.C. § 3713(a), provides that a claim of the United States shall be paid first when the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.  In addition, under 31

U.S.C. § 3713(b), the executor of an estate "paying any part of a debt of the . . . estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government."

188.   Before making any distributions from the Estate, Moshe and Zlaty, as executors of the Estate, had an obligation to pay the Estate's federal estate and income tax liabilities.

189.   Moshe and Zlaty, in their capacities as co-executors of the Estate, distributed property to themselves, their nominees, and various third parties before paying the outstanding federal estate and income tax claims of the United States, and accordingly they are personally liable to the extent of such distributions for the unpaid claims of the government pursuant to 31 U.S.C. § 3713.

190.   As more fully described above, Moshe and Zlaty made the following distributions of Estate property, which were worth at least the following amounts as of the date of Chaim's death:

| Estate Asset | Value |
|---|---|
| Original SL Holdings Assets | $5,510,266 |
| Madison Avenue Diamonds LLC (50% interest) | $21,342,826 |
| Dynamic Diamond Corp. | $10,280,000 |
| Chaja Trust Corpus | $500,000 |
| Deluxe Properties | $1,094,879 |
| First, Second, Third Bank Accounts | $2,379,565 |
| Nassau Properties | $387,000 |
| Insurance Policy Proceeds | $1,070,548.93 |
| **Total known transfers** | $42,565,084.93 |

191.    Moshe and Zlaty distributed or transferred the assets of the Estate described in paragraph 184, above, before satisfying the unpaid claims of the United States that had already become due.

192.    The transfers described in paragraph 184, above, were made at a time when the Estate was insolvent or rendered the Estate insolvent.

193.    Moshe and Zlaty knew or should have known of the Estate's unpaid income and estate tax liabilities at the time the Estate was rendered insolvent.  Moshe and Zlaty received Notices of Deficiency advising them of Chaim's substantial pre-death income tax liabilities in June 2009, and contested the Estate's income tax liabilities in proceedings before the U.S. Tax Court beginning in September 2009.  Moshe and Zlaty were aware of the IRS examination into the Estate's estate tax liability as of March 2010.  Moshe and Zlaty each signed a Form 890 Agreement Form, acknowledging the IRS's conclusions following the examination, including that Chaim's transfer of nearly $40 million in assets prior to his death had not been a bona-fide transaction.  Moshe and Zlaty also knew or should have known, at the time of the transfer of LX Holdings to the Lax Family Trust, that the transfer was made for no consideration and in an effort to defeat Chaim's creditors, including the IRS.

194.    At the time that they distributed the Estate's assets, Moshe and Zlaty knew that such transfers would leave the Estate unable to pay its income and estate tax liabilities.

195.    Pursuant to 31 U.S.C. § 3713, Moshe and Zlaty are each personally liable to the extent of the value of all Estate property they distributed before satisfying the claims of the United States—at least $42,565,084.93—plus interest that continues to accrue, until the Estate's federal tax liabilities are paid in full.

**Count III: Moshe Lax's Personal Liability for Outstanding Income and Estate Taxes Under N.Y. Est. Powers & Trusts Law § 12–1.1 as a Distributee of the Estate of Chaim Lax**

196.    The United States incorporates paragraphs 1 through 189, above.

197.    Moshe Lax, as distributee of the Estate, is liable pursuant to New York law for the Estate's federal estate and gift tax liabilities to the extent of the value of any property he received in that capacity, including any property received by his alter-egos and/or nominees.  *See, e.g.*, *United States v. Halpern*, No. 15-CV-0025, 2015 WL 5821620, at *4–5 (E.D.N.Y. Oct. 5, 2015) (United States can collect taxes using state law creditor remedies, and the applicable statute of limitations is the 10-year limitations period of 26 U.S.C. § 6502); *United States v. Bushlow*, 832 F. Supp. 574, 580–81 (E.D.N.Y. 1993) (same).  Such property includes, at least, the following:

| Transferred Property | Value |
|---|---|
| Madison Avenue Diamonds LLC (50% interest) | $10,671,413 |
| Dynamic Diamond Corp. | $10,280,000 |
| 2007 Form 1040 Tax Refund | $166,383 |
| Chaja Trust Corpus | $500,000 |
| Deluxe Properties | $1,094,879 |
| First Bank Account | $2,203,225 |
| Total received: | $24,915,900 |

198.    The United States cannot fully satisfy its claim otherwise because there is insufficient Estate property remaining in the hands of Moshe and Zlaty in their capacity as executors to satisfy the United States' claim; no person prior in liability to Moshe Lax exists; and enforcement of the United States' liens against the Estate's property will not fully satisfy the United States' claim.

**Count IV: Zlaty Schwartz's Personal Liability for Outstanding Income and Estate Taxes Under N.Y. Est. Powers & Trusts Law § 12–1.1 as a Distributee of the Estate of Chaim Lax**

199.    The United States incorporates paragraphs 1 through 192.

200.     Zlaty Schwartz, as distributee of the Estate, is liable pursuant to New York law for the Estate's federal estate and gift tax liabilities to the extent of the value of any property she received in that capacity, including any property received by her alter-egos and/or nominees. *See, e.g.*, *United States v. Halpern*, No. 15-CV-0025, 2015 WL 5821620, at *4–5 (E.D.N.Y. Oct. 5, 2015) (United States can collect taxes using state law creditor remedies, and the applicable statute of limitations is the 10-year limitations period of 26 U.S.C. § 6502); *United States v. Bushlow*, 832 F. Supp. 574, 580–81 (E.D.N.Y. 1993) (same).  Such property includes, at least, the following:

| Transferred Property | Value |
|---|---|
| 2007 Form 1040 Tax Refund | $166,383 |
| Chaja Trust Corpus | $500,000 |
| Deluxe Properties | $1,094,879 |
| Second Bank Account | $9,957 |
| Total received: | $1,771,219.00 |

201.     The United States cannot fully satisfy its claim otherwise because there is insufficient Estate property remaining in the hands of Moshe and Zlaty in their capacity as executors to satisfy the United States' claim; no person prior in liability to Zlaty Schwartz exists; and enforcement of the United States' liens against the Estate's property will not fully satisfy the United States' claim.

### Count V: Breach of Fiduciary Duty Against Moshe Lax

202.     The United States incorporates paragraphs 1 through 195, above.

203.     As a co-executor of the Estate, Moshe owed a fiduciary duty of undivided and undiluted loyalty to the Estate and its creditors.

204.    Moshe violated his fiduciary duty by engaging in self-dealing: He dealt with the property under his charge for his own benefit, rather than for the benefit of the Estate and its creditors.

205.    As described in Scheme 1, above, Moshe, as trustee of the Lax Family Trust, received nearly $40 million in assets from Chaim in exchange for the SCIN, in what he knew or should have known to be a fraudulent transaction.  As Executor, Moshe failed to pursue, on behalf of the Estate and its creditors, the assets that Chaim fraudulently transferred to the Lax Family Trust when he already owed millions to the IRS.  Moshe further failed to collect the two payments the Lax Family Trust owed to Chaim under the SCIN for the benefit of his Estate and its creditors.  As described in Schemes 2 and 3, above, Moshe kept the assets that were fraudulently transferred to the Lax Family Trust by Chaim for his own benefit and transferred them to his alter-egos and/or nominees, the SL Companies, in order to make it more difficult for the Estate's creditors, including the IRS, to recover the assets.

206.    As described in Scheme 3, above, Moshe, transferred the assets of Dynamic Diamond Corp., an Estate asset, to himself, through his alter-ego and/or nominee, Diamond Dynamics, LLC, while the Estate's federal tax liabilities went unpaid.

207.    As described in Scheme 8, above, Moshe forgave his own personal indebtedness of $797,844 under the loan secured by the Forest Road Mortgage to Dynamic Management, depriving the Estate of a valuable asset and leaving the Estate's creditors, including the IRS, to go unpaid.

208.    As described in Scheme 9, above, Moshe liquidated the Estate's bank accounts and appropriated the funds therein, leaving the Estate's federal tax liabilities to go unpaid.

