UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

               Plaintiff,                            MEMORANDUM AND ORDER
                                                                  18-CV-4061 (ILG) (PK)

   *v.*

MOSHE LAX, individually, as an executor of the
Chaim Lax Estate, as a trustee of the Chaim Lax
Family Trust, and as a trustee of the GAMA Trust;
ZLATY SCHWARTZ, individually, as executor of
the Chaim Lax Estate, as trustee of the Chaim Lax
Family Trust, and as a trustee of the GAMA Trust;
SHAINDY LAX; JUDITH LAX; J.L., a minor;
299 HEWES STREET REALTY CORP; 307
HEWES STREET REALTY CORP; JBAM
REALTY LLC, a/k/a JBAM REALTY 2 LLC;
BEN ZION JACOBOWITZ; TOBY
JACOBOWITZ; SL HOLDINGS I, LLC; SL
HOLDINGS II, LLC; SL HOLDINGS III, LLC;
SL HOLDINGS IV, LLC; SL HOLDINGS V,
LLC; DIAMOND DYNAMICS LLC; KGK
JEWELRY LLC; CONGREGATION BAIS
YEHUDAH D'GANITCH; LX HOLDINGS
LLC; MORRIS SCHLAGER; GITTY
SCHLAGER; JOSEPH GREEN; HANNAH
GREEN; HENNY GREEN; and HERSHI
GREEN,

               Defendants.
-----------------------------------------------------------x
GLASSER, Senior United States District Judge:

      In this civil action by the United States (the **"Government"**) seeking various forms of

relief related to unpaid tax liabilities, Defendant Shaindy Lax (**"Shaindy"**) moves to dismiss all

1

claims asserted against her pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* ECF No. 96).[1] For the reasons that follow, the motion is denied.

## BACKGROUND

The following facts are alleged in the amended complaint (Am. Compl., ECF No. 106) and are viewed in the light most favorable to the Government. Familiarity with the extensive factual allegations contained in the amended complaint is presumed, and they are recited here only insofar as necessary to dispose of the pending motion.

Chaim Lax (**"Chaim"**) was a diamond merchant and real estate developer who, through numerous business entities, owned parcels of real estate throughout Brooklyn, New York. (*See id.* ¶ 27). In or around November 2006, he was diagnosed with stomach cancer. (*See id.* ¶ 31). He died on or around November 3, 2008. (*See id.* ¶ 35). The executors of his estate (the **"Estate"**) are his son, Moshe Lax (**"Moshe"**), and his daughter, Zlaty Schwartz (**"Zlaty"**). (*See id.* ¶ 37). In addition, Moshe and Zlaty are the trustees of the Lax Family Trust (the **"Trust"**), an irrevocable trust Chaim had established in 2003, of which Chaim's children (including Moshe and Zlaty) and grandchildren are beneficiaries. (*See id.* ¶¶ 61-62). Shaindy is Moshe's wife. (*See id.* ¶ 74). Moshe and Zlaty have been named as Defendants in this action, in addition to Shaindy and numerous other individuals and business entities.

Prior to his death, Chaim knew that he was being audited by the Internal Revenue Service (**"IRS"**) and that he owed substantial income taxes. (*See id.* ¶ 258). He also knew that his Estate would owe substantial estate taxes following his death. (*See id.*). The Government alleges that,

---

[1] The Government filed its amended complaint after Shaindy moved to dismiss. The Government and Shaindy have stipulated that the amended complaint "does not differ in any material respect with respect to the claims and allegations against [Shaindy]" and that "[t]he motion papers and arguments set forth therein shall be deemed to apply to the Amended Complaint without need for further filings." (ECF No. 139 at 2-3).

"[k]nowing of his negative health prognosis, and that he owed millions in income taxes and would owe millions more upon his death, Chaim undertook a series of sham transactions designed to shield his assets from collection by the Internal Revenue Service." (*Id.* ¶ 32). The Government further alleges that Moshe and Zlaty "continued that effort after his death in order to avoid paying the taxes he owed." (*Id.*). As of April 25, 2018, the Estate had unpaid federal tax liabilities of over $60 million. (*See id.* ¶ 41).

