```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
―――――――――――――――――――――――x
                              :
UNITED STATES OF AMERICA,     :
                              :
        Plaintiff,            :
                              :
        v.                    :    No 18-cv-4061
                              :
MOSHE LAX, et al.,            :
                              :
        Defendants.           :
―――――――――――――――――――――――x
```

**MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES' MOTION TO DECLARE WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND THAT THE CRIME-FRAUD EXCEPTION APPLIES[1]**

**Introduction**

The United States seeks an order declaring that Defendant Moshe Lax ("Lax") has waived the attorney-client privilege in relation to certain areas of inquiry at a Fed. R. Civ. P. 30(b)(6) deposition of the Porzio Bromberg & Newman, PC law firm ("Porzio") by voluntarily disclosing certain documents to the United States in discovery. Lax has implicitly waived any privilege he had in certain Porzio communications by providing the Government with those communications during discovery and failing to make valid objections at the Porzio deposition. Because Porzio possesses information that is integral to this litigation, we now seek an order declaring a waiver of privilege related to certain Porzio communications. Moreover, having made not only the requisite *prima facie* showing under the crime-fraud exception to the attorney-

---

[1] The Court granted leave for the Government to file a motion to compel against Porzio Bromberg & Newman, PC law firm. The contours of the relief sought by the Government have slightly changed and, as such, the United States is now seeking a declaration of waiver of attorney-client privilege and that the crime-fraud exception to the privilege applies.

1

client privilege, but also providing ample evidence of fraud, the Government requests a declaration that the exception applies to those areas of inquiry.

## Background Facts

### I. The Suit Generally

The United States alleges that Lax, along with others, carried out ten distinct schemes with the objective of evading or defeating the collection of the liabilities of the estate of Chaim Lax (the "Lax Estate"). Common to many of the schemes is the allegation that the Lax Estate was insolvent when it made certain asset transfers.

One of the schemes involved an *assignment for the benefit of creditors* transaction, or "ABC." An ABC is a state court business liquidation proceeding available under New York law to an insolvent debtor as an alternative to bankruptcy. Immediately prior to filing an ABC proceeding involving an insolvent business named "Dynamic Diamond Corp.," Lax caused the name of the business to be changed to "White Coat." Lax caused the name change to confuse creditors (including the IRS) and conceal the identity of Dynamic Diamond Corp. An entity owned by Lax's wife, named "Diamond Dynamic LLC," then purchased the business assets of the White Coat/Dynamic Diamond Corp. entity as part of the ABC proceedings. The ABC transaction has been the subject of multiple suits brought by people who had business relationships with Lax alleging impropriety in the proceedings.

Generally, Porzio was the law firm that advised Lax on the ABC (although a different law firm actually filed and litigated the ABC). At the time of the ABC, Lax was in control of Dynamic Diamond Corp., although Porzio also dealt with Martin Ehrenfeld regarding the ABC. According to internal Porzio records provided to the United States through Lax, Moshe Lax was Porzio's client for multiple legal matters, including "Debt Restructuring/Bankruptcy," "Moshe

Lax, As Executor to the Estate of Chaim Lax – General Bankruptcy Advice," and "Moshe Lax – Financial Debt Restructuring." Diamond Dynamic LLC was Porzio's client in relation to a "Bankruptcy/Restructuring General Advice" legal matter. Based on this, it appears that the attorney client privilege at issue here belonged to Moshe Lax – either personally, as co-executor of the Lax Estate; as a manager of Dynamic Diamond Corp.; or as the *de facto* manager of Diamond Dynamic LLC (while Shaindy Lax, Moshe Lax's wife, was the sole manager on paper, Moshe retained and exercised control over the entity). In other words, any attorney-client privilege in connection with consulting Porzio about the ABC ultimately belonged to Moshe Lax.

Additional, specific details surrounding the ABC are included below, where relevant.

## II. The Porzio Deposition

On June 16, 2021, the United States conducted a Rule 30(b)(6) deposition of Porzio remotely via Veritext Virtual. Attorney Warren Martin was designated to testify on behalf of Porzio. Lax was present for the deposition. Porzio was represented by counsel; Lax was not. Porzio Dep. 7. (Lax was previously ordered to attend all law firm depositions. *See* April 17, 2021 Minute Order.) Based on information received from Veritext, Lax did not login to Exhibit Share (the exhibit sharing and viewing platform for remote depositions) during the deposition. However, Lax did have access to Exhibit Share.

