Exhibit
E

47 Misc.3d 1206(A)
Unreported Disposition
(The decision is referenced in
the New York Supplement.)
Supreme Court, New York County, New York.

Joseph BRUNNER, Abraham Mandel,
and JBAM Realty LLC, Plaintiffs,
v.
The ESTATE OF Chaim LAX, Deceased, Moshe
Lax, as Executor of the Estate of Chaim Lax,
Zlaty Schwartz, as Executor of the Estate of
Chaim Lax, White Coat, INC., f/k/a Dynamic
Diamond Corp., Diamond Dynamics, LLC, Tracy
L. Klestadt, as Assignee of White Coat, Inc.,
Shaindy Lax, Mordechai Ehrenfeld a/k/a Martin
Ehrenfeld, Diligence I LLC, SL Holding, LLC,
SL Holdings I, LLC, SL Holdings II, LLC, SL
Holdings III, LLC, SL Holdings IV, LLC, Favorite
Properties LLC, LX Holdings LLC, THE Chaim Lax
Family Trust, and John Does 1–20, Defendants.

No. 651013/2014.
|
April 3, 2015.

**Attorneys and Law Firms**

Herrick, Feinstein, LLP, for plaintiffs.

Davidoff Hutcher & Citron LLP, for defendants Moshe Lax, Martin Ehrenfeld, White Coat, Inc., Favorite Properties, LLC, and LX Holdings, LLC.

The Ryan Law Group, LLP, for defendants SL Holding, LLC, SL Holdings I, LLC, SL Holdings II, LLC, SL Holdings III, LLC, SL Holdings IV, LLC, Diamond Dynamics, LLC, Shaindy Lax, and the Chaim Lax Family Trust.

Wilson Elser Moskowitz Edelman & Dicker, LLP, for defendant Tracy L. Klestadt.

Jaspan Schlesinger, LLP, for defendant Diligence I, LLC.

Goldberg & Rimberg, PLLC, for defendants Zlaty Schwartz and the Estate of Chaim Lax.

**Opinion**

SHIRLEY WERNER KORNREICH, J.

*1 Motion sequence numbers 006, 007, 008, 009, and 010 are consolidated for disposition.

Before the court are five motions to dismiss the Amended Complaint (the AC) pursuant to CPLR 3211(a)(1), (5), and (7). Motion 6 was filed by defendants Moshe Lax (Moshe), Martin Ehrenfeld, White Coat, Inc., f/k/a, Dynamic Diamond Corp. (the Company), Favorite Properties, LLC (Favorite), and LX Holdings, LLC (LX Holdings). Motion 7 was filed by defendants Zlaty Schwartz and the Estate of Chaim Lax (the Estate). Motion 8 was filed by defendants SL Holding, LLC (SL Holding), SL Holdings I, LLC, SL Holdings II, LLC, SL Holdings III, LLC, SL Holdings IV, LLC (collectively, the Holding Companies), Diamond Dynamics, LLC (the New Company), Shaindy Lax (Shaindy), and the Chaim Lax Family Trust (the Trust). Motion 9 was filed by defendant Diligence I, LLC (Diligence). Finally, Motion 10 was filed by defendant Tracy L. Klestadt. The motions are granted in part and denied in part for the reasons that follow.

*Background & Procedural History*
As this is a motion to dismiss, the facts recited are taken from the AC. *See* Dkt. 31.

In early 2007, Chaim Lax (Chaim), who is now deceased, sought to invest $3 million with plaintiffs Joseph Brunner and Abraham Mandel. AC ¶¶ 30–31. Chaim, who allegedly was asset rich but cash poor, sought a loan from plaintiffs to fund his investment. ¶¶ 32–33. He asked for a loan which would be serviced by making interest payments only and which would not require collateral. ¶¶ 35, 37. In order to obtain such a loan, Chaim provided plaintiffs with financial statements showing a net worth of $174,408,308 as of October 31, 2006, of which $108,398,500 was invested in real estate and $47,170,887 was invested in diamonds. ¶ 34.

Plaintiffs arranged a loan through an attorney, non-party Jay Kimmel. ¶ 36. Kimmel found lenders and, in acting as their nominee, reached an agreement to lend $3 million to Chaim, which was guaranteed by plaintiffs. ¶¶ 38–39. On April 30, 2007, Chaim executed a $3 million note (the Note) on his individual behalf and on behalf of the Company, at the time known as Dynamic Diamond Corp.[1] ¶ 39; *see* Dkt. 32. The Note provides that it is payable to Kimmel as nominee. *Id.*

The $3 million principal sum was due on December 31, 2007 and was loaned at 14% interest per annum, which was payable in monthly installments. ¶ 41. The Note states that, so long as the Note was not in default, Chaim could extend the maturity date to April 30, 2008. *Id.* The Note defines Events of Default to include, *inter alia,* failure to make timely payments of principal or interest, and it provides for 24% per annum default interest. ¶¶ 53, 56. The lender also may recover counsel fees should the lender have to bring an enforcement action. ¶ 57. The Note is governed by New York law.

On April 30, 2007, Brunner and Mandel executed a personal guaranty of the Note (the Guaranty). ¶ 42; *see* Dkt. 33. The Guaranty prohibits the Note from being called prior to April 30, 2008, so long as Brunner and Mandel made the required monthly interest payments. *See* Dkt. 33 at 4.