209.    Moshe concealed his self-dealing in an effort to defraud the Estate's creditors, including the IRS.

210.    Moshe concealed his self-dealing by exploiting alter-ego and/or nominee entities supposedly controlled by his wife, Shaindy, who signed corporate documents using an alias.

211.    Moshe has repeatedly made statements to agencies of the United States with the intent to conceal his self-dealing.  As late as July 15, 2017, Moshe, through his accountant, has attempted to conceal his self-dealing by representing to the IRS that the transfers of assets between LX Holdings and the SL Companies were the result of arms-length commercial transactions, rather than mere circular transfers of assets from Moshe to himself.

212.    Only in August 2016, after an investigation into Moshe's conduct as executor of the Estate, did the United States become aware of Moshe's breaches of fiduciary duty.

213.    A constructive trust should be imposed on the property that Moshe gained by virtue of his self-dealing, and such property should be reconveyed to the Estate and used to pay the Estate's tax liabilities.

214.    Alternatively, Moshe should be required to disgorge any benefit, including profits and rents, that he derived from the property misappropriated from the Estate.

**Count VI: Transferee Liability of Moshe Lax and Zlaty Schwartz Pursuant to 26 U.S.C. § 6324(a)(2)**

215.    The United States incorporates paragraphs 1 through 208, above.

216.    Pursuant to 26 U.S.C. § 6324(a)(2), if the estate tax is not paid when due, then the spouse, transferee, trustee, surviving tenant, person in possession of the property by reason of the exercise, nonexercise, or release of a power of appointment, or beneficiary who receives, or has on the date of the decedent's death, property included in the gross estate under sections 2034 to

2042, inclusive, is personally liable for such tax to the extent of the value, at the time of the decedent's death, of such property.

217.     Moshe Lax is a transferee, trustee, beneficiary, and person in possession of property by reason of the exercise or nonexercise of a power of appointment, within the meaning of 26 U.SC. § 6324(a)(2), because he held on the date of death, or received, cash and other assets that were includible in Chaim's gross estate under 26 U.S.C. §§ 2036, 2038, 2039, and 2041, both personally and through various nominees and/or alter egos, as well as in his capacity as trustee of the Lax Family Trust and the GAMA Trust.

218.     Zlaty Schwartz is a transferee, trustee, beneficiary, and person in possession of property by reason of the exercise or nonexercise of a power of appointment, within the meaning of 26 U.SC. § 6324(a)(2), because she held on the date of death, or received, cash and other assets that were includible in Chaim's gross estate under 26 U.S.C. §§ 2036, 2038, 2039, and 2041, both personally and through various nominees and/or alter egos, as well as in her capacity as trustee of the Lax Family Trust and the GAMA Trust.

219.     In particular, Moshe Lax and Zlaty Schwartz, as Trustees of the Lax Family Trust, held on the date of death, or received, Chaim's interest in LX Holdings, which owned Chaim's interests in the Holding Companies, as described in Scheme 1 above, assets worth at least $41,260,205.09; and held on the date of death, or received, the assets of the GAMA Trust.

220.     The Estate's estate tax liability remains unpaid to this date.

221.     Pursuant to 26 U.S.C. § 6324(a)(2), Moshe Lax and Zlaty Schwartz are each personally liable for the unpaid estate tax owed by the Estate, to the extent of the value of all of the assets they received that were included in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042, inclusive, to the extent of the value of such property at the time of his

death, including but not limited to Chaim's interests in the Holding Companies and the GAMA Trust.

222.    To the extent Moshe or Zlaty has transferred the property includible in the gross estate pursuant to sections 2034 through 2042 to any purchaser or holder of a security interest, there exists a lien on all of Moshe and/or Zlaty's property as provided in the second sentence of 26 U.S.C. § 6324(a)(2).

### Count VII: Set Aside Fraudulent Conveyance of Dynamic Diamond Corp.

223.    The United States incorporates paragraphs 1 through 216, above.

224.    As described in Scheme 4, above, Moshe and Zlaty's conveyance of Dynamic Diamond Corp.'s assets to Diamond Dynamics LLC, after briefly changing the company's name to White Coat Inc., was made without fair consideration.

225.    Under N.Y. Debt. & Cred. Law § 276, the conveyance of Dynamic Diamond Corp.'s assets to Diamond Dynamics LLC, disguised as an assignment for the benefit of creditors, was undertaken with actual intent to defraud the creditors of Dynamic Diamond Corp. and the Estate, including the IRS.

226.    Alternatively, pursuant to N.Y. Debt. & Cred. Law § 273, the conveyance of Dynamic Diamond Corp.'s assets to Diamond Dynamics LLC was constructively fraudulent as to the Estate's creditors, including the IRS.

227.    As set forth more fully in Scheme 3, above, and as determined by the New York State Supreme Court, Moshe and Zlaty attempted to obscure their fraudulent conveyance from creditors by changing Dynamic Diamond Corp.'s name only days before the conveyance.

228.    The transactions described as Scheme 3, above, were conducted between those with a close familial relationship: Moshe and Zlaty transferred Dynamic Diamond Corp. to

Moshe's nominee and/or alter-ego, Diamond Dynamics LLC, which he operates nominally through his wife, Shaindy.

229.    The transactions described as Scheme 3, above, were part of a series of transfers designed to render the Estate insolvent, and to place Chaim's assets beyond the reach of his creditors, including the IRS.

230.    The transfers described as Scheme 3, above, were not arms-length, commercial transfers but the Executor's attempt to appropriate Estate assets in derogation of the Estate's creditor's claims, including the IRS.

231.    The transfer to Diamond Dynamics LLC was made at a time the Estate was insolvent; additionally, it was one of a series of transfers that rendered the Estate insolvent.  Prior to the transfers described above as Scheme 3, Moshe and Zlaty knew the Estate was insolvent and had already represented to the Surrogate's Court that the Estate was insolvent.

232.    The transfer to Diamond Dynamics LLC was made at times when the outstanding federal estate tax and income tax liabilities were due and owing.

233.    The transfer to Diamond Dynamics LLC was made to the detriment of the United States because the Estate had unpaid federal tax liabilities.

234.    Moshe and Zlaty knew that the transferred assets would be required to pay the Estate's creditors, including the IRS, but nonetheless made the transfer, disguising it as an assignment for benefit of creditors.

235.    The transfer described in Scheme 3, above, should be set aside and the assets of Dynamic Diamond Corp. should be used to satisfy the Estate's federal tax liabilities, pursuant to N.Y. Debt. & Cred. Law §§ 273 and 276.

236.    In the alternative, should setting aside the fraudulent conveyance provide an inadequate remedy, Diamond Dynamic LLC, as a transferee, should be liable, in equity, for a judgment equal to the value of the fraudulent assets it received, as well as all rents, profits, and other benefits wrongfully obtained from the fraudulent assets.  *See In re Adelphia Recovery Tr.*, 634 F.3d 678, 692 (2d Cir. 2011).

237.    Additionally, should setting aside the fraudulent conveyance provide an inadequate remedy, a money judgment for the full amount of the transferred assets should be granted against Moshe, Zlaty, and Shaindy, jointly and severally, as participants in the fraudulent conveyance who were transferees and beneficiaries of the conveyance.  *See, e.g., RTC Mortg. Tr. 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001).

**Count VIII: Set Aside Fraudulent Conveyance of Madison Avenue Diamonds**

238.    The United States incorporates paragraphs 1 through 231, above.

239.    As described in Scheme 4, above, after Chaim's death, Moshe and Zlaty transferred his 50% ownership interest in Madison Avenue Diamonds, valued at $21,342,826, to SL Holdings I for no consideration. SL Holdings I was nominally owned by Shaindy Lax, Moshe's wife, and was effectively owned and operated by Moshe.

240.    The conveyance of Madison Avenue Diamonds to SL Holdings I for no consideration was undertaken with actual intent to defraud the Estate's creditors, including the IRS.

241.    Alternatively, the conveyance of Madison Avenue Diamonds to SL Holdings I for no consideration was constructively fraudulent as to the Estate's creditors, including the IRS.