In this action, the Government seeks various forms of relief related to these unpaid tax liabilities. As relevant to the pending motion, the Government asserts that Moshe and Zlaty orchestrated a series of sham transactions to hide the Estate's assets from the IRS by conveying them to assorted business entities held in Shaindy's name. The Government describes three such schemes in the amended complaint, denoted as **"Scheme 2"**, **"Scheme 3"**, and **"Scheme 4"**. Scheme 2 was essentially a continuation of an earlier scheme, denoted as **"Scheme 1"**. The Government alleges that each of these Schemes "was part of a series of transfers … designed … to place Chaim's assets beyond the reach of his creditors, including the IRS." (*Id.* ¶¶ 229, 244, 263, 281).[2]

### I. Scheme 1: Conveyance of More Than $41.2 Million of Real Property Interests to the Lax Family Trust

Scheme 1 consisted of the alleged conveyance, for less than adequate consideration, of more than $41.2 million in real property holding company interests by Chaim to the Trust. This Scheme consisted of essentially two steps. First, on or about February 1, 2007, Chaim conveyed these assets to an entity called LX Holdings LLC (**"LX Holdings"**), of which he was

---

[2] The amended complaint described ten such "Schemes." Schemes 5 through 10 are not relevant to the pending motion.

"effectively the sole owner." (*Id.* ¶¶ 59-60, 63).[3] Second, on or about May 7, 2007, Chaim conveyed his ownership interests in LX Holdings to the Trust, without adequate consideration. (*See id.* ¶¶ 61, 64-69).[4] The Government alleges that "[t]he transfer described in Scheme 1 … was not an arms-length, commercial transfer but Chaim's attempt to pass property to his children in derogation of his creditor's claims, including the IRS." (*Id.* ¶ 264).

**II.     Scheme 2: Conveyance of More Than $4.6 Million of Real Property Interests to the SL Companies**

Scheme 2, as alleged and described in the amended complaint, was essentially a continuation of the efforts alleged in Scheme 1 to shield Chaim's real property interests from the IRS. Pursuant to Scheme 2, more than $4.6 million of the real property interests described in Scheme 1 above were allegedly conveyed by LX Holdings, for less than adequate consideration, to five companies: SL Holdings I, LLC; SL Holdings II, LLC; SL Holdings III, LLC; SL Holdings IV, LLC; and SL Holdings V, LLC. (collectively, the **"SL Companies"**). (*See id.* ¶¶

---

[3] Chaim held interests in LX Holdings directly and through an entity called Favorable Enterprises LLC, which was owned by an offshore trust, the GAMA Trust, of which Chaim was the sole trustee and beneficiary. (*See* Am. Compl. ¶ 60). Upon Chaim's death, Moshe and Zlaty succeeded him as trustees for the GAMA Trust. (*See id.*).

[4] As purported consideration for the conveyance of Chaim's interests in LX Holdings to the Trust, the Trust executed a Self-Cancelling Installment Note (**"SCIN"**) in favor of Chaim. (*See id.* ¶ 64). Under the SCIN, the Trust was to pay a total of $40,750,000 to Chaim, in semiannual payments of $3,887,360, at an interest rate of 7.24% per annum. (*See id.* ¶ 65). However, by its terms, the SCIN would "self-cancel" upon Chaim's death, at which point no more payments would be due. (*Id.* ¶ 65). Only two payments became due under the SCIN before Chaim's death, for $3,887,360 each. (*See id.* ¶ 66). However, the Estate never made any efforts to collect payments on the SCIN from the Trust. (*See id.* ¶ 66). Indeed, Moshe and Zlaty controlled both the Estate (as co-executors) and the Trust (as co-trustees), so any attempt by the Estate to collect from the Trust would have been an attempt by Moshe and Zlaty to "collect … from themselves." (*Id.*). The Government alleges that "[t]here was never any expectation that the Lax Family Trust would make any payments on the SCIN." (*Id.* ¶ 69).

4

72-73, 87).[5] The SL Companies were formed by Moshe and Zlaty in 2009 and 2010 and were capitalized with funds from the Trust or other sources under Moshe's control. (*See id.* ¶¶ 73, 78). The sole member and 100% owner of each of the SL Companies was Shaindy. (*See id.* ¶¶ 74-75).