The topics discussed at the deposition included the ABC transaction; the decision to change the name of Diamond Dynamic Corp. to "White Coat" almost immediately before the ABC; and Porzio's knowledge of federal tax liabilities of Lax persons or entities.

On several occasions, Porzio's counsel (but not Lax) instructed Mr. Martin not to answer certain questions due to claims of attorney-client privilege. Specifically, Porzio did not answer

questions related to the purpose of the name change from Dynamic Diamond Corp. to White Coat immediately before the ABC transaction and whether Lax was the decision-maker during the ABC. Porzio Dep. 24, 44, and 59. [2]

After about an hour and a half of questioning, Lax stated that he did not intend to assert privilege himself, but was joining all objections being made by Porzio, although he stated he understood that he was free to make objections independent of Porzio. Porzio Dep. 38-39. Porzio made clear they would not answer questions involving alleged attorney-client privileged communications, absent a written waiver from the person with whom the privilege is held or a court order finding a waiver. Porzio Dep. 38.

III. **Relevant deposition exhibits**

The Government introduced several email exhibits between Porzio and Lax during the deposition (collectively, the "Deposition Emails"). On different occasions, Government counsel reminded the Deposition participants that the email being considered before them was produced by Lax pursuant to discovery requests. The Deposition Exhibits include Exhibits 564, 567, 568, 569, and 570.[3]

The Deposition Emails were produced by Lax during the course of litigation pursuant to a discovery request. The United States and Lax stipulated to parameters that would govern the

---

[2] Porzio did describe *generally* why other businesses might change their name immediately before an ABC, but not specifically why Dynamic Diamonds did.

[3] The Porzio deposition transcript and exhibits, all of which were admitted at the deposition without objection, are not attached to this motion. On September 9, 2021, undersigned counsel spoke to Lax over the phone regarding this motion. Lax threatened to file an ethics complaint against Government counsel should the United States file the deposition exhibits that contain attorney-client communications, or even describe the exhibits in this brief with specificity. Undersigned contends any such complaint would be totally without merit because Lax waived privilege, as explained in this brief. Nevertheless, the United States will produce the transcript and exhibits *in camera* if the Court wishes to see them and orders the United States to do so.

production of emails (including the Deposition Exhibits) from a Gmail account owned by Lax. *See Exhibit A*. Under the terms of stipulation, Lax was to review the emails in the Gmail account to determine whether any should be withheld as privileged. *Id*. Then, Lax was to produce all emails determined to be non-privileged, along with a privilege log related to any emails withheld. *Id*. The United States was then supposed to search the produced emails using agreed-upon search terms. *Id*.

Because Lax did not comply with the terms of the stipulation, the United States hired and paid for the services of Innovative Discovery, a third-party litigation support firm. Innovative Discovery took custody of all relevant Gmail account emails by obtaining them directly from Lax's Gmail account, and facilitated Lax's privilege review. At no time did the United States possess the emails prior to Lax's review. Innovative Discovery assisted Lax in the technical aspects of his review as well as in the creation of a privilege log for withheld emails.

## IV.    Present Discovery Dispute

The United States contends that Lax has waived privilege in the Deposition Emails by voluntarily producing them, and that the crime-fraud exception applies to communications with Porzio. Porzio maintains that it will not provide certain attorney communications without a Court order or written waiver. When the first law firm was deposed in this case, Lax did not appear or participate. This left that firm (and the remaining firms to be deposed) in a conundrum – do they assert a privilege that is not theirs to assert (because the privilege belongs to Lax) – or do they respond fully because by failing to appear and object, Lax has effectively waived any privilege claim. To avoid potential claims of improper disclosure, the firms understandably chose the former, resulting in generally unproductive depositions.

## Argument

**I.   Moshe Lax Has Voluntarily Waived Privilege in The Deposition Emails.**

The voluntary disclosure of communications protected by the attorney-client privilege generally results in waiver of a privilege as to those documents. *See In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993); *United States v. Gangi*, 1 F. Supp. 2d 256, 263 (S.D.N.Y. 1998) ("Even privileged documents are not protected if a party voluntarily discloses them"). In most respects, "the discussion of a third-party waiver is virtually the same for both the attorney-client privilege and the work product doctrine." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 138 (N.D.N.Y. 2007). "Once a party allows an adversary to share in an otherwise privileged document," "the need for the privilege disappears." *In re Steinhardt Partners*, 9F.3d at 235 (citing *United States v. Nobles*, 422 U.S. 225, 239 (1975)).