**\*2** The $3 million loan was made to Chaim, and he invested the money with plaintiffs. ¶ 44. In 2007, Chaim was issued Schedule K–1s reflecting his investment. ¶ 45. The Note's maturity date was extended to April 30, 2008. ¶ 49. Chaim, however, defaulted on the Note by not paying back the principal on time. ¶ 50. Nonetheless, Chaim continued to make monthly interest payments until he died in November 2008. ¶ 51. At the instruction of Chaim's son, Moshe, the K–1s for 2008–2010 were issued to defendant SL Holding. ¶ 46. After Chaim's death, Moshe, acting as the executor of the Estate and manager of the Company, continued making monthly interest payments until March 2009. ¶ 52. In April 2009, Moshe informed plaintiffs that neither the Estate nor the Company had sufficient funds to continue making monthly interest payments and asked plaintiffs to make interest payments instead. ¶ 58. Plaintiffs agreed to do so based on Moshe's offer to provide diamonds as collateral, which he did. ¶ 60. Plaintiffs then began making the monthly interest payments. ¶ 59.

In June 2010, plaintiffs and Kimmel agreed that plaintiffs would purchase the Note and assign it to plaintiff JBAM Realty LLC (JBAM). ¶ 63. Later in 2010, plaintiffs demanded that the Estate and the Company pay off the Note. ¶ 64.

However, unbeknownst to plaintiffs, on February 26, 2010, the Company had changed its named from Dynamic Diamond Corp. to White Coat, Inc. ¶ 76. Less than one week later, on March 4, 2010, the Company "executed a Deed of Assignment for the Benefit of Creditors [Deed], which provided that [the Company] would transfer its assets to an attorney to hold in trust, for the purpose of selling or disposing of [the Company's] assets to the satisfaction of its known creditors. According to the Deed, any residual monies would inure to the benefit of [the Company] or its successors." ¶ 77. Defendant Ehrenfeld executed the Deed on behalf of the Company. ¶ 78. The Deed was submitted to this Court in a special proceeding, styled *Matter of the General Assignment for the Benefit of Creditors of White Coat, Inc., Assignor, to Tracy L. Klestadt, Assignee,* Index No. 510001/2010 (Sup Ct, N.Y. County) (the ABC). Ehrenfeld then negotiated a sale of all of the Company's assets to a new company, Diamond Dynamics, LLC (the New Company). ¶ 79. The sole member of the New Company is Moshe's wife, Shaindy, an Orthodox Jewish, stay-at-home mother with no experience in the diamond manufacturing business. ¶¶ 81–82. According to the complaint, some of the Company's assets eventually came to be owned by the Holding Companies, which also are owned by Shaindy. ¶ 82. Moshe allegedly controls the New Company and the Holding Companies. ¶ 83.

On March 10, 2010, this Court (Diamond, J.) issued an order to show cause directing that all of the Company's creditors (which should have included plaintiffs) be given notice of the plan to transfer the Company's assets to the New Company. ¶ 84; *see* Dkt. 34. The court specifically ordered that notice be published in the New York Law Journal and be provided to "all known creditors." *Id.* Moshe does not (nor can he) deny that he knew that Kimmel and plaintiffs were creditors of the Company and that *Kimmel and plaintiffs were not given notice of the sale.*[2] Plaintiffs did not become aware of the ABC until 2014 (¶ 88), and the court approved the sale by order dated March 25, 2010. *See* Dkt. 168. This scheme was carried out, in part, by temporarily changing the Company's name to "White Coat" during the pendency of the ABC. As a result of these acts, plaintiffs are not bound by the ABC, and the ABC has no res judicata or collateral estoppel effect as to plaintiffs.

**\*3** After the ABC concluded in 2011, Moshe informed plaintiffs that the Estate and the Company would never be able to pay off the Note. ¶ 65. He told plaintiffs to keep the diamonds, which were collateral for the interest payments made by plaintiffs. *Id.* Plaintiffs allege, upon information and belief, that the diamonds are worth approximately $2 million. ¶ 66.

Plaintiffs further allege that, as agreed in 2010, Kimmel assigned the Note to JBAM in March 2014. ¶ 68.[3] On March 31, 2014, plaintiffs commenced this action to collect on the Note. They sued the Estate, the Company, and myriad parties

allegedly liable under theories of veil piercing, successor liability, and fraudulent transfer.

The AC, filed on July 11, 2014, asserts 14 causes of action: (1) breach of the Note against the Estate, Moshe and defendant Schwartz (the executors of the Estate),[4] the Company, Klestadt,[5] the New Company and SL Holding; (2) breach of the covenant of good faith and fair dealing against the Estate, Moshe, Schwartz, the Company, Klestadt, the New Company, and SL Holding; (3) unjust enrichment on the Note against the Estate, Moshe, Schwartz, the Company, Klestadt, the New Company, and SL Holding; (4) equitable subrogation against the Estate, Moshe, Schwartz, the Company, Klestadt, the New Company, and SL Holding; (5) indemnification against the Estate, Moshe, Schwartz, the Company, Klestadt, the New Company, and SL Holding; (6) reimbursement against the Estate, Moshe, Schwartz, the Company, Klestadt, the New Company, and SL Holding; (7) unjust enrichment on the Guaranty against the Estate, Moshe, Schwartz, the Company, Klestadt, the New Company, and SL Holding; (8) fraudulent inducement of the Note against the Estate, Moshe, and Schwartz; (9) fraudulent conveyance, pursuant to New York Debtor & Creditor Law (DCL) § 275, against the Estate, Moshe, Schwartz, the Company, Klestadt, the New Company, the Holding Companies, the Trust, LX Holdings, and Favorite; (10) fraudulent conveyance, pursuant to DCL § 275, against Diligence, and (11) against the Company, Klestadt, the New Company, Moshe, Shaindy, and Ehrenfeld; (12) fraudulent conveyance, pursuant to DCL § 276, against the Estate, Moshe, Schwartz, the Holding Companies, the Trust, LX Holdings, and Favorite, (13) against Diligence, and (14) against the Company, Klestadt, the New Company, Moshe, Shaindy, and Ehrenfeld. The fraudulence conveyance claims are based on actions taken by Moshe after his father's death, whereby he established the Trust, the Holding Companies, and Diligence (which was not incorporated until February 6, 2014, the month before this action was commenced). He allegedly created these entities in order to transfer the Estate's assets to them to avoid creditors and the federal government, the latter of which, it is claimed, is owed more than $20 million in estate taxes.