242.    Prior to the conveyance of Madison Avenue Diamonds to SL Holdings I, Moshe and Zlaty were on notice of the Estate's substantial tax liabilities.

243.     The conveyance of Madison Avenue Diamonds to SL Holdings I was between those with a close familial relationship: Moshe and Zlaty transferred the 50% interest in Madison Avenue Diamonds to SL Holdings I, which Moshe operates nominally through his wife, Shaindy.  Moshe already owned the other 50% interest in Madison Avenue Diamonds.

244.     The conveyance of Madison Avenue Diamonds to SL Holdings I for no consideration was part of a series of transfers designed to render the Estate insolvent, and to place Chaim's assets beyond the reach of his creditors, including the IRS.

245.     The conveyance of Madison Avenue Diamonds to SL Holdings I was an not arms-length, commercial transfer but Moshe and Zlaty's attempt to appropriate Estate assets in derogation of the Estate's creditor's claims, including the IRS.

246.     The conveyance of Madison Avenue Diamonds to SL Holdings I was made at a time the Estate was insolvent; additionally, it was one of a series of transfers that rendered the Estate insolvent.  Prior to the transfer, Moshe and Zlaty knew that the Estate was insolvent and had already represented to the Surrogate's Court that the Estate was insolvent.

247.     The transfer of Madison Avenue Diamonds to SL Holdings I was made at a time when the outstanding federal estate and income tax liabilities were due and owing.

248.     The transfer of Madison Avenue Diamonds to SL Holdings I was made to the detriment of the United States because the Estate had unpaid federal tax liabilities.

249.     Moshe and Zlaty knew that the transferred assets would be required to pay the Estate's creditors, including the IRS, but nonetheless made the transfer.

250.     Pursuant to N.Y. Debt. & Cred. Law §§ 273 and 276, the transfer described as Scheme 4, above, should be set aside and the assets of Madison Avenue Diamonds should be used to satisfy the Estate's federal tax liabilities.

251.    In the alternative, should setting aside the fraudulent conveyance provide an inadequate remedy, SL Holdings I, as transferee, should be liable, in equity, for a judgment equal to the value of the fraudulent assets it received, as well as all rents, profits, and other benefits wrongfully obtained from the fraudulent assets.  *See In re Adelphia Recovery Tr.*, 634 F.3d 678, 692 (2d Cir. 2011).

252.    Additionally, should setting aside the fraudulent conveyance provide an inadequate remedy, a money judgment for the full amount of the transferred assets should be granted against Moshe, Zlaty, and Shaindy, jointly and severally, as participants in the fraudulent conveyance who were transferees and/or beneficiaries of the conveyance.  *See, e.g., RTC Mortg. Tr. 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001).

**Count IX: Set Aside Fraudulent Conveyance of LX Holdings to the Lax Family Trust**

253.    The United States incorporates paragraphs 1 through 246, above.

254.    As set forth more fully above in Scheme 1, Chaim transferred his interests in the Holding Companies to LX Holdings, and then transferred his interest in LX Holdings to the Lax Family Trust, for no consideration.

255.    Chaim's transfer of the Holding Companies to the Lax Family Trust through LX Holdings is avoidable as a fraudulent transfer.

256.    Chaim engaged in Scheme 1 with the actual intent to defraud his creditors.

257.    Alternatively, Chaim's transfer of the Holding Companies to the Lax Family Trust through LX Holdings was constructively fraudulent as to his creditors.

258.    Prior to the events described in Scheme 1, above, Chaim knew that the IRS had opened an audit into his income taxes for 2002, 2003, 2004, and knew that he owed substantial income taxes for those years. Chaim also had received a diagnosis of stomach cancer and knew

or should have known that his estate would be liable for a substantial estate tax following his death.

259.    Chaim and LX Holdings exchanged no consideration for the Holding Companies, which were worth at least $40,750,000.

260.    In exchange for LX Holdings, the Lax Family Trust provided Chaim with the SCIN, which purported to self-cancel on the death of Chaim, who had been diagnosed with terminal cancer at the time of the transaction.

261.    It was understood and expected by all the parties to the transfer of LX Holdings to the Lax Family Trust that no payments would ever be made on the SCIN, and in fact no payments were ever made.

262.    The participants in the transfer described in Scheme 1, above, have close familial relationships to one another: Chaim owned and controlled LX Holdings, and Chaim's children, Moshe and Zlaty, are the trustees of and beneficiaries of the Lax Family Trust.

263.    The transfer described in Scheme 1, above, was part of series of transfers, described in Schemes 2 through 10, above, designed to render the Estate insolvent, and to place Chaim's assets beyond the reach of his creditors, including the IRS.

264.    The transfer described in Scheme 1, above, was not an arms-length, commercial transfer but Chaim's attempt to pass property to his children in derogation of his creditor's claims, including the IRS.

265.    Chaim rendered himself and his Estate insolvent by transferring $40,750,000 in salable assets for no consideration, when such assets would be required to pay his income and estate tax liabilities as they became due.

266.    Chaim knew or should have known that transferring $40,750,000 in salable assets for no consideration would cause him or his Estate to be unable to pay his income tax liability.

267.    Chaim further knew or should have known that his Estate would be liable for a significant federal estate tax following his death, and knew or should have known that transferring $40,750,000 in salable assets for no consideration would cause his Estate to be unable to pay his estate tax liability as it became due.

268.    Moshe and Zlaty, as the trustees of the Lax Family Trust, knew or should have known of their father's plan to render himself and his estate insolvent, when the Lax Family Trust received $40,750,000 in saleable assets in exchange for the SCIN, upon which they never made a payment and never expected to make a payment, in anticipation of Chaim's approaching death.

269.    Pursuant to N.Y. Debt. & Cred. Law §§ 273 and 276, Chaim's circuitous transfers to the Lax Family Trust should be set aside and his ownership interests in the Holding Companies and their assets should be used to satisfy the Estate's federal tax liabilities.

270.    In the alternative, should setting aside the fraudulent conveyance provide an inadequate remedy, a money judgment should be granted against Moshe and Zlaty, jointly and severally, equal to the value of the assets transferred to the Lax Family Trust.  Moshe and Zlaty are liable as trustees and beneficiaries of the Lax Family Trust (the transferee of the fraudulently transferred assets), and as participants in the fraudulent conveyance who were beneficiaries of the conveyance.  *See, e.g.*, *In re Adelphia Recovery Tr.*, 634 F.3d 678, 692 (2d Cir. 2011); *RTC Mortg. Tr. 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001).

### Count X: Set Aside Fraudulent Conveyances to the SL Companies

271.    The United States incorporates paragraphs 1 through 264, above.

272.     Following Chaim's fraudulent transfer of his interests in the Holding Companies to the Lax Family Trust through LX Holdings, Moshe and Zlaty purported to transfer several of the Holding Companies from LX Holdings to the SL Companies, which were Moshe's alter-egos and/or nominees, as set forth in Scheme 2 above, which transfers are avoidable as fraudulent.

273.     Moshe and Zlaty knew or should have known that Chaim transferred his interests in the Holding Companies to the Lax Family Trust through LX Holdings for no consideration, in an attempt to defeat his creditors.

274.     Moshe and Zlaty acknowledged that Chaim transferred his interests in the Holding Companies to the Lax Family Trust for no consideration, by signing the Forms 890 on December 3, 2012.

275.     Moshe and Zlaty knew that the Lax Family Trust owed the Estate two payments under the SCIN that had become due before Chaim's death, totaling $7,774,720 plus interest.

276.     Despite having actual or constructive knowledge that the Holding Companies were fraudulently conveyed assets that should have been used to pay the Estate's federal tax liabilities and/or to make the outstanding SCIN payments to the Estate, Moshe and Zlaty transferred LX Holdings' interests in 301 Hooper LLC, 12 12 Lorimer Realty LLC, CHL Realty LLC, The Peace Park LLC, 385 South 5th Realty LLC, and 307 Hewes Street Realty Corp., together worth at least $4,625,813, to various of the SL Companies for less than adequate consideration, as described more fully in Scheme 2, furthering Chaim's attempts to defraud creditors of his estate, and rendering the Lax Family Trust unable to make the SCIN payments to the Estate.  Pursuant to N.Y. Debt. & Cred. Law §§ 273 and 276, those fraudulent transfers should be set aside and the assets used to pay the Estate's federal tax liabilities.