Scheme 2 proceeded as follows. On or about October 9, 2009, one of the SL Companies, SL Holdings I, LLC (**"SL Holdings I"**), advanced LX Holdings a line of credit of approximately $3 million. (*See id.* ¶ 89). Because Moshe had financed SL Holdings I with funds from the Trust, which owned LX Holdings, this line of credit was "essentially a loan by the Lax Family Trust to itself[.]" (*Id.* ¶ 91). Moshe and Zlaty then caused LX Holdings to default on the line of credit. (*See id.* ¶ 92). As purported "repayment" of the now-defaulted loan, LX Holdings agreed to convey more than $4.6 million in real property interests to SL Holdings I. (*Id.* ¶ 93). This conveyance was effected by a Membership Interest and Stock Transfer Agreement dated November 2, 2010, which was signed by Zlaty on behalf of LX Holdings and countersigned by Shaindy on behalf of SL Holdings I. (*See id.* ¶ 94). After its receipt of the real property interests from LX Holdings, SL Holdings I distributed these assets to the remaining SL Companies. (*See id.* ¶ 95). The Government alleges that this "artificial loan transaction" was "engineer[ed]" by Moshe and Zlaty "to create the appearance of consideration" for the transfer of these real property interests. (*Id.* ¶ 88). In fact, according to the Government, "Moshe's and Zlaty's transfer of these assets to the SL Companies was a continuation of the effort to render the Estate and the Lax Family Trust insolvent by placing assets outside the Estate and the Trust—but still within their personal control—for less than adequate consideration." (*Id.* ¶ 96).

---

[5] Each of the SL Companies has been named as a Defendant herein.

The Government alleges that "Shaindy nominally operates the SL Companies under the direction of Moshe" (*id.* ¶ 80), who "instructed or directed Shaindy to act as sole member and owner of the SL Companies with the expectation that he would retain control over the assets held by the SL Companies." (*id.* ¶ 81). The Government alleges that "Moshe directed [Shaindy] to use a former name, Chana Weisz, in conducting business on behalf of the SL Companies" in order "[t]o obscure [Moshe's] relationship to the SL Companies." (*Id.* ¶ 82). Indeed, "[i]n 2014, Shaindy testified under oath that, notwithstanding that she is the sole owner of all five SL Companies, she was only aware of SL Holdings I." (*Id.* ¶ 83). The Government further alleges that the SL Companies never filed tax returns (*see id.* ¶ 86) and that they operated from an address associated with Moshe's other businesses (*see id.* ¶ 85).

### III. Scheme 3: Conveyance of More Than $10.2 Million of Interests to Diamond Dynamics LLC

Before his death, Chaim was the sole owner of Dynamic Diamond Corp. (**"DDC"**), a diamond wholesaling business. (*See id.* ¶¶ 97-98). Those interests, valued at more than $10.2 million, passed to the Estate upon his death. (*See id.* ¶ 99). Scheme 3, as alleged and described in the amended complaint, involved a conveyance by the Estate of these business interests, for less than adequate consideration, to a similarly-named entity, Diamond Dynamics LLC (**"Diamond Dynamics"**), of which Shaindy was the sole member. (*See id.* ¶ 110).[6]

Specifically, on February 26, 2010, Moshe and Zlaty caused DDC to change its name to "White Coat, Inc." (**"White Coat"**) "in the hope [creditors] would not realize that 'White Coat' was really [DDC]." (*Id.* ¶¶ 94, 112). Less than a week later, on March 4, 2010, White Coat executed a "Deed of Assignment for the Benefit of Creditors" (the **"ABC Deed"**), which

---

[6] Diamond Dynamics has been named as a Defendant herein.

provided that White Coat would transfer its assets to an attorney to hold in trust, to be sold or disposed of in satisfaction of its creditors. (*Id.* ¶ 102). The ABC Deed was submitted to the New York Supreme Court in a special proceeding styled as *Matter of the General Assignment for the Benefit of Creditors of White Coat, Inc.*, *Assignor, to Tracy L. Klestadt, Assignee*, No. 510001/2010 (N.Y. Sup. Ct., N.Y. Cty.), in which White Coat assigned its assets and liabilities to Tracy L. Klestadt (**"Klestadt"**) of Klestadt & Winters, LLP. (*Id.* ¶ 104). That same day, Klestadt submitted a motion requesting the entry of an order approving the sale of substantially all of White Coat's assets to Diamond Dynamics (*Id.* ¶ 105). On March 26, 2010, New York Supreme Court approved the sale of White Coat's assets to Diamond Dynamics for $3,826,258 in cash and assumption of $3,116,668 of its debts and liabilities. (*Id.* ¶ 110).

It is unclear from the pleadings when, precisely, Diamond Dynamics was formed. However, the amended complaint describes it as being "newly-formed" as of March 4, 2010, when the ABC Deed was executed. (*Id.* ¶ 105).