Failure to assert privilege results in waiver of any privilege or protection. *Loguidice v. McTiernan*, 2018 WL 4011584, at *2 (N.D.N.Y.) quoting *In re County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008). Normally, the failure to object to a privileged document being used during a deposition plainly constitutes a waiver. *See United States v. Wells Fargo Bank, N.A.*, No. 12-cv-7527 (JMF), 2015 WL 5051679, at *4 (S.D.N.Y. August 26, 2015). "[T]he client alone controls the privilege and may or may not choose to divulge his own secrets." *In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987).

Lax has voluntarily waived privilege in the Deposition Emails by providing them to United States. Lax had ample opportunity to review the Deposition Emails for privilege. Sufficient procedural safeguards were in place to facilitate Lax's review. As stated above, the United States paid for a third-party vendor to assist Lax in his review. The United States is not in the business of subsidizing litigants' discovery obligations. However, in this case it chose to do

so because of the lengthy delays in production and to respect Lax's *pro se* status. The United States received the Deposition Emails in discovery over a year ago, and at no point has Lax ever sought to claw-back the emails. Nor did Lax object to the introduction of the Deposition Emails at the deposition (which was held June 16, 2021), or at any time since request return of the emails.[4] Such an inordinate delay justifies finding that Lax voluntarily disclosed the Deposition Emails and no privilege attaches.

Moshe Lax's calculated actions and inactions have consequences. He has repeatedly been rewarded for his deliberate ignorance and inactions by receiving time extensions, payment of Innovative Discovery's services, and other things that have only worked to frustrate the efforts of the United States. This Court should not reward Moshe Lax's calculated ignorance and should enter an order declaring that any attorney-client privilege in the Deposition Emails has been waived due to his voluntary disclosure of the emails.

**II.  The Crime-Fraud Exception Applies to the Porzio Communications[5]**

The purpose of the attorney-client privilege is to promote open communication between attorneys and their clients so that fully informed legal advice may be given. The crime-fraud exception strips the privilege from attorney-client communications that "relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984).

---

[4] At the meet-and-confer conference Lax stated he was unaware of the emails being used at the Porzio deposition, notwithstanding his attendance at the deposition. Lax has not asked for the return of the Deposition Emails.

[5] The Government's assertion of the crime-fraud exception should not be interpreted as accusing Porzio of knowingly participating in any wrongdoing related to the facts of this case.

An *in camera* proceeding may be used to determine whether the exception applies. Prior to an *in camera* disclosure of the communications, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person … that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal quotations and citation omitted). Only non-privileged material may be used to make the threshold determination that triggers *in camera* review. *Id*. at 574. A party seeking to overcome the attorney-client privilege with the crime-fraud exception must show that there is probable cause to believe that a crime or fraud has been committed and that the communications were in furtherance thereof. *In re John Doe, Inc.*, 13 F.3d 633, 637 (2nd Cir. 1994). This standard has been rephrased as requiring "that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." Id. Indeed, "a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege." *Zolin*, 491 U.S. at 572.

Once a *prima facie* showing is made, the decision whether to engage in *in camera* review rests in the discretion of the district court. *Id*. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply. *Id*. However, a court can also exercise its discretion not to hold *in camera* proceedings (and instead declare that the crime-fraud exception applies) if it determines that a party has "comfortably made a showing of probable cause that [the] communications …

were in furtherance of a crime or fraud." *United States v. Tucker*, 254 F.Supp.3d 620, 625 (S.D.N.Y. 2017).

Here, the United States urges the Court to exercise its discretion and decline to conduct an *in camera* review because the United States is able to "comfortably" make a showing that fraud was perpetrated by Lax in relation to the ABC.

The Government's Amended Complaint lays out myriad schemes intended to defraud the United States from collection of federal income and estate tax. ECF Doc. 106. Relevant to the Porzio communications is Scheme 3, wherein the United States alleges that Lax participated in appropriating the assets of Dynamic Diamond Corp. from the Lax Estate using a sham restructuring, i.e., the ABC transaction. *Id*, at PageID 1950-53. Although Porzio did not serve as the assignor in the ABC (akin to a trustee in bankruptcy), Porzio did advise Lax on the procedures of the transaction. That is, Lax did not engage Porzio for legal advice related to past crimes or fraud, but rather for advice related to a future transaction, the ABC. Porzio provided advice regarding the various restructuring options, given the large amount of debt incurred by Dynamic Diamond Corp. *See Exhibit B* (Letter from Moshe Lax to Yoel and Zlaty Schwartz discussing restructuring options and referencing conversations with Porzio attorney Warren Martin)[6]. It is clear that the communications at issue here were in furtherance of the sham ABC restructuring. The ABC proceeding contained hallmarks of fraudulent activity such that a reasonable person would suspect the perpetration of a fraud.