The complaint alleges a scheme wherein the assets, including receivables and moneys allegedly owed to the Estate, were transferred to the shell entities; the entities were then used to both pursue the Estate's claims and intimidate creditors; defendants threatened lawsuits and other action, warning of repercussions if the debtors attempted to speak to counsel or anyone else about the threats. Many of those threatened are members of the Orthodox Jewish community.

**\*4** Brunner and Mandel allege the following:

On or about March 4, 2014, Mandel received a telephone call informing him that the caller was calling as a "favor" to inform Mandel that bad things were coming his way (the "Caller"). The Caller informed Mandel that an entity known as [Diligence] had purchased the claims belonging to the [Estate], and that a Complaint was being prepared that would destroy Brunner and Mandel. Mandel was told not to inform his partner—Brunner—about the call and was also told not to talk to counsel, rather he should come in to meet with the Caller. Mandel informed his partner, Brunner, about the call. Subsequently, Mandel received a proposed Settlement Negotiations Agreement via email that provided, in part, (1) that [Moshe] and [Ehrenfeld] would be participating in the contemplated settlement discussions; (2) the parties would be bound by confidentiality; and (3) Brunner and Mandel would be bound by a $5 million liquidated damages provision.

Brunner and Mandel soon went to meet with the Caller who claimed to be representing the interests of Diligence. During the meeting, the Caller again threatened that a Complaint had been prepared against Brunner and Mandel, personally, alleging racketeering claims as well as other possible claims. The Caller refused to provide[ ] any detail concerning the bases of such allegations, but advised Brunner and Mandel that if they executed the Settlement Negotiations Agreement, the Complaint would be shown to them. The Caller again warned Brunner and Mandel that the Complaint would be very damaging and it would seek $20 million in damages, but that a payment could be negotiated now to make this go away.

A second similar meeting later took place where the Caller reiterated the same threatening warnings to pressure and intimidate Brunner and Mandel to negotiate a payment. Upon information and belief, [Moshe] and [Ehrenfeld] have engaged in a pattern and practice of extorting and attempting to extort funds from members of the orthodox Jewish community through the use of sham entities such as [Diligence], and previously through Prudence LLC, and possibly through other entities. Upon information and belief, [Moshe] [Ehrenfeld] and their sham entities threaten to report the subjects of their extortion to governmental entities and threaten legal actions demanding millions of dollars in damages.

Brunner and Mandel did not agree to the Settlement Negotiations Agreement, and instead began to investigate the conduct of [the Estate]. Such investigation, in 2014, has revealed that upon information and belief, the Defendants have defrauded Plaintiffs through providing false financial statements and fraudulently transferring assets from the Estate and from Dynamic to avoid creditors like Plaintiffs. Upon information and belief, Defendants have fraudulently backdated trust documents, fraudulently conveyed assets from the Estate, and fraudulently conveyed assets from Dynamic all in a scheme to dupe, defraud, and avoid obligations, such as Defendant's debt obligations to Plaintiffs. See Dkt. 31 at 22–23 (AC ¶¶ 116–126) (emphasis added; paragraph numbers omitted; paragraph breaks added for clarity).

**\*5** This is not the first case in which a creditor of the Estate sued defendants for this alleged fraudulent transfer scheme. In 2010, Steven Schlesinger of Jaspan Schlesinger LLP, (*counsel for defendant Diligence in this action*), commenced an action on behalf of two of the Estate's creditors. *See BRT Realty Trust v. Estate of Chaim Lax,* Index No. 11632/2010 (Sup Ct, Nassau County), in which allegations of fraudulent conveyances against the very same group of defendants were asserted. Such allegations are set forth in an order dated December 7, 2010, in which that court denied a motion to dismiss those claims. For the reasons that follow, dismissal of the fraudulent conveyance claims here is denied as well.

*Legal Standard*

On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. *Amaro v. Gani Realty Corp.,* 60 AD3d 491 (1st Dept 2009); *Skillgames, LLC v. Brody,* 1 AD3d 247, 250 (1st Dept 2003), citing *McGill v. Parker,* 179 A.D.2d 98, 105 (1992); *see also Cron v. Harago Fabrics,* 91 N.Y.2d 362, 366 (1998). The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. *Skillgames, id.,* citing *Guggenheimer v. Ginzburg,* 43 N.Y.2d 268, 275 (1977). Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. *Amaro,* 60 NY3d at 491. "However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration." *Skillgames,* 1 AD3d at 250, citing *Caniglia v. Chicago Tribune–New York News Syndicate,* 204 A.D.2d 233 (1st Dept 1994). Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed only if "the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." *Goshen v. Mutual Life Ins. Co. of NY,* 98 N.Y.2d 314, 326 (2002) (citation omitted); *Leon v. Martinez,* 84 N.Y.2d 83, 88 (1994).