277.    As described in Scheme 2, above, Moshe and Zlaty engineered a sham loan to make it appear that SL Holdings I paid adequate consideration for LX Holdings' assets; however, adequate consideration was not exchanged.

278.    The transfers to the SL Companies were conducted between parties with a close familial relationship: Moshe owned and controlled LX Holdings together with Zlaty, and Moshe owned and controlled the SL Companies nominally through his wife, Shaindy.

279.    Moshe and Zlaty made the transfers described in paragraphs 66 through 90, above, with the actual intent to defraud the Estate's creditors, including the IRS, by placing the assets out of creditors' reach.  Alternatively, the transfers described in paragraphs 66 through 90, above, were constructively fraudulent as to the Estate's creditors.

280.     The transfers described in paragraphs 66 through 90 above were not arms-length, commercial transfers but Moshe and Zlaty's attempt to appropriate Estate assets in derogation of the Estate's creditors' claims, including the IRS.

281.    The transfers described in paragraphs 66 through 90 above were part of series of transfers designed to place Chaim's assets beyond the reach of his creditors, including the IRS.

282.    The transfers described in paragraphs 66 through 90 above were made at a time the Estate was insolvent; additionally, they were part of a series of transfers that rendered the Estate insolvent.

283.    Prior to the transfers described in paragraphs 66 through 90 above, Moshe and Zlaty knew of the Estate's substantial income tax liability because, among other things, the IRS had sent them Notices of Deficiency.  At the time of the transfers described in paragraphs 66 through 90 above, Moshe and Zlaty had already represented to the Surrogate's Court that the Estate was insolvent.

284.    Moshe and Zlaty knew or should have known that the assets described in paragraphs 66 through 90 above had been transferred to the Lax Family Trust fraudulently and would be required to pay the Estate's creditors, but nonetheless made the transfers, in some cases disguising them as arms-length deals using alter-ego/nominee entities and sham loans.

285.    Moshe and Zlaty's fraudulent transfers of the Holding Companies and their assets as described in paragraphs 66 through 90 above should be set aside and Chaim's pre-death ownership interests in such assets should be used to satisfy the Estate's tax liabilities.

286.    In the alternative, should setting aside any of the fraudulent conveyances provide an inadequate remedy, the SL Companies should be liable, in equity, for a judgment equal to the value of the fraudulent assets they received, as well as all rents, profits, and other benefits wrongfully obtained from the fraudulent assets. *See In re Adelphia Recovery Tr.*, 634 F.3d 678, 692 (2d Cir. 2011).

287.    Additionally, because Moshe and Zlaty were participants in the fraudulent transfers described in paragraphs 66 through 90 above and beneficiaries of the transfers, a money judgment for the full amount of the transferred assets should be granted against Moshe Lax and Zlaty Schwartz, jointly and severally, pursuant to New York law. *See, e.g.*, *RTC Mortg. Tr. 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001).

**Count XI: Transferee Liability of Judith Lax and J.L. Pursuant to 26 U.S.C. § 6324(a)(2)**

288.    The United States incorporates paragraphs 1 through 281, above.

289.    At the time of his death, Chaim owned a life insurance policy on his own life, provided by Guardian Life Insurance Company of America, bearing the policy number 5186361 (the "Guardian Life Policy"). The face amount of the policy was approximately $1,042,587.32.

290.    The beneficiaries of the Guardian Life Policy were Judith Lax, Chaim's spouse, and J.L., Chaim's son.

291.    On information and belief, Judith Lax received $951,598.09 in proceeds from the Guardian Life Policy.

292.    On information and belief, J.L. received $118,950.84 in proceeds from the Guardian Life Policy.

293.    Pursuant to 26 U.S.C. § 2042, the proceeds of the Guardian Life Policy are included in Chaim's gross estate for estate tax purposes.

294.    Judith Lax is a spouse, beneficiary, and transferee of the Estate who received property included in the gross estate pursuant to 26 U.S.C. § 2042.

295.    J.L. is a beneficiary and transferee of the Estate who received property included in the gross estate pursuant to 26 U.S.C. § 2042.

296.    The Estate's estate tax liability remains unpaid to this date.

297.    Pursuant to 26 U.S.C. § 6324(a)(2), Judith Lax and J.L. are each personally liable for the unpaid estate tax owed by the Estate, to the extent of the value of all of the assets they received that were included in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042, inclusive, to the extent of the value of such property at the time of the decedent's death, including but not limited to the Guardian Life Policy proceeds.

298.    To the extent Judith Lax or J.L. has transferred the Guardian Life Policy proceeds they received to any purchaser or holder of a security interest, there exists a lien on all of Judith Lax and/or J.L.'s property as provided in the second sentence of 26 U.S.C. § 6324(a)(2).

**Count XII: Enforce Tax Liens against Property**

299.    The United States incorporates paragraphs 1 through 292, above.

300.    On November 3, 2008, a federal estate tax lien arose, pursuant to 26 U.S.C.

§ 6324(a)(1), in favor of the United States upon all of the probate and non-probate assets

required to be reported as part of Chaim's gross estate.

301.    On the dates of the assessments set forth below, federal tax liens arose in favor of

the United States upon all probate property or rights to property belonging to the Estate, pursuant

to 26 U.S.C. § 6321.  A delegate of the Secretary of Treasury filed Notices of Federal Tax Lien

("NFTL"), in accordance with 26 U.S.C. § 6323(f), with the Offices of the City Register for

Kings County on the dates set forth below:

| Tax Year or DOD | Type of Tax | Assessment Date | Date NFTL or Revocation of Release of Lien Recorded |
|---|---|---|---|
| 11/03/2008 | 706 | 12/21/2012 | 05/21/2014 |
| 12/31/2002 | 1040 | 03/28/2011 | 05/05/2016 |
| 12/31/2003 | 1040 | 03/28/2011 | 05/05/2016 |
| 12/31/2004 | 1040 | 03/28/2011 | 05/05/2016 |
| 12/31/2007 | 1040 | 02/19/2013 | 08/28/2013 |
| 12/31/2006 | 1040 | 09/05/2011 09/20/2012 | 04/14/2015 03/30/2015 |

302.    As reflected in the above chart, on or about October 26, 2015, the IRS

inadvertently allowed the federal tax liens for Chaim's income tax liabilities for 2002, 2003, and

2004 to self-release.  On May 5, 2016, the IRS revoked the releases of lien for those tax periods,

by filing revocations with the recording offices described in the preceding paragraph, reinstating

the federal tax liens as of that date.

*Madison Avenue Diamonds*

303.    As described in Scheme 4, above, Chaim owned a 50% interest in Madison

Avenue Diamonds at the time of his death.  Chaim's interest in Madison Avenue Diamonds is

included in his gross estate pursuant to 26 U.S.C. § 2033, and was included on his Form 706.

304.     As further described in Count VIII, above, Moshe and Zlaty fraudulently conveyed Madison Avenue Diamonds to SL Holdings I for no consideration, and such transfer is void.

305.     The estate tax lien that arose on November 3, 2008 upon all assets in Chaim's gross estate pursuant to 26 U.S.C. § 6324(a) attaches to Chaim's interest in Madison Avenue Diamonds.

306.     Because the transfer of Chaim's interest in Madison Avenue Diamonds to SL Holdings I was fraudulent and should be voided, the lien provided by 26 U.S.C. § 6321 also continues to attach to Chaim's interest in Madison Avenue Diamonds. *See Abondolo v. GGR Holbrook Medford, Inc.*, 285 B.R. 101, 107 (E.D.N.Y. 2002).