The Government alleges that the consideration paid by Diamond Dynamics "was inadequate and based on artificially low valuations and appraisals that Moshe obtained to defraud the creditors of [DDC] and the Estate, including the IRS." (*Id.* ¶ 114). As with the SL Companies, the Government alleges that "Shaindy nominally operates [Diamond Dynamics] under the direction of Moshe" (*id.* ¶ 119), who "placed titular ownership in Shaindy's name, with the expectation that he would retain control over the assets held by [Diamond Dynamics]." (*id.* ¶ 117). The Government alleges that "Shaindy has no experience operating a diamond business, unlike Moshe, who has operated several such businesses." (*Id.* ¶ 114). As with the SL Companies, the Government alleges that "Moshe directed [Shaindy]" to conduct business on behalf of Diamond Dynamics under the name "Chana Weisz" "[t]o obscure his relationship to

[Diamond Dynamics.]" (*Id.* ¶ 118). As with the SL Companies, the Government alleges that Diamond Dynamics operates from an address associated with Moshe's other businesses (*see id.* ¶ 121) and was capitalized with funds from the Trust or other sources under Moshe's control (*see id.* ¶ 122).

### IV. Scheme 4: Conveyance of More Than $21 Million in Interests to SL Holdings I

At the time of his death, Chaim owned a 50% interest in Madison Avenue Diamonds LLC (**"Madison Avenue Diamonds"**), a retail jewelry business. (*See id.* ¶ 125). As of March 31, 2008, Chaim's accountant valued his interest in Madison Avenue Diamonds at more than $21 million. (*See id.* ¶ 127). These interests passed to the Estate upon Chaim's death. (*See id.* ¶ 126). The Government alleges that, "at some point between 2008 and 2012, Moshe caused the Estate to transfer its interest in Madison Avenue Diamonds LLC to SL Holdings I for no consideration." (*Id.* ¶ 128). As previously mentioned, the Government alleges that SL Holdings I is wholly-owned by Shaindy and "nominally operate[d]" by her "under the direction of Moshe." (*Id.* ¶¶ 74, 80). The Government denotes this conveyance as Scheme 4 in the amended complaint.

## DISCUSSION

The Government seeks to set aside Schemes 2, Scheme 3, and Scheme 4 (collectively, the **"Schemes"**) as fraudulent conveyances under New York Debtor and Creditor Law (**"DCL"**) §§ 273 and/or 276. (*See* Am. Compl. ¶¶ 235, 250, 276, Prayer for Relief ¶¶ J, K, M). In the alternative, "should setting aside the fraudulent conveyance[s] provide an inadequate remedy,"

8

the Government seeks money damages against Moshe, Zlaty, and Shaindy, jointly and severally. (*Id.* ¶¶ 237, 252, Prayer for Relief ¶¶ J, K, M).[7]

Shaindy moves to dismiss on decidedly narrow grounds. She does not dispute, for purposes of the present motion, that the Schemes were fraudulent under DCL §§ 273 and/or 276. Nor does she contest the liability of any of the other Defendants, including the SL Companies or Diamond Dynamics (collectively, the **"Transferee Companies"**), nor that of Moshe or Zlaty. Her sole contention is that the Government may not seek money damages against her personally.

Section 278 of the DCL describes the rights available to a creditor as to whom a conveyance is fraudulent. Section 278 provides, in relevant part, that:

> Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
>
>> a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
>>
>> b. Disregard the conveyance and attach or levy execution upon the property conveyed.

*Id.* § 278(1). The DCL makes no express provision for the recovery of money damages. Courts have recognized, however, that an implied right of action for damages exists where "the traditional fraudulent conveyance remedy of rescission is no longer practicable"—where, for example, the transferred assets have been sold or commingled with other assets. *In re Adelphia Recovery Trust*, 634 F.3d 678, 692-693 (2d Cir. 2011) (collecting cases); *see* 30 N.Y. Jur. 2d *Creditors' Rights and Remedies* § 449 ("Where the assets fraudulently transferred no longer exist

---

[7] Alternatively, the Government seeks damages from the SL Companies (as to Scheme 2), Diamond Dynamics (as to Scheme 3), and SL Holdings I (as to Scheme 4). (Am. Compl. ¶¶ 236, 251, 286).