For example, on February 26, 2010, Dynamic Diamond Corp. changed its name to White Coat, Inc. via a filing with the New York Secretary of State, Division of Corporations. *See Exhibit C*. Less than one week after the name change, on March 4, 2010, White Coat executed a

---

[6] This document has been used in other depositions without objection.

Deed of Assignment for the Benefit of Creditors, which provided that White Coat would transfer its assets to an attorney (which was not Porzio) to hold in trust, for the purpose of selling its assets to the satisfaction of its creditors. *See Exhibit D.* Martin Ehrenfeld, Moshe Lax's brother-in-law, executed the ABC deed on behalf of White Coat as "Chief Restructuring Officer." On March 26, 2010 – only about 22 days after the ABC deed was executed – the ABC court entered a sale order approving the sale of substantially all of the assets of White Coat, Inc. to Diamond Dynamic LLC. The sole member of Diamond Dynamic LLC was Shaindy Lax, Lax's wife. For all intents and purposes, Lax still retained control of the successor entity, Diamond Dynamic LLC. The speed of the proceeding, coupled with the relatedness of the various parties involved (Ehrenfeld as Chief Restructuring Officer and Moshe Lax's wife as the sole member of the "buyer" entity) indicates a strong suspicion that a fraud was perpetrated.

Yet another indicator that Moshe Lax engaged Porzio for advice related to fraudulent activity related to the ABC is Lax's assertion of the Fifth Amendment privilege against self-incrimination at his deposition in this case (his assertion is the subject of a motion to compel currently pending with the Court). During his deposition, Lax was specifically asked several questions about the ABC transaction. *See* ECF Doc. 252-1, PageID 4669. He responded by invoking the Fifth Amendment. *Id*. A prudent person would have a reasonable basis to suspect that Lax's assertions of privilege to that line of questioning are indicative of the perpetration of a fraud related to the ABC.

But perhaps more importantly, the issue of fraud as related to the ABC was the very subject of a state court suit brought by a creditor. *Brunner v. Estate of Lax*, 47 Misc. 3d 1206(A), at *7, 15 N.Y.S.3d 710 (N.Y. Sup. Ct. 2015), *aff'd*, 137 A.D.3d 553, 27 N.Y.S.3d 148 (N.Y. App. Div. 2016). *Opinion attached as Exhibit E.* The New York State Supreme Court determined

10

that Moshe Lax and his sister Zlaty "changed the name of the Company in the hope [creditors] would not realize that 'White Coat' was really Dynamic Diamond [Corp.]." That court concluded that the fraudulent intent of the ABC transaction's architects was evident "based on the circumstances of the ABC alone, but also because the badges of fraud are prominently on display." *Id*. at *11. The Court should rely on the sound judgment of the *Brunner* court, as that court considered evidence and adjudicated the merits of the case. It is unnecessary to hold *in camera* proceedings given the state court's finding of fraud in the ABC. Surely, the well-reasoned finding of another court as to the fraudulent nature of the ABC is a comfortable showing of probable cause. Therefore, the Court need not hold *in camera* proceedings in order to find that the crime-fraud exception applies.

## **Conclusion**

For the reasons stated above, the United States of America respectfully requests this Honorable Court to enter an order declaring 1) a waiver of attorney-client privilege in the Deposition Emails (as defined above) and 2) that the crime-fraud exception applies.

    DAVID A. HUBBERT
    Acting Assistant Attorney General
    U.S. Department of Justice, Tax Division

    */s/ Ali Gadelhak*

    KARI M. LARSON
    Senior Litigation Counsel, Tax Division
    U.S. Department of Justice
    P.O. Box 403
    Washington, D.C. 20044
    P: 202-616-3822
    F: 202-307-2504
    Kari.M.Larson@usdoj.gov

    PHILIP L. BEDNAR
    STEPHANIE W. CHERNOFF
    ALI GADELHAK

SAMUEL P. JONES
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C. 20044
P: 202-307-6415 (plb), 202-307-2251 (swc), 202-307-0854 (ag), 202-616-9085 (spj)
F: 202-514-5238 (plb, swc, ag, spj)
Philip.L.Bednar@usdoj.gov
Stephanie.W.Chernoff@usdoj.gov
Ali.Gadelhak@usdoj.gov
Samuel.P.Jones@usdoj.gov
Counsel for Plaintiff United States of America