*Discussion*

Given the substantial overlap of arguments across defendants' briefs, the court will address defendants' arguments in the order they are addressed in plaintiffs' omnibus opposition brief (Dkt.114), rather than address each of defendants' motions separately.

First, defendants argue that plaintiffs have not alleged damages because the value of the collateral (the diamonds) exceeds the amount due on the Note. Dismissal for lack of damages is denied because the Note has indisputably not been paid off. Though plaintiffs allege the diamonds are worth approximately $2 million, the outstanding debt alleged is the $3 million of principal plus interest (both regular and default) and plaintiffs' attorneys' fees, minus the value of the diamonds. The diamonds allegedly were collateral for the monthly interest payments plaintiffs made, beginning in April 2009, on defendants' behalf, not collateral for the principal. The record on this motion does not support defendants' position that the value of the diamonds exceeds the outstanding principal and interest owed.

**\*6** Second, defendants' argument that plaintiffs lack standing does not merit dismissal. Plaintiffs allege that the assignment of the Note was agreed to in 2010 and was effectuated as of March 7, 2014. To be sure, the documents submitted by plaintiffs are somewhat unclear as to the circumstances of the assignment and when, precisely, it was effectuated. Moreover, though it seems quite plausible that Kimmel had actual authority to effectuate the assignment, the documentary evidence is not definitive in this regard. These questions of fact, however, are not grounds for dismissal. Nor are such questions grounds to delay discovery. Rather, they simply are a basis to permit defendants discovery to ensure that plaintiffs have the right to enforce the Note.[6] The

very cases cited by defendants (which, it should be noted, concern residential mortgage foreclosures, not commercial loans between sophisticated parties), make clear that a motion to dismiss should be denied where, as here, "questions of fact exist as to whether the note was physically delivered to the plaintiff prior to the commencement of the action, when the note was endorsed, and whether [authority existed] to assign the note [on behalf of the lender]." *Deutsche Bank Nat'l Trust Co. v. Haller,* 100 AD3d 680, 683 (2d Dept 2012); [7] *see Carlin v. Jemal,* 68 AD3d 655, 655–56 (1st Dept 2009) ("Regardless of whether plaintiff is a "holder in due course", a mere "holder", or only an "assignee" or "transferee", he has standing to bring this action," plaintiff has standing when it "establishes that, at the very least, plaintiff took the note as assignee prior to commencement of the action.") (citations omitted). [8]

Third, defendants contend that plaintiffs' claim for breach of the Note is time-barred. They are wrong. Breach of contract claims are subject to a 6–year statute of limitations [CPLR 213(2) ] and accrue when the contract is breached. *Elie Int'l, Inc. v. Macy's West Inc.,* 106 AD3d 442, 443 (1st Dept 2013), accord *Ely–Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399, 402 (1993). Contrary to defendants' arguments, plaintiffs' claim for breach of the Note did not accrue on the original maturity date of December 31, 2007 or the extended maturity date of April 30, 2008. [9] Rather, the claim accrued on the date defendants failed to make payment, in April 2009, less than 6 years before this action was commenced. *See Chiu v. 1–9 Bond St. Realty, Inc.,* 79 AD3d 416 (1st Dept 2010), citing *Roth v. Michelson,* 55 N.Y.2d 278, 281 (1982), *Lew Morris Demolition Co., Inc. v. Bd. of Ed. of City of New York,* 40 N.Y.2d 516, 521 (1976), and *Nat'l Heritage Life Ins. Co. in Liquidation v. Hill St. Assocs.,* 262 A.D.2d 378 (2d Dept 1999).

Next, plaintiffs may maintain a claim for breach of the Note against all of the corporate defendants. The AC pleads facts giving rise to a reasonable inference that the New Company and the other corporate defendants could have successor liability for the debts of the Company, which, it should be noted, were not extinguished in the ABC, as they would have been in a federal bankruptcy proceeding. *See Abondolo v. Jerry WWHS Co.,* 829 FSupp2d 120, 126 (E.D.N.Y.2011). As noted in *Abondolo:*

**\*7** "A general assignment for the benefit of creditors is an assignment by a debtor transferring all of his or her property in general terms to an assignee in trust for all creditors of the debtor, or a voluntary transfer by a debtor of all his property to a trustee of his own selection, for administration, liquidation, and equitable distribution among his creditors." [*Compagnia Distribuzione Calzature v. PSF Shoes,* 206 A.D.2d 343, 344 (2d Dept 1994); *City of New York v. United States,* 283 F.2d 829, 831–32 (2d Cir1960).] "The intent of the Debtor and Creditor Law, as stated, is to obtain expeditious finality and payment to creditors of obligations and debts due them from the estate of the Assignor." [*Speciner v. Chase Manhattan Bank, N.A.,* 103 Misc.2d 19, 20 (Sup Ct, Queens County 1980).]

**A general assignment "is distinguishable from a federal bankruptcy proceeding in that no discharge from the assignor's debts is obtainable in an assignment for the benefit of creditors."** [*Freeman v. Marine Midland Bank– N.Y.,* 419 FSupp 440, 447 (E.D.N.Y.1976); NY Jur2d Creditor § 215 (2011) ("[A] general assignment may be viewed as a quasi-bankruptcy proceeding except for the fundamental factor of discharging a debtor from his debts.").] **Because a general assignment does not result in the discharge of the assignor's debts "[t]he creditor is not estopped from exhausting his legal remedies against the assignor**". [*Swift & Co. v. Novotny,* 28 N.Y.S.2d 562, 563 (Co Ct, Westchester County 1941); *see also Delta Trading Corp. v. Kohn & Son Co.,* 28 Misc.2d 894 (Sup Ct, N.Y. County 1961), *Kay Mfg. Corp. v. Weiss,* 11 Misc.2d 164 (Sup Ct, Kings County 1957). (emphasis added); *see also Silver v. Whitney Partners LLC,* 2013 WL 6921992, at \*2–3 (Sup Ct, N.Y. County 2013) (same).