307.     Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce its liens upon Chaim's 50% interest in Madison Avenue Diamonds, and to have such property sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the proceeds distributed to the United States or as otherwise determined by the Court.

308.     Pursuant to 26 U.S.C. § 7402(a), the Court has the jurisdiction to make and issue an order appointing a receiver as may be necessary or appropriate for the enforcement of the internal revenue laws.  Additionally, pursuant to 26 U.S.C. § 7403(d), the Court may appoint a receiver to enforce the United States' liens.

309.     In order to protect the value of the United States' interest in Madison Avenue Diamonds, and in order to enforce the United States' tax liens upon such interest, it is necessary and appropriate to appoint a receiver who is authorized to liquidate the corporation, and operate

it as needed until it can be liquidated, with the proceeds to be distributed to such parties and in such amounts as the Court determines.

310.    Appointment of a receiver who is authorized to liquidate Madison Avenue Diamonds is necessary in order to realize the value of the United States' 50 percent interest in Madison Avenue Diamonds.  Liquidating Madison Avenue Diamonds, either by sale of all of its stock or all of its assets, is the only apparent avenue to satisfy the Estate's substantial tax liabilities.  Without a receiver, the United States would be limited to enforcing its lien by conducting a sale of 50 percent of the corporate stock in Madison Avenue Diamonds, a closely-held corporation, with SL Holdings I nominally retaining ownership of the remaining 50 percent on behalf of Moshe Lax and serving as sole officer.  Such a sale would likely produce a steeply-discounted price relative to the value of the company, because any purchaser would have to take measures to assert its 50-percent stake in the corporation.  This would frustrate the United States' collection of the taxes owed.  By contrast, a receiver authorized to conduct a sale of all of Madison Avenue Diamonds's stock or assets could maximize value for both the United States and Moshe.

*Original SL Holdings Assets*

311.    As described in Scheme 5, above, Chaim was, at the time of his death, the sole member of the Original SL Holdings and owner of the Original SL Holdings Assets.  The Original SL Holdings Assets are included in Chaim's gross estate pursuant to 26 U.S.C. § 2033 as a probate asset, and were included on Schedule F of his Form 706 at a total value of $5,510,266.

312.    As further described in Scheme 5, above, Moshe and Zlaty transferred the Original SL Holdings Assets to JBAM to repay an unsecured debt, which was junior to the interest of the United States.

313.    The estate tax lien that arose on November 3, 2008 upon all assets in Chaim's gross estate pursuant to 26 U.S.C. § 6324(a)(1) attaches to Chaim's interest in the Original SL Holdings Assets.

314.    Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce its lien upon the Original SL Holdings Assets, and to have such property sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the proceeds distributed to the United States or as otherwise determined by the Court.

*GAMA Trust Assets*

315.    The GAMA Trust, EIN 41-6575729, was established in the British Virgin Islands on or about March 5, 2001.  While the GAMA Trust initially consisted of two trusts, GAMA Trust I and GAMA Trust II, GAMA Trust I was defunded and its assets transferred to GAMA Trust II on or about August 23, 2007, leaving GAMA Trust II as the entire GAMA Trust.

316.    Chaim Lax was the trustee and beneficiary of the GAMA Trust, and had a limited power to appoint the trust property by his last will and testament. Chaim also had the right to appoint additional and successor trustees.  Meir Bernat, Chaim's cousin, was the grantor of the GAMA Trust.

317.    On or about September 4, 2008, 60 days before his death, Chaim appointed Moshe and Zlaty as successor trustees of the GAMA Trust, to become trustees upon his death or resignation.  On information and belief, Moshe and Zlaty became the trustees of the GAMA trust upon Chaim's death, and remain the trustees of the GAMA Trust.

318.    The estate tax lien that arose on November 3, 2008 upon all assets in Chaim's gross estate pursuant to 26 U.S.C. § 6324(a) attaches to the assets of the GAMA Trust.

319.     Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce its lien upon the GAMA Trust, and to have the assets of the GAMA Trust sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the proceeds distributed to the United States or as otherwise determined by the Court.

*301 Hewes Street*

320.    By deed dated February 7, 1985 and recorded at reel 1611 and page 1336 of the Office of the City Register for New York City, Michael and Golda Farkas conveyed to Chaim and his first wife, Deborah Lax ("Deborah"), the parcel of real property that was then known as 301 Hewes Street, Brooklyn, New York located at what was then Block 2207, Lot 40, which is legally described as:

> BEGINNING at a point on the northerly side of Hewes Street, distant 82 feet westerly from the corner formed by the intersection of the northerly side of Hewes Street with the westerly side of Harrison Avenue;
> RUNNING THENCE northerly parallel with Harrison Avenue and part of the distance through a party wall, 100 feet;
> THENCE westerly parallel with Hewes Street, 20 feet;
> THENCE southerly parallel with Harrison Avenue and part of the distance through a party wall, 100 feet to the northerly side of Hewes Street;
> THENCE easterly along the northerly side of Hewes Street, 20 feet to the point or place of BEGINNING.

321.    By deed dated September 12, 1985 and recorded at reel 1712 and page 85 of the Office of the City Register for New York City, Ormond and Myrtle Duncan conveyed to Chaim and Deborah the parcel of real property that was then known as 299 Hewes Street located at what was then Block 2207, Lot 41, which is legally described as:

> BEGINNING at a point on the northwesterly side of Hewes Street, distant 102 southwesterly from the corner formed by the

intersection of the northwesterly side of Hewes Street and the
southwesterly side of Harrison Avenue;
RUNNING THENCE northwesterly parallel with Harrison Avenue
and part of the distance through a party wall, 100 feet;
THENCE southwesterly parallel with Hewes Street, 20 feet 8
inches;
THENCE southeasterly parallel with Harrison Avenue and part of
the distance through a party wall, 100 feet to the northe[a]sterly
side of Hewes Street;
THENCE northeasterly along the northwesterly side of Hewes
Street, 20 feet 8 inches to the point or place of BEGINNING.

322.    On or about December 7, 1987, 299 Hewes Realty Corp. was incorporated

pursuant to Section 402 of the New York Business Corporation Law.

323.    By agreement dated January 19, 1988 between Chaim Lax, Deborah Lax, Morris

Schlager, Gitty Schlager, Joseph Green, and 299 Hewes Realty Corp., Chaim agreed to organize

299 Hewes Realty Corp. and to convey title in the land located at 299-301 Hewes Street,

Brooklyn New York to that corporation in exchange for $100,000.  Among other things, the

January 19, 1988 agreement further provided as follows:

    a.  The real property located at 299-301 Hewes Street would be the sole asset of the

       corporation.

    b.  Morris Schlager and Gitty Schlager (together, the "Schlagers") agreed to jointly

       purchase 25% of the shares of 299 Hewes Realty Corp. for $355,000.

    c.  Joseph Green would obtain 25% of the shares in 299 Hewes Realty Corp.

       pursuant to a separate agreement.

    d.  Chaim would retain the remaining 50% of the shares in 299 Hewes Realty Corp.

    e.  299 Hewes Realty Corp. would be managed by a Board of Directors consisting

       of three members, with each of the shareholders having the right to elect one

       member of the Board of Directors.

f. Chaim Lax would be the President of 299 Hewes Realty Corp.; Morris Schlager would be the Secretary/Treasurer; and Joseph Green would be the Vice President.  All decisions of the Board of Directors would be made "exclusively by unanimous consent" of the three directors.

g. Chaim would construct a building on the land, to consist of three apartments. The Schlagers would receive the apartment on the upper two floors of 299 Hewes Street to pursuant to a proprietary lease.  Chaim would receive the two bottom floors of 299 Hewes Street.

h. The cost of operating the property—including repairs to common areas, real estate taxes, water and sewer charges, and insurance—would be shared by all of the shareholders of 299 Hewes Realty Corp. in proportion to their percentage interest in the corporation.