9

or are no longer in the possession of the transferee, a money judgment may be entered against the transferee in an amount up to the value of the fraudulently transferred assets").[8]

In *Stochastic Decisions, Inc. v. DiDomenico*, the Second Circuit held that money damages may be awarded under the DCL against persons who "participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance." 995 F.2d 1158, 1172 (2d Cir. 1993), *cert. denied*, 510 U.S. 945 (1993). Since *Stochastic Decisions*, the overwhelming majority of courts have framed this transferee/beneficiary test in the disjunctive, holding that a defendant may be held liable for damages if they are *either* a "transferee" *or* a "beneficiary" of the conveyance. *Cadle Co. v. Newhouse*, 74 Fed. Appx. 152, 153 (2d Cir. 2003) (summary order) ("Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance"); *RTC Mortgage Trust 1995 S/N1 v. Sopher*, 31 Fed. Appx. 37, 38 n. 2 (2d Cir. 2002) (summary order); *DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, 323 F.Supp.3d 393, 467 (S.D.N.Y. 2018); *Tae H. Kim v. Ji Sung Yoo*, 311 F.Supp.3d 598, 613 (S.D.N.Y. 2018); *Perrone v. Amato*, No. 09-CV-316 (AKT), 2017 WL 2881136, at *38 (E.D.N.Y. Jul. 5, 2017); *Integrity Electronics, Inc. v. Garden State Distributors, Inc.*, No. 14-CV-3197 (BMC), 2016 WL 3637004, at *14 (E.D.N.Y. Jun. 30, 2016); *Lyman Commerce Solutions, Inc. v. Lung*, No. 12-CV-4398 (TPG), 2015 WL 4545089, at *3 (S.D.N.Y. Jul. 16, 2015); *Amusement Industry, Inc. v. Midland Avenue Associates, LLC*, 820 F.Supp.2d 510, 527 (S.D.N.Y. 2011); *TD Bank, N.A. v. Coppolino*, No. 09-CV-3721 (JG) (JO),

---

[8] Here, the Government's claim for money damages against Shaindy and others is brought only insofar as "setting aside the fraudulent conveyance[s] [will] provide an inadequate remedy." (Am. Compl. ¶¶ 237, 252, Prayer for Relief ¶¶ J, K, M). Shaindy does not dispute in her motion to dismiss that rescission might be an inadequate remedy.

2010 WL 11626968, at *7 (E.D.N.Y. Sept. 30, 2010), *report and recommendation adopted*, (E.D.N.Y. Oct. 25, 2010); *Robert Smalls Inc. v. Hamilton*, No. 09-CV-7171 (DAB) (JLC), 2010 WL 3238955, at *5 (S.D.N.Y. Jul. 19, 2010), *report and recommendation adopted*, 2010 WL 3238963 (S.D.N.Y. Aug. 11, 2010); *Jet Star Enterprises, Ltd. v. Soros*, No. 05-CV-6585 (HB), 2006 WL 2270375, at *3 (S.D.N.Y. Aug. 9, 2006); *Fundacion Presidente Allende v. Banco de Chile*, No. 05-CV-9771 (GBD), 2006 WL 2796793, at *3 (S.D.N.Y. 2006); *Neshewat v. Salem*, 365 F.Supp.2d 508, 522 (S.D.N.Y. 2005); *RTC Mortg. Trust 1995-S/N1 v. Sopher*, 171 F.Supp.2d 192, 201 (S.D.N.Y. 2001). That the test is disjunctive supported by language in *Federal Deposit Ins. Corp. v. Porco*, in which the New York Court of Appeals stated that the DCL does "not, either explicitly or implicitly, create a creditor's remedy for money damages against parties who … were *neither transferees* of the assets *nor beneficiaries* of the conveyance." 75 N.Y.2d 840, 842 (N.Y. 1990) (emphasis added). In their papers, both parties appear to endorse the disjunctive test as the correct legal standard. (*See* Def. Mem. at 4, ECF No. 97 (citing *Fundacion President Allende*, 2006 WL 2796793, at *3); Pl. Opp at 5, ECF No. 101).

This case presents a straightforward application of the law to the facts. By any meaning of the word, Shaindy was a "beneficiary" of the Schemes. It is undisputed that the assets conveyed in the Schemes were transferred to the Transferee Companies, entities of which Shaindy is the sole owner. The reasonable inference can be made, as required on this motion to dismiss, that the value of her equity interests in the Transferee Companies increased concomitantly with those entities' receipt of the transferred assets. Shaindy thus directly benefitted from the Schemes. *See Sopher*, 171 F.Supp.2d at 202 (sole shareholder of corporation that received fraudulently conveyed assets, "[w]hile not a direct transferee, … plainly benefitted

11

from the transaction," and may therefore be held personally liable for money damages under the DCL).