In addition, contrary to defendants' arguments, the doctrines of res judicata and collateral estoppel do not apply. "[T]he doctrine of res judicata bars future actions between the same parties on the same cause of action." *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 347 (1999) (emphasis added); *see also Gomez v. Brill Secs., Inc.,* 95 AD3d 32, 35 (1st Dept 2012) ("the party seeking to invoke the doctrine of res judicata must demonstrate that the critical issue in a subsequent action was decided in the prior action and that **the party against whom estoppel is sought was afforded a full and fair opportunity to contest such issue.**") (emphasis added). "Collateral estoppel precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided

against that party." *Parker,* 93 N.Y.2d at 349 (emphasis added). Plaintiffs were not involved in the ABC, and, thus, were not afforded a fair opportunity to litigate the issues raised in that action. Plaintiffs were deprived of their right to be heard when defendants knowingly and intentionally violated the court's March 10, 2010 notice order and changed the name of the Company in the hope plaintiffs (and other creditors) would not realize that "White Coat" was really Dynamic Diamond.[10]

**\*8** Plaintiffs seek to maintain a claim for successor liability. Consequently, one of four scenarios must be pleaded: "(1) [the successor company] expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 245 (1983); *Tap Holdings, LLC v. ORIX Fin. Corp.,* 109 AD3d 167, 176 (1st Dept 2013); *see also Fitzgerald v. Fahnestock & Co.,* 286 A.D.2d 573, 575 (1st Dept 2001) (noting that the successor liability doctrine now applies to both tort and contract claims); *see generally TAP Holdings, LLC v. ORIX Finance Corp.,* 45 Misc.3d 1217(A) (Sup Ct, N.Y. County 2014) (Ramos, J.) (same; collecting cases).

Plaintiffs' brief is somewhat unclear as to whether their successor liability theory is based on the de facto merger or mere continuation doctrines, the difference being that the latter applies when "the predecessor corporation ceases to exist." *Ring v. The Elizabeth Found. for the Arts,* 2014 WL 5908429, at \*6 (Sup Ct, N.Y. County 2014), citing *Schumacher,* 59 N.Y.2d at 245; *see Tap Holdings,* 109 AD3d at 176. In any event, both theories are grounded in the same basic concept, namely that the transaction which purported to transfer a business from one entity to another is a sham and that, here, such transaction occurred as a means to evade liability. *See Ring, id.* While there are factors courts consider when assessing successor liability [*see id.* at \*4 (collecting cases) ],[11] courts are flexible in analyzing these factors since the law looks to substance and reality, not nominal form, to determine if a sham transaction occurred. *See id.; see also Tap Holdings,* 109 AD3d at 176 ("the question whether a de facto merger exists is analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of [the successor] to absorb and continue the operation of the [predecessor].") (quotation marks omitted). However, "continuity of ownership has been deemed essential to a de facto merger finding, as ownership continuity is the essence of a merger." *Ring,* 2014 WL 5908429, at \*4, citing *New York City Asbestos Lit.,* 15 AD3d at 258.

Continuity of ownership is alleged in the AC with particularity, plausibility, and, indeed, scienter. Putting a business in a spouse's name does not magically help one escape liability. Doing so where, as here, Moshe's wife is not even plausibly qualified to run a diamond production business is not only somewhat cynical, but also is a badge of fraud relevant for a DCL claim (discussed below). Simply put, the AC gives rise to a strong inference that the New Company, as well as the other corporate defendants, may be directly liable for the Company's breach of the Note.

**\*9** Plaintiffs, moreover, assert veil piercing claims. Liability on the theory of veil piercing requires plaintiff to establish that the owner of the entity, through domination of it, "abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against the party asserting the claim such that a court in equity will intervene." *Tap Holdings,* 109 AD3d at 174. Plaintiffs allege that Moshe owns and controls the Company and the New Company, that he uses shell companies (e.g., the Holding Companies) he also owns and controls to perpetrate a fraud against plaintiffs (and others), and that the companies do not adhere to any real, as opposed to nominal, corporate formalities. *See Fantazia Int'l Corp. v. CPL Furs NY, Inc.,* 67 AD3d 511, 512 (1st Dept 2012) (setting forth veil piercing factors), accord *Morris v. N.Y. State Dep't of Taxation & Finance,* 82 N.Y.2d 135, 141 (1993). Simply put, the AC validly pleads a claim to enforce the Note against all the corporate defendants.

That being said, while plaintiffs' claim to enforce the Note survives, plaintiffs' claim for breach of the duty of good faith and fair dealing is dismissed because it is duplicative of the claim for breach of the Note. *See Netologic, Inc. v. Goldman Sachs Group, Inc.,* 110 AD3d 433, 433–34 (1st Dept 2013) ("Plaintiff's claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of its contract claims, since both claims arise from the same facts and seek the identical damages for each alleged breach.' "), *quoting Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce,* 70 AD3d 423, 426 (1st Dept 2010).