324.    By agreement dated July 7, 1988 between Chaim, Deborah, Morris Schlager, Gitty Schlager, Joseph Green, Hannah Green, and 299 Hewes Realty Corp., Chaim agreed to convey 25% of the shares in 299 Hewes Realty Corp. to Joseph Green and Hannah Green (together, the "Greens") in exchange for $281,825.00, and to convey to the Greens the apartment located on the two upper floors of 301 Hewes Street, Brooklyn, New York.  Chaim would receive the apartment on the bottom two floors of 301 Hewes Street.

325.    By deed dated January 20, 1988, and recorded at reel 2169 and page 1143 of the Office of the City Register for New York City, Chaim and Deborah transferred the parcels of real property then known as 299 Hewes Street and 301 Hewes Street to 299 Hewes Street Realty Corp. for no recorded consideration.

326.     At some point thereafter, the parcels of real property commonly known as 299 Hewes Street and 301 Hewes Street, Brooklyn, NY were combined into what is now known as 301 Hewes Street, Brooklyn, New York under Block 2207 and Lot 40 ("301 Hewes Street").

327.     Notwithstanding the agreement to provide 25% of the shares in 299 Hewes Street Realty Corp. each to the Greens and the Schlagers, the Greens and the Schlagers each received only 25 of the 200 outstanding shares, or a 12.5% interest in the corporation.

328.     Deborah died on August 15, 1999.  At the time of his death in 2008, Chaim resided at 301 Hewes Street with his second wife, Judith Lax.  Judith Lax continues to reside at 301 Hewes Street.

329.     The Schlagers and the Greens continue to reside at 301 Hewes Street.

330.     On September 12, 2004, Joseph Green purported to transfer twenty-five shares in 299 Hewes Street Realty Corp., consisting of the Greens' entire interest in the corporation, to Hershi Green and Henny Green, jointly.

331.     On or about June 23, 1993, 299 Hewes Street Realty Corp. was dissolved by proclamation of the New York Secretary of State, pursuant to Section 203-a of the New York Tax Law, for failure to file annual reports and/or pay franchise taxes.  Such dissolution has not been annulled.

332.     Once dissolved, 299 Hewes Street Realty Corp. was obligated to wind up its affairs, including by selling its assets, discharging its liabilities, and otherwise liquidating its business, and was prohibited from carrying on any business other than winding up its affairs.  N.Y. Bus. Corp. Law § 1005.  However, 299 Hewes Street Realty Corp. never took any steps to wind up its affairs and remains the record title owner of 301 Hewes Street.

333.    As a dissolved corporation, 299 Hewes Street Realty Corp. is not entitled to enjoy the privileges of corporate existence, including the privilege of limited liability protection.

334.    The shareholders of 299 Hewes Street Realty Corp. are jointly and severally liable to creditors of the corporation.

335.    Additionally, 299 Hewes Street Realty Corp. is the alter ego of its shareholders.

336.    At all times since at least 1993, 299 Hewes Street Realty Corp. has observed no corporate formalities, filed no annual reports, and paid no state franchise taxes.

337.    At all relevant times, the shareholders of 299 Realty Corp. have exerted complete domination and control over the corporation and disregarded the corporate form at their convenience.

338.    Since Chaim died in November 2008, 299 Hewes Street Realty Corp. has had no president and has lacked one of its three directors.  No steps were ever taken to replace Chaim in either capacity.

339.    Chaim's estate tax return (Form 706) reported that, at the time of his death, Chaim was the sole owner of 299 Hewes Street Realty Corp.

340.    In his Last Will and Testament, Chaim bequeathed a life estate in his interest in 301 Hewes Street to his wife, Judith Lax, notwithstanding that 299 Hewes Street Realty Corp. was the record title owner of that property.

341.    Chaim transferred his interest in 301 Hewes Street to 299 Hewes Street Realty Corp. for no consideration.

342.    The Schlagers and Greens paid Chaim directly for their interests in 299 Hewes Street Realty Corp., rather than the corporation.

343.     Chaim maintained title to 301 Hewes Street in the name of 299 Hewes Street Realty Corp., notwithstanding that the corporation was long defunct and never functioned as an independent entity, in order to frustrate his creditors by limiting their recovery to shares in a worthless, defunct corporation, rather than the valuable asset that Chaim owned outright in substance.

344.     Given that 299 Hewes Street Realty Corp. is the alter ego of its shareholders, the corporation's assets may be used satisfy the debts of its shareholders.

345.     Automatically upon Chaim's death, a federal estate tax lien attached to all property in his gross estate, pursuant to 26 U.S.C. § 6324(a)(1).

346.     Pursuant to 26 U.S.C. § 6321, on the dates of the assessments set forth above, federal tax liens arose in favor of the United States upon all property or rights to property belonging to the Estate.

347.     The liens described in paragraphs 345 and 346, above, continue to attach to 299 Hewes Street Realty Corp. and, given that that corporation was defunct, and was the alter-ego of its shareholders, such liens attach directly to 301 Hewes Street.

348.     On November 16, 2016, a delegate of the Secretary of Treasury recorded a Notice of Federal Tax Lien on the title of 301 Hewes Street, naming the 299 Hewes Street Realty Corp. as nominee of the Chaim Lax Estate, at City Register File Number ("CFRN") 2016110700416007.

349.     Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce its liens upon 301 Hewes Street, to have that property sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the

proceeds distributed, after the payment of the cost of sale and any real estate taxes due and owing under 26 U.S.C. § 6323(b)(6), to the United States or as otherwise determined by the Court.

350.    Alternatively, the United States is entitled to enforce its liens upon 299 Hewes Street Realty Corp., to have its stock or assets sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the proceeds distributed to the United States or as otherwise determined by the Court.

*307 Hewes Realty Corp.*

351.    By a deed dated April 28, 1992, and recorded at reel 2834 and page 130, Industrial Enterprises Ltd. conveyed to Chaim a parcel of real property located at 307 Hewes Street, Brooklyn, New York, which is situated on Block 2207, Lot 37 ( "307 Hewes Street"), which is legally described as:

> BEGINNING at a point on the Northerly side of Hewes Street, distant 21 feet Westerly from the Northwesterly corner of Hewes Street and Harrison Avenue;
> RUNNING THENCE Northerly parallel with Harrison Avenue and part of the distance through a party wall, 80 feet;
> THENCE Westerly parallel with Hewes Street, 20 feet 6 inches;
> THENCE Southerly parallel with Harrison Avenue and part of the distance through a party wall, 80 feet to Hewes Street;
> THENCE Easterly along Hewes Street, 20 feet 6 inches to the point or place of BEGINNING.

352.    A corrective deed dated March 30, 1993 and recorded at reel 3049 and page 2106 asserts that 307 Hewes Realty Corp., rather than Chaim, had actually acquired title to 307 Hewes Street for an undisclosed amount.

353.    By deed dated June 8, 1993, and recorded at reel 3074 and page 2061 of the Office of the City Register for New York City, Chaim and 307 Hewes Realty Corp. jointly conveyed 50% interest in 307 Hewes Street to Ben Zion Jacobowitz and Toby Jacobowitz, as "tenants in common to the extent of half," for $400,000.

354.   Prior to purporting to transfer his interests in the Holding Companies to the Lax Family Trust through LX Holdings, as described in Scheme 1, Chaim was the sole member and 100% owner of 307 Hewes Realty Corp.

355.   Notwithstanding the purported transfer of LX Holdings to the Lax Family Trust, Chaim continued, during his life, to enjoy ownership over 307 Hewes Realty Corp. and the other Holding Companies.  In particular, Chaim continued to obtain credit from third parties on the basis of his ownership of 307 Hewes Realty Corp.  Accordingly, Chaim's 100% interest in 307 Hewes Realty Corp. is includable in his gross estate pursuant to 26 U.S.C. § 2036.

356.   Automatically upon Chaim's death, a federal estate tax lien attached to all property required to be included in his gross estate, pursuant to 26 U.S.C. § 6324(a)(1), including Chaim's ownership interest in 307 Hewes Street and 307 Hewes Realty Corp.  The estate tax lien continues to attach to Chaim's interest in 307 Hewes Street and Chaim's 100% interest in 307 Hewes Realty Corp.