Shaindy does not appear to dispute that she was a "beneficiary" of the Schemes. Nevertheless, she argues that she cannot be held liable because the Government is not entitled to pierce the veil and disregard the corporate form of the Transferee Companies. (*See* Def. Mem. at 5). This argument, however, misunderstands the role of corporate veil-piercing and its relevance in fraudulent conveyance cases arising under the DCL. Veil-piercing is fundamentally "a form of 'derivative liability.' " *In re Tronox Incorporated*, 549 B.R. 21, 44 (S.D.N.Y. 2016) (quoting *United States v. Bestfoods*, 524 U.S. 51, 65 (1998)). That is to say, a defendant against whom the veil is pierced is made to stand in the shoes of the corporation and answer for its "underlying corporate obligation[s]." *Matter of Morris v. New York State Dept. of Taxation & Fin.*, 82 N.Y.2d 135, 141 (N.Y. 1993). Under the DCL, however, the liability of a beneficiary of a fraudulent conveyance is direct, not derivative. Thus, once it has been established that a defendant benefited from a fraudulent conveyance, it is unnecessary to consider whether the traditional prerequisites for veil-piercing are satisfied.[9]

Even if, *arguendo*, it were necessary to pierce the corporate veil in order to hold Shaindy liable for the Schemes, the Court would have no difficulty finding that the requirements for veil-piercing have been met. "Broadly speaking, [New York courts] will disregard the corporate form

---

[9] In support of her contention that the Government "needs to pierce the corporate veil" (Def. Reply at 6, ECF No. 102), Shaindy cites a duo of cases: *Constitution Realty, LLC v. Oltarsh*, 309 A.D.2d 714 (N.Y. App. Div. 1st Dept. 2003) and *First Bank of Americas v. Motor Car Funding*, 257 A.D.2d 287 (N.Y. App. Div. 1st Dept. 1999). Neither supports the proposition for which it is cited. To the contrary, *Oltarsh* undermines it: in that case, the court determined that the defendants were "transferees of the assets and beneficiaries of the conveyance," notwithstanding the fact that the record was "insufficient to warrant piercing the corporate veil." 309 A.D.2d at 716 (citations and quotation marks omitted). *First Bank* is even further from the mark, as that case did not involve any claims under the DCL. *See* 257 A.D.2d at 290.

… whenever necessary 'to prevent fraud or to achieve equity.' " *Cortlandt St. Recovery Corp. v. Bonderman,* 31 N.Y.3d 30, 47 (N.Y. 2018) (quoting *Morris*, 82 N.Y.2d at 140). Under New York law, "a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or a wrong against the plaintiff which resulted in plaintiff's injury." *Id.* (quoting *Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 18 (N.Y. 2015)).

With regard to the first veil-piercing element, Shaindy was the sole member of the Transferee Companies, and the pleadings do not disclose any corporate managers, officers, or other individuals authorized to conduct business on behalf of these entities, other than Shaindy. Indeed, under the New York Limited Liability Company Law, the management of these companies would have vested exclusively in Shaindy as sole member unless their articles of organization provided otherwise. *See* N.Y. Limited Liability Company Law § 401(a).[10] It may therefore be reasonably be inferred, on this motion to dismiss, that Shaindy exercised ultimate control and dominion over these entities.

As for the second veil-piercing element, the pleadings are replete with badges of fraud indicating that the Transferee Companies were created and used to hide the Estate's and Trust's assets from its creditors, including the IRS. All of these companies were held by Shaindy, despite the fact that she has no apparent experience managing multi-million dollar real estate or diamond businesses; additionally, all of them were held under a prior name, "Chana Weisz," making it more difficult to associate them with her late father-in-law's Estate. All of them operated from

---

[10] The amended complaint alleges that the SL Companies and Diamond Dynamics are organized under the laws of New York. (Am. Compl. ¶¶ 8-13).

addresses associated with Moshe's businesses; all were funded by the Trust and/or other financial sources under Moshe's control; most failed to file any tax returns; and all were formed close in time to the Schemes in which they allegedly partook. At the motion to dismiss stage, these indicia of fraud are enough to support the plausible inference that the Transferee Companies' corporate form was abused to facilitate the Schemes.[11]

Shaindy's argument that she was "not a transferee of the conveyances" (Def. Mem. at 5) is therefore unavailing. There is no question that the Transferee Companies themselves were "transferee[s]" within the meaning of *Stochastic Decisions* and its progeny. Thus, if the corporate veil of the Transferee Companies is pierced as to Shaindy, she too would be deemed a "transferee." In any event, because the Court follows the overwhelming majority of other courts in applying the transferee/beneficiary test in the disjunctive, Shaindy could be held liable as a "beneficiary" even if she were not a "transferee." *Cadle Co.*, 74 Fed. Appx. at 153; *Sopher*, 31 Fed. Appx. at 38 n. 2; *Sopher*, 171 F.Supp.2d at 201.