Likewise, the unjust enrichment claim is dismissed because defendants' debt is governed by a written contract—the Note. See EBC I, Inc. v. Goldman Sachs & Co., 5 NY3d 11, 23 (2005), accord Clark–Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987). Nor can unjust enrichment be asserted against any of the non-contracting defendants because their liability must arise either from breach of the Note by virtue of successor liability, an alter ego claim, or a DCL claim. If such claims fail, a separate unjust enrichment claim would fail as well since the absence of grounds for these theories would preclude a finding that any enrichment was unjust. See Mandarin Trading Ltd. v. Wildenstein, 16 NY3d 173, 182 (2011) (unjust enrichment claim viable only when "it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered").

Similarly, plaintiffs assert other infirm claims, including equitable subrogation, common law indemnification and reimbursement. These claims, and the laundry list of erroneous arguments made by the parties about their viability, do not merit discussion. Plaintiffs are suing, as holders of the Note, to enforce the Note. Subrogation-like claims are inapposite when the underlying debt is exclusively owned and enforced by plaintiffs. See generally Winkelmann v. Excelsior Ins. Co., 85 N.Y.2d 577 (1995); see also Fasso v. Doerr, 12 NY3d 80, 86–87 (2009) (discussing equitable subrogation).

\*10 Plaintiffs' fraud claims, likewise, are deficient. Plaintiffs claim that the financial information Chaim provided about his net worth was false and, therefore, Chaim fraudulently induced Kimmel to make the loan and plaintiffs to guaranty it. "The elements of a cause of action for fraud [are] a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 NY3d 553, 559 (2009). Pursuant to CPLR 3016(b), "the circumstances constituting the wrong shall be stated in detail." Pludeman v. Northern Leasing Sys., Inc., 10 NY3d 486, 491 (2008).

The fraud claim is dismissed because plaintiffs did not plead, nor could they, that their reliance on Chaim's financial statements was reasonable.[12] Reasonable reliance does not exist where the fraud could have been discovered with reasonable due diligence. Mountain Creek Acquisition LLC v. Intrawest U.S. Holdings, Inc., 96 AD3d 633, 634 (1st Dept 2012), citing UST Private Equity Invs. Fund v. Salomon Smith Barney, 288 A.D.2d 87, 88 (1st Dept 2001) ("a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it"); Stuart Silver Assoc. v. Baco Dev. Corp., 245 A.D.2d 96, 98–99 (1st Dept 1997) ("Where a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he cannot claim justifiable reliance on defendant's misrepresentations"). Plaintiffs do not plead that they performed any due diligence on the veracity or accuracy of Chaim's financial statements. See AC ¶ ¶ 166–173 (fraud allegations, which do not include any claim that due diligence was even attempted). Defendants, moreover, aver that the identity of the true owner of the property Chaim claimed to personally own (LX Holdings) was easily and publicly verifiable on ACRIS.

To be sure, the fraudulent inducement claim's lack of viability has no bearing on the validity and timeliness of plaintiffs' DCL claims, which are based on a different set of events and are sufficiently pleaded. DCL § 275 provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." DCL § 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

As noted in Taberna Preferred Funding II, Ltd. v. Advance Realty Group LLC, 45 Misc.3d 1204(A) (Sup Ct, N.Y. County 2014), at \*11–12:

\*11 To properly plead a claim for actual fraudulent conveyance under § 276, "the claimant must allege that (1) the thing transferred has value of which the creditor could have realized a portion of its claim; (2) that this thing was transferred or disposed of by the debtor and (3) that the transfer was done with actual intent to defraud." Chambers v. Weinstein, 44 Misc.3d 1224(A), at \*7 (Sup Ct, N.Y. County 2014) (Sherwood, J.), quoting In re Monahan Ford Corp. of Flushing, 340 BR 1, 37 (Bankr E.D.N.Y.2006)

Alternatively, to state a claim for constructive fraudulent conveyance, the plaintiff must allege one of the following three scenarios: "(i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275." *In re Sharp Int'l. Corp.,* 403 F3d 43, 53 (2d Cir2005). (footnotes omitted).

In other words, a claim for actual fraudulent conveyance requires intent, but not proof of unfair consideration or insolvency, whereas a constructive fraudulent conveyance claim requires a showing of unfair consideration or insolvency, but not intent. *Wall Street Assocs. v. Brodsky,* 257 A.D.2d 526, 529 (1st Dept 1999). Under New York law, a plaintiff may prove intent by pleading "badges of fraud", which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Id.* (citations omitted); *see CIT Group/ Commercial Servs., Inc. v. 160–09 Jamaica Ave. L.P.,* 25 AD3d 301, 303 (1st Dept 2006). "Fair consideration' is not only a matter of whether the amount given for the transferred property was a fair equivalent' or not disproportionately small' but whether the transaction is made in good faith,' an obligation that is imposed on both the transferor and the transferee." *Sardis v. Frankel,* 113 AD3d 135, 141–42 (1st Dept 2014) (emphasis added), citing *CIT Group,* 25 AD3d at 303.