357.   Additionally, pursuant to 26 U.S.C. § 6321, on the date of the assessments set forth above, federal tax liens arose in favor of the United States upon all property or rights to property belonging to the Estate, including Chaim's ownership interest in 307 Hewes Street and 307 Hewes Realty Corp.  Given that the transfer of 307 Hewes Realty Corp. to the Lax Family Trust through LX Holdings was fraudulent and should be voided, the lien provided by 26 U.S.C. § 6321 continues to attach to Chaim's 100% interest in the corporation.  *See Abondolo v. GGR Holbrook Medford, Inc.*, 285 B.R. 101, 107 (E.D.N.Y. 2002).

358.   Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce its liens upon 307 Hewes Realty Corp., to have its stock or its assets, including 307 Hewes Street, sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any

rights of redemption, and to have the proceeds distributed in such amounts and to such parties as the Court determines.

359.     Alternatively, to the extent that Chaim owned 50% of the 307 Hewes Street Property outright at the time of his death, rather than through 307 Hewes Realty Corp., the liens provided by 26 U.S.C. §§ 6321 and 6324(a)(1) continue to attach to the 307 Hewes Street Property directly, and the United States is entitled to enforce its liens upon the 307 Hewes Street Property, to have that property sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the proceeds distributed, after the payment of the cost of sale and any real estate taxes due and owing under 26 U.S.C. § 6323(b)(6), to the United States or as otherwise determined by the Court.

*12 12 Lorimer Realty*

360.     By deed dated December 19, 2002 and recorded at CFRN 2003000303153 on August 18, 2003, 95 Lorimer, LLC conveyed to 12 12 Lorimer Realty LLC the parcel of real property know as 93 Lorimer Street, Unit 3, Brooklyn, New York ( "93 Lorimer Street"). It is more fully described as:

> The Condominium Unit (hereinafter referred to as the "Unit") known as Unit No. 3 in the building (hereinafter referred to as the "Building") known as The 93 Lorimer Street Condominium and by the street number 93 Lorimer Street, Brooklyn, New York, Borough of Brooklyn, County of Kings and State of New York, said Unit being designated and described as Unit No. 3 in a certain declaration dated 6/11/02 made by Grantor pursuant to Article 9-B of the Real property Law of the Strate of New York (hereinafter referred to as the "Condominium Act") establishing a plan for condominium ownership of the Building and the land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed, hereto and made a part hereof), which declaration was recorded in the Kings County Office of the Register of the City of New York on 6/17/02 in Real 5675 Page 1018 as Condominium Plan No 914, (which declaration and amendments thereto are hereinafter

collectively referred to as the "Declaration"). The Unit is also
designated as Tax Lot 1803 in Block 2241 of Section 8 of the
Borough of Brooklyn on the Tax Map of the Real Property
Assessment Department of the City of New York and on the Floor
Plans of the Building, certified by Bricoloage Designs on 6/3/02,
and filed with the Assessment Department of the City of New
York

Together with an undivided 25% interest in the Common Elements
(as such term is defined in the Declaration).

361.     Prior to transferring his interests in the Holding Companies to the Lax Family

Trust through LX Holdings, as described in Scheme 1, Chaim was the sole member and 100%

owner of 12 12 Lorimer Realty LLC.  93 Lorimer Street is the sole asset of 12 12 Lorimer Realty

LLC.

362.     Notwithstanding the purported transfer of LX Holdings to the Lax Family Trust,

Chaim continued, during his life, to enjoy ownership over 12 12 Lorimer Realty LLC and the

other Holding Companies.  In particular, Chaim continued to obtain credit from third parties on

the basis of his ownership of 12 12 Lorimer Realty LLC.  Accordingly, Chaim's 100% interest in

307 Hewes Realty Corp. is includable in Chaim's gross estate pursuant to 26 U.S.C. § 2036.

363.     Automatically upon Chaim's death, a federal estate tax lien attached to all

property required to be included in his gross estate, pursuant to 26 U.S.C. § 6324(a)(1), including

his interest in 12 12 Lorimer Realty LLC.

364.     Additionally, pursuant to 26 U.S.C. § 6321, on the date of the assessments set

forth above, federal tax liens arose in favor of the United States upon all property or rights to

property belonging to the Estate.  Given that the transfer of 12 12 Lorimer LLC to the Lax

Family Trust through LX Holdings was fraudulent and should be voided, the lien provided by 26

U.S.C. § 6321 continues to attach to Chaim's 100% interest in the corporation.  *See Abondolo v.*

*GGR Holbrook Medford, Inc.*, 285 B.R. 101, 107 (E.D.N.Y. 2002).

365.     On January 14, 2011, a document titled "NYC Real Property Transfer Tax" was recorded purporting to reflect the transfer of 93 Lorimer Street from LX Holdings as grantor to SL Holdings I, LLC as grantee.  However, no deed transferring the property from 12 12 Lorimer Realty LLC to LX Holdings was ever recorded and, per New York City property tax records, the property remains titled to 12 12 Lorimer Realty LLC.

366.     Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce its liens upon 12 12 Lorimer Realty LLC, to have its stock or assets, including 93 Lorimer Street, sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the proceeds distributed to the United States or as otherwise determined by the Court.

*267 Franklin Ave LLC*

367.     By deed dated December 27, 2007, Broadway Estates LLC conveyed to 267 Franklin Avenue LLC a parcel of real estate known as 275 Franklin Avenue, Brooklyn, New York ("275 Franklin Avenue"), which is more fully described as:

> All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, City and State of New York, designated on the Tax Map of the City of New York, for the Borough of Brooklyn, as said Tax Map was on April 27, 1976, Block 1941, Lot 11.

368.     At the time of his death, Chaim owned a 100% membership interest in 267 Franklin Avenue LLC, which owned at least two parcels of real property.  Chaim's 100% interest in 267 Franklin Avenue LLC was included on Schedule F of his Form 706.

369.     Automatically upon Chaim's death, a federal estate tax lien attached to all property required to be included in his gross estate, pursuant to 26 U.S.C. § 6324(a)(1), including Chaim's ownership interest in 267 Franklin Avenue LLC.  The estate tax lien continues to attach to Chaim's 100% interest in 267 Franklin Avenue LLC.

370.    Additionally, pursuant to 26 U.S.C. § 6321, on the date of the assessments set forth above, federal tax liens arose in favor of the United States upon all property or rights to property belonging to the Estate, including Chaim's ownership interest 267 Franklin Avenue LLC.

371.    Pursuant to 26 U.S.C. § 7403, the United States is entitled to enforce its liens upon 267 Franklin Avenue LLC, to have its stock or assets, including 275 Franklin Avenue, sold at a judicial sale free and clear of all rights, titles, claims, and interests of the parties, including any rights of redemption, and to have the proceeds distributed to the United States or as otherwise determined by the Court.

**Prayer for Relief**

WHEREFORE, the United States of America respectfully requests that the Court grant the following relief:

A.    Enter an Order temporarily and preliminarily freezing all assets of Defendants Moshe Lax, Zlaty Schwartz, and Shaindy Lax and the entities managed or controlled by them as provided for in the accompanying motion and proposed order;

B.    Enter judgment in favor of the United States of America and against Moshe Lax and Zlaty Schwartz in their representative capacities as executors of the Estate of Chaim Lax for its unpaid federal tax liabilities, in the amount of $61,559,044.81, plus statutory additions and interest according to law from April 25, 2018;

C.    Enter judgment in favor the United States of America against Moshe Lax and Zlaty Schwartz personally, holding them jointly and severally liable for the unpaid estate and income tax liabilities of the Estate of Chaim Lax, in the amount of $61,559,044.81, plus statutory additions and interest according to law from April 25, 2018, to the extent of the value of all

Estate property that they distributed in violation of their fiduciary duties pursuant to 31 U.S.C. § 3713;

D.      Enter judgment in favor the United States of America against Moshe Lax personally for the unpaid estate and income tax liabilities of the Estate of Chaim Lax to the extent of the value of the assets he received in his capacity as a distributee and/or testamentary beneficiary of the Estate, not less than $24,915,900, plus interest that continues to accrue, pursuant to New York Est. Powers & Trusts Law § 12–1.1;

E.      Enter judgment in favor the United States of America against Zlaty Schwartz personally for the unpaid estate and income tax liabilities of the Estate of Chaim Lax to the extent of the value of the assets she received in her capacity as a distributee and/or testamentary beneficiary of the Estate, not less than $1,771,219.00, plus interest that continues to accrue, pursuant to New York Est. Powers & Trusts Law § 12–1.1;

F.      Enter judgment in favor of the United States of America against Moshe Lax for breach of fiduciary duty, imposing a constructive trust on all property that Moshe Lax gained by virtue of his self-dealing property; or, alternatively, ordering Moshe Lax to disgorge any benefit, including profits and rents, that he derived from the property misappropriated from the Estate.