Shaindy argues that, even if the Government's allegations are afforded every favorable inference, it is her husband, not she, who should be regarded as the true alter-ego of the Transferee Companies and the true beneficiary of the Schemes. (*See* Def. Mem. at 5). After all, in the amended complaint's own words, "Moshe created [the Transferee Companies], but placed titular ownership in Shaindy's name, with the expectation that he would retain control over the assets held by [the Transferee Companies]." (Am. Compl. ¶¶ 81, 117). However, this argument

---

[11] *Liberty Mutual Ins. Co. v. Horizon Bus Co.*, No. 10-CV-449 (JS) (WDW), 2011 WL 1131098 (E.D.N.Y. Feb. 22, 2011), *report and recommendation adopted*, 2011 WL 1136270 (E.D.N.Y. Mar. 24, 2011), cited by Shaindy (*see* Def. Mem. at 5; Def. Reply at 6 n. 1), is completely distinguishable. *Liberty Mutual* did not involve an attempt to pierce the corporate veil against a corporation's sole owner. Instead, the plaintiff in *Liberty Mutual* sought to invoke veil-piercing in order to hold a fraudulent transferor liable for the transferee. *See* 2011 WL 1131098, at *7. The court quite appropriately found this argument nonsensical and rejected it. *See id.* at *7.

ignores the fact that Moshe could only control the Transferee Companies and their underlying assets *through Shaindy*. (*See id.* ¶¶ 80, 119 ("Shaindy nominally operates [the Transferee Companies] under the direction of Moshe")). Thus, Moshe's involvement may be sufficient to impose liability on *both* him and Shaindy; but it does not exculpate Shaindy. Although Shaindy seems to imply that she was merely an agent of her husband in operating the Transferee Companies, the law in New York and elsewhere is settled that an agent remains liable for his or her own tortious conduct. *See Medrano v. Aramark Healthcare Technologies, LLC*, No. 14-CV-6777 (RA), 2015 WL 4750703, at *3 (S.D.N.Y. Aug. 11, 2015); *International Equity Investments, Inc. v. Opportunity Equity Partners Ltd.*, 475 F.Supp.2d 450, 455 & n. 17 (S.D.N.Y. 2007); *Reliance Ins. Co. v. Morris Associates, P.C.*, 200 A.D.2d 728, 729 (N.Y. App. Div. 2d Dept. 1994); Restatement (Third) of Agency § 7.01 (2006). And while Shaindy may have been the less sophisticated party, she was not a minor or incompetent, and there is no basis in the complaint to assume that her participation was anything less than voluntary. In short, the law does not deem Shaindy a mere adjunct of her husband. A wrong is a wrong, regardless of whether the wrongdoer carries it out on her own initiative or at the request of another. *See Standard Chartered Bank v. Pakistan National Shipping Corp.*, 1 A.C. 959, 968 (2003) ("No one can escape liability for his [or her] fraud by saying: 'I wish to make it clear that I am committing this fraud on behalf of someone else' ") (per Lord Hoffmann).

In similar vein, Shaindy contends that she cannot be held liable because she was not a "participant" in the conveyances. (Def. Mem. at 6). There appears to be a split of authority regarding whether a 'passive' beneficiary or transferee who does not otherwise 'participate' in the fraudulent conveyances may be held liable. *Compare Sullivan v. Kodsi*, 373 F.Supp.2d 302, 309 (S.D.N.Y. 2005) (finding no authority for the proposition that "beneficiaries and transferees"

15

who do not participate in the fraudulent transfers may be held liable), *with Federal National Mortgage Association v. Olympia Mortgage Corp.*, 792 F.Supp.2d 645, 655 (E.D.N.Y. 2011) ("Courts applying *Stochastic* have repeatedly noted that one need *only* be a transferee or beneficiary to be a participant in a fraudulent transfer; not either a transferee or beneficiary of a fraudulent conveyance *and* a participant in the underlying fraud") (emphasis in the original); *Integrity Electronics*, 2016 WL 3637004, at *10 n. 7 (concurring with *Olympia Mortgage*). But the Court need not explore the issue at this juncture, because the allegations are sufficient to support the inference that Shaindy 'participated' in the Schemes by any ordinary sense of the word. As recited in the amended complaint, Shaindy "operate[d]" the Transferee Companies "under the direction of Moshe." (Am. Compl. ¶¶ 80, 119). In addition, as to at least one of the Schemes, she signed (together with Zlaty) the operative corporate document that effected the fraudulent conveyance at issue. (*See id.* ¶ 94).