In the instant case, both actual and constructive fraudulent conveyance claims are validly pleaded. Intent is sufficiently pleaded based on the circumstances of the ABC alone, but also because the badges of fraud are prominently on display. *See Taberna,* 45 Misc.3d 1204(A), at *13 n. 14 ("The badges of fraud include circumstances such as a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance.' "), quoting *Square Mile Structured Debt (ONE) LLC v. Swig,* 2013 WL 6409967, at *3 (Sup Ct, N.Y. County 2013), quoting *Wall St. Assocs.,* 257 A.D.2d at 529. More than a reasonable inference of fraud has been pleaded. The AC raises serious questions as to whether Moshe really completely dominates and controls all of the defendant entities and if the roles of his wife, Schwartz, and Ehrenfeld amount to nothing more than his captive agents. *See* Dkt. 114 at 57 n. 17 ("Diligence's authorized signatory is Christopher Milito of Morrison Cohen, LLP who is counsel to Moshe Lax and Martin Ehrenfeld in their various affairs."), citing *Skoblo v. L & M Naden Corp.,* 43 Misc.3d 1209(A) (Sup Ct, Kings County 2014).[13]

**\*12** As for the specifics of the alleged fraudulent conveyances between the Company, the Estate, and the other corporate defendants, countless questions of fact preclude dismissal. While defendants correctly contend that CPLR 3016(b) applies to DCL claims [*see Uni–Rty Corp. v. N.Y. Guangdong Fin., Inc.,* 117 AD3d 427, 428 (1st Dept 2014) ], the badges of fraud pleaded meet this standard. *See id.; see generally Eurycleia Partners,* 12 N.Y.2d at 559, ("CPLR 3016(b) is satisfied when the facts suffice to permit a reasonable inference' of the alleged misconduct"), quoting *Pludeman,* 10 NY3d at 493. Of course, it is not possible for plaintiffs to know of all of the transactions entered into by defendants; that is what discovery is for. The AC contains enough examples of transaction that are, at best, suspicious. Aside from the fact that these transactions lack the indicia of arms' length dealings, the explanations proffered by defendants [14] are insufficient to support dismissal at this stage. [15]

Finally, the fifth motion before the court (Seq.10), defendant Klestadt's motion to dismiss, is now moot. Klestadt was the assignee in the ABC and was named by plaintiffs, out of an abundance of caution, as a necessary party. Defendants have conceded that Klestadt is not a necessary party and do not oppose his dismissal from this action. *See* Dkt. 185 (1/6/15 Tr. at 58–59). Plaintiffs and Klestadt have executed a stipulation of discontinuance (*see* Dkt. 181), but the other defendants refuse to so stipulate. *See* Dkt. 182. Plaintiffs and Klestadt ask the court to so-order their stipulation. The court will do so, provided that a stipulation bearing the parties' actual (as opposed to electronic) signatures is submitted.[16] Accordingly, it is

ORDERED that defendants' motions to dismiss are decided as follows: (1) the second (breach of the covenant of good faith and fair dealing), third (unjust enrichment on the Note), fourth (equitable subrogation), fifth (indemnification), sixth (reimbursement), seventh (unjust enrichment on the

Guaranty), and eighth (fraudulent inducement of the Note) causes of action are dismissed; (2) all claims against defendant Tracy L. Klestadt will be dismissed in accordance with the stipulation filed as Dkt. 181 after a copy of a non-electronically signed version is submitted to be so-ordered; and (3) the motions are otherwise denied; and it is further

ORDERED that the parties are to appear in Part 54, Supreme Court, New York County, 60 Centre Street, Room 228, New York, NY, for a preliminary conference on April 28, 2015 at 10:30 in the forenoon; and it further

ORDERED that before the preliminary conference, the parties must read and comply with the court's rules, and the joint status letter discussed therein must be e-filed and faxed to Chambers (212–952–2777) no later than April 21, 2015 at 4:00 pm.

**All Citations**

47 Misc.3d 1206(A), 15 N.Y.S.3d 710 (Table), 2015 WL 1509815, 2015 N.Y. Slip Op. 50453(U)

## Footnotes

1     "The Company operated one of the largest full-service diamond manufacturing businesses in the United States producing high-end ideal cut loose diamonds and jewelry for sale at whole sale." ¶ 8.

2     Ehrenfeld executed a notarized affidavit stating "that the foregoing inventory and schedule [which did not include plaintiffs] is in all respects a just and true inventory and schedule of deponent's estate of the 4th day of March 2010, the date of the assignment made by deponent to Tracy L. Klestadt as Assignee." *See* Dkt. 35. Plaintiffs are entitled to take discovery to ascertain whether Ehrenfeld perjured himself. The issue in this case not only implicates plaintiffs' rights (and, as set forth below, the rights of the federal government), but also the integrity of this Court.

3     Since, as discussed below, one of defendants' myriad defenses is lack of standing, plaintiffs submitted an Authorization to Assign, dated August 7, 2014, in which the three lenders attest to the fact that they authorized Kimmel to assign the Note to JBAM as of March 7, 2014. *See* Dkt. 120.

4     Moshe and defendant Schwartz are named as necessary parties, but plaintiffs do not allege that Moshe and Schwartz are personally liable for breach or fraudulent inducement of the Note.

5     Klestadt, the assignee in the ABC, was also named as a purported necessary party. As discussed below, plaintiffs have since stipulated to withdraw all claims against him.

6     Allegations in other cases in which Kimmel's actual authority was questioned are not a cause for concern in this case. Defendants do not deny that Kimmel, as nominee, loaned $3 million to defendants and that defendants never paid him back. Simple confirmation in discovery from the lenders that they actually authorized Kimmel to sell the Note to plaintiffs should put to rest any notion that plaintiffs are not entitled to enforce the Note.

7     Indeed, even in mortgage foreclosure actions, standing is a waivable affirmative defense that can be adjudicated at the summary judgment stage; it is not a jurisdictional defense that must be resolved at the outset. *See Wells Fargo Bank, N.A. v. Muskopf,* 44 Misc.3d 1223(A), at *2–3 (Sup Ct, Suffolk County 2014) (Whelan, J .) (collecting cases).