G.      Enter judgment in favor the United States of America against Moshe Lax, pursuant to 26 U.S.C. § 6324(a)(2), holding him liable for the unpaid estate tax owed by the Estate, to the extent of the value of all of the assets he received that are includible in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042, inclusive, to the extent of the value of such property at the time of the decedent's death, including but not limited to Chaim's interests in the Holding Companies and the GAMA Trust.

H.      Enter judgment in favor the United States of America against Zlaty Schwartz, holding her liable for the unpaid estate tax owed by the Estate, to the extent of the value of all of the assets she received that are includible in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042, inclusive, to the extent of the value of such property at the time of the decedent's death, including but not limited to Chaim's interests in the Holding Companies and the GAMA Trust.

I.      Enter judgment determining that, to the extent that Moshe Lax or Zlaty Schwartz transferred the property they received from the Estate that is includible in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042, inclusive, to any purchaser or holder of a security interest, there exists a lien on all such property as provided in 26 U.S.C. § 6324(a)(2);

J.      Enter judgment determining that the purported transfer from Dynamic Diamond Corp. to Diamond Dynamics LLC constituted a fraudulent conveyance under N.Y. Debt. & Cred. Law §§ 273 and 276 and should therefore be set aside and the assets of Dynamic Diamond Corp. should be used to satisfy the Estate's federal tax liabilities; or alternatively, should setting aside the fraudulent conveyance provide an inadequate remedy, Diamond Dynamic LLC, as a transferee, should be liable, in equity, for a judgment equal to the value of the fraudulent assets it received, as well as all rents, profits, and other benefits wrongfully obtained from the fraudulent assets; or alternatively, should setting aside the fraudulent conveyance provide an inadequate remedy, a money judgment for the full amount of the transferred assets should be granted against Moshe Lax, Zlaty Schwartz, and Shaindy Lax, jointly and severally, as participants in the fraudulent conveyance who were transferees and beneficiaries of the conveyance;

K.      Enter judgment determining that the purported transfer of Madison Avenue Diamonds to SL Holdings I constituted a fraudulent conveyance under N.Y. Debt. & Cred. Law §§ 273 and 276 and should therefore be set aside and the assets of Madison Avenue Diamonds should be used to satisfy the Estate's federal tax liabilities; or alternatively, should setting aside the fraudulent conveyance provide an inadequate remedy, SL Holdings I, as transferee, should be liable, in equity, for a judgment equal to the value of the fraudulent assets it received, as well as all rents, profits, and other benefits wrongfully obtained from the fraudulent assets; or alternatively, should setting aside the fraudulent conveyance provide an inadequate remedy, a money judgment for the full amount of the transferred assets should be granted against Moshe Lax, Zlaty Schwartz, and Shaindy Lax, jointly and severally, as participants in the fraudulent conveyance who were transferees and/or beneficiaries of the conveyance.

L.      Enter judgment determining that the purported transfer of LX Holdings to the Chaim Lax Family Trust to constituted a fraudulent conveyance under N.Y. Debt. & Cred. Law §§ 273 and 276 and should therefore be set aside and the assets of LX Holdings should be used to satisfy the Estate's federal tax liabilities; or alternatively, should setting aside the fraudulent conveyance provide an inadequate remedy, the Lax Family Trust, as transferee, should be liable, in equity, for a judgment equal to the value of the fraudulent assets it received, as well as all rents, profits, and other benefits wrongfully obtained from the fraudulent assets; or alternatively, should setting aside the fraudulent conveyance provide an inadequate remedy, a money judgment for the full amount of the transferred assets should be granted against Moshe Lax and Zlaty Schwartz, jointly and severally, as participants in the fraudulent conveyance who were transferees and/or beneficiaries of the conveyance;

M.      Enter judgment determining that the purported transfer of 12 12 Lorimer Realty LLC, The Peace Park LLC, 385 South 5th Realty LLC, CHL Realty LLC, 301 Hooper Realty LLC, and 307 Hewes Street Realty Corp to SL Holdings I, and the subsequent transfer of those assets from SL Holdings I to other of the SL Companies, constituted fraudulent conveyances under N.Y. Debt. & Cred. Law §§ 273 and 276 and should therefore be set aside and those assets should be used to satisfy the Estate's federal tax liabilities.  Alternatively, should setting aside the fraudulent conveyances provide an inadequate remedy, the SL Companies, as transferees, should each be held liable, in equity, for a judgment equal to the value of the fraudulent assets each received, as well as all rents, profits, and other benefits wrongfully obtained from the fraudulent assets; or alternatively, a money judgment for the full amount of the transferred assets should be granted against Moshe Lax, Zlaty Schwartz, and Shaindy Lax, jointly and severally, as participants in the fraudulent conveyance who were transferees and/or beneficiaries of the conveyance;

N.      Enter judgment in favor the United States of America against Judith Lax and J.L., pursuant to 26 U.S.C. § 6324(a)(2), holding them jointly and severally liable for the unpaid estate tax owed by the Estate, to the extent of the value of all of the assets they received that were included in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042, inclusive, to the extent of the value of such property at the time of the decedent's death, including but not limited to the Guardian Life Policy proceeds;

O.      Enter judgment determining that, to the extent that Judith Lax and J.L. transferred the property they received that is includible in Chaim's gross estate pursuant to 26 U.S.C. §§ 2034 through 2042, inclusive, there exists a lien on all such property as provided in 26 U.S.C. § 6324(a)(2);

P.      Enter judgment enforcing the United States of America's federal tax liens against the following property:

1.   Madison Avenue Diamonds;

2.   The Original SL Holdings Assets;

3.   The GAMA Trust;

4.   301 Hewes Street, or, alternatively, 299 Hewes Street Realty Corp.;

5.   307 Hewes Street, or alternatively, 307 Hewes Realty Corp.; and

6.   12 12 Lorimer Realty LLC;

and order that those properties, or, in the case of corporations, their stock or assets, be sold free and clear of all rights, title, liens, claims, and interests of the parties, including any rights of redemption, and distribute the proceeds, after the payment of the costs of sale, to United States of America, or as otherwise determined by the Court; and, in the case of Madison Avenue Diamonds, by appointing a receiver pursuant to 26 U.S.C. § 7403(d) who is authorized to liquidate the corporation, and operate it as needed until it can be liquidated;

Q.      Enter judgment in favor the United States of America against any defendant and transferee found to have participated in a conveyance made with actual intent to defraud the United States in amount equal to the reasonable attorneys' fees incurred by the United States with respect to that conveyance, pursuant to N.Y. Debt. & Cred. Law § 276-a;

R.      Enter judgment determining that, pursuant to N.Y. Debt. & Cred. Law § 273-a, any conveyance made without fair consideration by any defendant during the pendency of this action is fraudulent as to the United States if such defendant fails to satisfy the judgment in favor the United States; and

S.      Award the United States of America such further relief that the Court deems just

and proper.

Respectfully submitted,

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

*/s/ Stephanie Weiner Chernoff*
STEPHANIE WEINER CHERNOFF
STEVEN S. TENNYSON
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C.  20044
202-307-2251 (v)
202-514-5238 (f)
Stephanie.W.Chernoff@usdoj.gov
Steven.Tennyson@usdoj.gov