Perhaps the most compelling argument that Shaindy should not be held personally liable for the Schemes, though not explicitly raised in her motion papers, comes from ¶ 83 of the amended complaint, wherein the Government references (and, apparently, credits) Shaindy's 2014 testimony that she was not "aware" of the existence of any of the SL Companies, other than SL Holdings I. (Am. Compl. ¶ 83). At face value, this suggests that Shaindy may have been deceived by Moshe regarding the transactions that had been carried under her name; and from this it can be further be argued that she did not act with a sufficiently culpable state of mind to justify the imposition of personal liability.

This argument, however, fails on both the facts and the law. It fails on the law because a mere lack of knowledge of the fraudulent conveyance is not a defense. Rather, DCL § 278 exempts from liability only those who are "purchaser[s] *for fair consideration* without

16

knowledge of the fraud at the time of purchase." DCL § 278(1) (emphasis added). Obviously, the proviso that an acquirer of the transferred assets must pay "fair consideration" evinces a clear intent by the statute's drafters that creditors may recover against acquirers who have not paid fair consideration, regardless of their knowledge, *vel non*, of the fraudulent nature of the transfer. And while DCL § 278, on its face, only addresses the traditional remedies of rescission and/or attachment, there is no reason why the rule should be different where "rescission is no longer practicable" and money damages are sought. *Adelphia,* 634 F.3d at 692. If the rule were otherwise, a debtor could easily circumvent the purposes and objectives of the DCL by giving the assets to a friend or relative, keeping them blissfully unaware of the fraud while retaining *de facto* control over the assets (or their proceeds, if the assets are later sold). Here, the Government alleges that the Schemes were effected without fair consideration (Am. Compl. ¶¶ 96, 114, 128), a point that Shaindy has not disputed for purposes of this motion. Therefore, her purported lack of awareness of the fraud is no defense.[12]

Additionally, her argument fails on the facts because, in evaluating a motion to dismiss, the plaintiff, here the Government, must be "afforded every favorable inference." *Marcus v. Barilla America NY, Inc.*, 14 F.Supp.3d 108, 115 (W.D.N.Y. 2014). Although one *could* infer that Shaindy's participation in the Schemes was not knowing and informed based on this singular item of testimony, no such conclusion is *required*. Scheme 2 centered primarily on the transfer of assets to SL Holdings I, and Shaindy personally signed the Membership Interest and Stock

---

[12] Shaindy contends that, in *Stochastic Decisions*, "the Second Circuit held that an unknowing participant in a fraudulent scheme was not liable." (Def. Reply at 6 (citing *Stochastic Decisions*, 995 F.2d at 1169)). What she fails to mention in her papers, however, is that this portion of the Court's decision related to the plaintiff's civil RICO claims—**not** the DCL claims. *See Stochastic Decisions*, 995 F.2d at 1169; *cf. id.* at 1172 (affirming judgment in plaintiff's favor as to the DCL claims).

Transfer Agreement at the core of that Scheme. (*See id.* ¶ 94). The significance of SL Holdings II through V to Scheme 2, by contrast, was marginal (*see id.* ¶ 95), and these entities were not involved in Schemes 3 or 4 at all. Thus, even if Shaindy were ignorant of the existence of SL Holdings II through V, she might still have been generally aware of the existence and fraudulent nature of these Schemes. *See Integrity Electronics*, 2016 WL 3637004, at *10 n. 7 (finding "unavailing" the argument that beneficiary lacked "knowledge of the fraud," where beneficiary "was joint owner of the bank account, and joint owner of Realty, both of which were transferred the funds").

## CONCLUSION

For the foregoing reasons, Shaindy's motion to dismiss is **DENIED**.

SO ORDERED.

Dated:  Brooklyn, New York
        October 11, 2019

/s                               
I. Leo Glasser              U.S.D.J.