8     It should be noted that defendants' argument that plaintiffs have some nefarious desire to keep the identities of the lenders secret is belied by plaintiffs' disclosure of the three lenders and their allegation that defendants always knew who they were.

9     Of course, even if the claim accrued on the extended maturity date, this action would still be timely.

10    For these reasons, the court need not reach the parties' procedural disputes as to whether the proper mechanism for challenging the judgment in the ABC is a motion to vacate that judgment or a separate plenary action. The authority cited by the parties indicates a lack of clear appellate guidance on this procedural question. Motions to vacate are generally the favored procedural device [*see Citizens for St. Patrick's v. Saint*

*Patrick's Church of W. Troy,* 117 AD3d 1213, 1214 (3d Dept 2014) ], but other cases suggest that a plenary action is the appropriate vehicle for alleging that an ABC was a means to defraud creditors. *See Gelfman v. Hamershlag & Potash, Inc.,* 11 N.Y.S.2d 739 (App Tem, 1st Dept 1939); *but see In re N.Y. Diet Drug Lit.,* 47 AD3d 586 (1st Dept 2008), quoting *St. Clement v. Londa,* 8 AD3d 89, 90 (1st Dept 2004) ("The remedy for fraud allegedly committed during the course of a legal proceeding must be exercised in that lawsuit by moving to vacate the civil judgment [ ] and not by another plenary action collaterally attacking that judgment"). This, however, is an academic question, as grounds to vacate the ABC judgment are clearly present. Regardless, plaintiffs are simply not bound by the judgment and, most critically, the ABC judgment did not discharge the Note. Hence, plaintiffs may seek to enforce the Note both against the Company and against the New Company and its alleged fraudulent transferees. Should defendants continue to press the issue, the court would entertain a motion to vacate the ABC judgment.

11  "(1) continuity of ownership; (2) cessation of ordinary business operations and the dissolution of the selling corporation as soon as possible after the transaction; (3) the buyer's assumption of the liabilities ordinarily necessary for the uninterrupted continuation of the seller's business; and (4) continuity of management, personnel, physical location, assets and general business operation." *New York City Asbestos Lit.,* 15 AD3d 254, 256 (1st Dept 2005); *see generally MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 40 Misc.3d 643, 657–673 (Sup Ct, N.Y. County 2013).

12  It also appears that the fraudulent inducement claim is time barred. More than 6 years elapsed between the production of the financials in 2007 and the filing of this lawsuit in 2014. Moreover, while CPLR 213(8) provides a two-year-from-discovery rule, no facts are pleaded to explain why the falsity of the financials could not have been discovered from day one, let alone at some later date that would render this action timely. *See Lim v. Kolk,* 122 AD3d 547 (1st Dept 2014) ("the fraud cause of action, brought more than two years from the date the alleged fraud could have been discovered and more than six years from the date the cause of action accrued, is time-barred").

13  *See also* Dkt. 114 at 57–58 n. 18 (noting that in the Estate's probate action, "the Estate conceded that it is insolvent. In fact, [Moshe and Schwartz,] the executors of the Estate, petitioned for judicial settlement of the Estate and noted that the IRS shall have a $24.5 million priority claim against the Estate and that the Estate should be declared insolvent.") Plaintiffs, therefore, claim that Moshe has transferred the Estate's assets to shell companies so Moshe could collect on the Estate's debts without having to pay the IRS or its creditors, such as plaintiffs.

14  Which, by the way, were improperly proffered by way of witness affidavits that are not permitted to be submitted by a defendant opposing a motion to dismiss. *See U.S. Fire Ins. Co. v. N. Shore Risk Mgmt.,* 114 AD3d 408, 409 (1st Dept 2014), citing *Lawrence v.. Miller,* 11 NY3d 588, 595 (2008), accord *Rovello v. Orofino Realty Co.,* 40 N.Y.2d 633, 635–36 (1976).

15  For instance, defendants explain that Diligence purchased the Estate's claims against Moshe individually. However, no meaningful detail about what those claims might encompass is provided, let along how such claims are valued-an omission that both stands in the way of assessing whether fair value was exchanged and, on its face, seems questionable. If Moshe really controls both the Estate and Diligence, transferring the claim hardly seems like a bona fide transfer of value. One possibility is that Moshe may have breached his fiduciary duty to the Estate by engaging in self-dealing other acts that might cause the Estate to incur liability, or, perhaps, if the IRS takes issue with his apparent efforts to evade estate taxes. Leaving aside these questions of fact, which, again, will be sorted out in discovery, that Moshe appears to be on both sides of all of the subject transfers raises enough of an inference that no real consideration was exchanged, as opposed to assets moving hands simply to frustrate creditors. These details beg to see the light of day and, therefore, without the benefit of discovery, the DCL claims are not amenable to dismissal.

16  In light of the numerous law firms involved in this case, before the preliminary conference directed herein, the parties are respectfully reminded to review this part's rules in advance of that conference. While the parties are not necessarily expected to fully agree upon an ESI protocol, all attorneys appearing at the conference

must be *fully* familiar with their clients' ESI. All requests for an adjournment of that conference must be made within 7 days of the entry of this decision and will only be considered via joint telephone conference with all parties on the line. The parties are further reminded that, unless directed otherwise, discovery motions and letters are disfavored in this part.

---

**End of Document**     © 2021 Thomson Reuters. No claim to original U.S. Government Works.