UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
UNITED STATES OF AMERICA,         :
      :
         Plaintiff,      :
      :
      :      **DECISION AND ORDER**
      -against-      :
      :      1:18-cv-04061 (ILG)(PK)
      :
MOSHE LAX, individually, as an executor of the  :
Chaim Lax Estate, as a trustee of the Chaim Lax  :
Family Trust, and as a trustee of the GAMA  :
Trust; ZLATY SCHWARTZ, individually, as  :
executor of the Chaim Lax Family Trust, and as a  :
trustee of the GAMA trust; SHAINDY LAX;  :
JUDITH LAX; J.L., a minor; 299 HEWES  :
STREET REALTY CORP; 307 HEWES  :
STREET REALTY CORP; JBAM REALTY  :
LLC, a/k/a JBAM REALTY 2 LLC; BEN ZION  :
JACOBOWITZ; TOBY JACOBOWITZ;  SL  :
HOLDINGS I, LLC; SL HOLDINGS II, LLC;  :
SL HOLDINGS III, LLC; SL HOLDINGS IV,  :
LLC; SL HOLDINGS V, LLC; DIAMOND  :
DYNAMICS LLC; KGK JEWELRY LLC;  :
CONGREGATION BAIS YEHUDAH  :
D'GANITCH; LX HOLDINGS LLC; MORRIS  :
SCHLAGER; GITTY SCHLAGER; JOSEPH  :
GREEN; HANNAH GREEN; HENNY  :
GREEN; and HERSHI GREEN,  :
      :
         Defendants.    :
      :
------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

      The United States of America ("Plaintiff") filed this action against Moshe Lax ("Lax" or

"Defendant Lax") and others to collect unpaid federal income and estate tax liabilities owed by the

Estate of Chaim Lax and to obtain money judgments related to alleged schemes undertaken to shield

businesses and property held by Lax and others from creditors of the Estate, including the IRS.  (Am.

Compl. at 1-2, Dkt. 106.)

1

Plaintiff has filed a Motion to Declare Waiver of Attorney-Client Privilege and that the Crime-Fraud Exception Applies (the "Motion," Dkt. 253), seeking a declaration (1) that Lax waived attorney-client privilege related to five documents he disclosed in discovery, and (2) that the crime-fraud exception applies to Lax's communications with the law firm of Porzio Bromberg & Newman, PC (the "Porzio Firm") regarding a transaction that Plaintiff contends was fraudulent.  (*See* "Pl. Mem.," Dkt. 258-1.) For the reasons set forth below, the Court grants the Motion.

## BACKGROUND

I.      **The Assignment for the Benefit of Creditors ("ABC")**

Plaintiff alleges that Lax and other defendants engaged in a series of schemes to evade the collection of the liabilities of the estate of Chaim Lax.  (Pl. Mem. at 2; Am. Compl. ¶¶ 58-179.)  The schemes involved "a series of fraudulent transfers and other artificial transactions designed to hide the Lax family assets from the IRS and other creditors and make it appear as though the Estate was insolvent."  (Am. Compl. ¶ 58.)

Among the alleged schemes carried out by Lax was a 2010 assignment for the benefit of creditors transaction, or "ABC," related to Dynamic Diamond Corp., a business controlled by Lax (the "2010 ABC").  (Pl. Mem. at 2.)  An ABC is a New York state court business liquidation proceeding offered to insolvent debtors as an alternative to bankruptcy, during which the business "would transfer its assets to an attorney to hold in trust, for the purpose of selling or disposing of the assets to the satisfaction of its creditors."  (Am. Compl. ¶ 102.)

Prior to the 2010 ABC, Lax wrote a memorandum dated September 8, 2009, titled "Confidential internal Lax Family Memo," addressed to "Ma, Sisters, brother and brothers-in-law," and with the subject line "RE: Restructuring legal structure of Dynamic Diamond Corp. due to the creditors situation."  (the "Lax Memo," Ex. B to the Motion at 1 (all references to ECF pagination), Dkt. 253-3.)  In it, Lax stated, in part,

> After days, weeks, and months of discussions with attorneys of restructure, corporate and tax laws in addition to hired accountants by the attorneys firm it is becoming crystal clear that the old Dynamic co. might become insolvent in regards to future business. (It is of course solvent in the sense of paying its obligations other then the IRS claim) which might result that all future profits in addition of all assets might be seized by the IRS.
>
> It is the understanding of the attorneys that in some way a new corporation needs to be formed rather sooner than later.  (See: attached memo from the leading attorney, Warren Martin Jr.)

(*Id.* at 1 (all errors in original).)  The memo sets forth three options for forming a new corporation and, although it references an "attached memo," no document was attached to the submission to the Court.

On February 26, 2010, approximately one week before initiating the 2010 ABC, Dynamic Diamond Corp. changed its name to White Coat, Inc.  (Am. Compl. ¶ 100; Department of State Record for White Coat, Inc., Ex. C to the Motion at 2, Dkt. 253-4.)

On March 4, 2010, White Coat, Inc. executed a deed of Assignment for the Benefit of Creditors (the "ABC Deed"), by which it assigned its assets and liabilities to Tracy L. Klestadt, Esq. for the sum of one dollar, to "sell or dispose" of the assets, and "pay and discharge in full" all debts and liabilities.  (*See* ABC Deed, Ex. D to the Motion at 1-2, Dkt. 253-5.)  Lax's brother-in-law[1], Martin Ehrenfeld, signed the ABC Deed on behalf of White Coat, Inc. as its "Chief Restructuring Officer." (Am. Compl. ¶ 103; Transcript of Oral Argument held on January 25, 2022 ("Oral Arg. Tr.")  41:3-9, Dkt. 282.)

On the same day, Klestadt requested "entry of an order approving the sale of substantially all of White Coat Inc.'s assets to Diamond Dynamics LLC, a newly-formed corporation," whose sole member was Shaindy Lax, Defendant Lax's wife.  (Am. Compl. ¶¶ 105, 110.)  Plaintiff alleges that

---

[1] Although the Amended Complaint refers to Martin Ehrenfeld as Lax's cousin (Am. Compl. ¶ 103), both Plaintiff (Pl. Mem. at 10) and Lax (Oral Arg. Tr. 41:3-9) later describe him as Lax's brother-in-law.

although Shaindy Lax nominally owned Diamond Dynamics LLC, Defendant Lax retained control of that entity.[2]  (Am. Compl ¶ 117.)

On March 26, 2010, the state court granted Klestadt's request and entered a Sale Order approving the sale of substantially all the assets of White Coat, Inc. to Diamond Dynamics LLC.  (Am. Compl. ¶ 110.)

## II.    Discovery of Lax's Emails

Plaintiff filed the Complaint on July 16, 2018 and the Amended Complaint on June 18, 2019. (Compl., Dkt. 1; Dkt. 106.)  To facilitate Lax's production of emails from his Gmail account, Plaintiff and Lax entered into a stipulation ("First Discovery Stipulation," Ex. A to the Motion, Dkt. 253-2) in which Lax agreed to review all the emails in his account for privilege, then produce all non-privileged emails to Plaintiff, along with a privilege log.  (First Discovery Stipulation ¶¶ 1-2.)  Plaintiff would then search those emails for responsiveness by using a list of agreed-upon search terms and review only those emails responsive to those searches.  (*Id.* ¶¶ 4-6.)  Plaintiff agreed to provide "technical guidance" to Lax, who is proceeding *pro se*, as necessary to meet his obligations.  (*Id.* ¶ 3.)

Due to a dispute regarding the production of documents belonging to Lax but in the custody of the Porzio Firm, Plaintiff hired a third-party vendor, Innovative Discovery, to "upload the files and help facilitate Moshe Lax's privilege review."  ("Status Report dated Jan. 9, 2020" at 5-6, Dkt. 147; Pl. Mem. at 5.)  Plaintiff and Lax entered into a second stipulation, pursuant to which Lax would make available all documents (or instruct the Porzio Firm to make available documents in its custody) to Innovative Discovery to maintain.  ("Second Discovery Stipulation" at 3, Dkt. 156-2.)  Lax agreed to

---

[2] Plaintiff also points out that Shaindy Lax used her maiden name, Chana Weisz, while acting on behalf of Diamond Dynamics LLC, thus obscuring her relationship to Defendant Lax.  (Am Compl. ¶ 118; Oral Arg. Tr. 13:25-14:2.)  Defendant Lax asserts that Chana Weisz is his wife's legal name due to a problem with her marriage license.  (Oral Arg. Tr. 41:10-18.)

review the documents for privilege within 30 days and produce a privilege log, after which Innovative

Discovery would produce all non-privileged documents to Plaintiff.  (*Id.* at 3.)

The Porzio Firm released Lax's documents in its custody to Innovative Discovery for Lax's

review.  ("Letter from Porzio Firm," Dkt. 158-1.)  Lax reviewed the documents and produced a

privilege log to Plaintiff.  ("Def. Opp. Mem." at 4 (all references to ECF pagination), Dkt. 276; Oral

Arg. Tr. 48:14-15, 61:13-17.)

Lax contends that Plaintiff's counsel promised that in the event of inadvertent production of

privileged communications, Plaintiff would comply with Fed. R. Evid. 502(b) procedures "and return

it immediately and destroy any copy."[3]  (Def. Opp. Mem. at 2.)  Lax submitted an excerpt of an email

exchange with Plaintiff's counsel Kari M. Larson, dated February 26, 2020, in which he wrote, "Kari,

thought over the issue with the Porzio files and I am comfortable following your advice in re: to [sic]

independent company assuming we do it as last time with confidentiality letter etc. M."  (Ex. 1 to Def.

Opp. Mem.; Def. Opp. Mem. at 1-2.)  Larson states, however, that although she had proposed a draft

Rule 502(d) agreement, neither the Porzio Firm nor Lax ever finalized it.  (Declaration of Kari M.

Larson ("Larson Decl.") ¶¶ 7-10, Dkt. 284-1; Ex. A and B to Larson Decl., Dkt. 284-2 and Dkt. 284-

3.)

## III.    Deposition of the Porzio Firm

On June 16, 2021, Plaintiff conducted a deposition of attorney Warren J. Martin, Jr., who was

designated to testify on behalf of the Porzio Firm pursuant to Fed. R. Civ. P. 30(b)(6).  (Pl. Mem. at

---

[3] Federal Rule of Evidence 502(b) states:

> Inadvertent Disclosure. When made in a federal proceeding or to a federal office or agency,
> the disclosure does not operate as a waiver in a federal or state proceeding if:
> (1) the disclosure is inadvertent;
> (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and
> (3) the holder promptly took reasonable steps to rectify the error, including (if applicable)
> following Federal Rule of Civil Procedure 26 (b)(5)(B).

3; *see* "Dep. Tr.," Dkt. 283 (filed under seal).)  In order to address any issues of attorney-client privilege, Lax was ordered to appear "at the depositions of attorneys who provided him legal advice over which he intends to assert any privileges."  (Minute Order dated Apr. 17, 2021.)  The deposition was conducted remotely, and Lax attended using virtual deposition software.  (Pl. Mem. at 3; Dep. Tr. at 2.)

Attorney Charles J. Stoia, representing the Porzio Firm, instructed Martin several times during the deposition not to answer certain questions, citing a duty to maintain attorney-client privilege.  Lax himself did not assert privilege, stating that he was relying on Stoia's assertions of the privilege "[i]n places that is not necessary for me to add because the deposed attorney is claiming privilege."  (Dep. Tr. 37:22-38:1.)  Stoia confirmed that he was not asserting any privilege on behalf of Lax, but believed that it was ethically impermissible for the Porzio Firm to disclose any attorney-client privileged information absent a waiver or direction from the Court.  (Dep. Tr. 38:9-18.)

Martin thus declined to answer questions about the 2010 ABC, including the purpose of the name change from Dynamic Diamond Corp. to White Coat and whether Lax was the "decision-maker as far as initiating the [2010] ABC."  (Dep. Tr. 59:20-24, 44:6-11.)

During the deposition, Plaintiff introduced several emails between the Porzio Firm and Lax that Lax had produced in discovery.  (Pl. Mem. at 4; *see* Deposition Exhibits 564, 567, 568, 569, and 570 (collectively, the "Deposition Emails"), Dkts. 283-1, 283-2, 283-3, 283-4, 283-5).[4]  Lax did not assert privilege over the documents during the deposition.

With regard to Exhibit 564, a communication which included a non-attorney, Lax stated that the recipient was covered "through a Kovel agreement."[5]  (Dep. Tr. 52:11-14.)  Asked if he believed

---

[4] The Court granted leave for the Deposition Emails and Porzio Firm Deposition Transcript to be filed under seal.

[5] No agreement pursuant to *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) (extending the attorney-client privilege, in some circumstances, to the attorney's agent) has been produced.

the document was privileged, however, Lax said, "I'm not sure about this specific document."  (Dep. Tr. 52:23-24.)  Plaintiff's counsel stated on the record that the document was produced by Lax in discovery and proceeded with questioning about the document.  (Dep. Tr. 53:5-8.)

When Exhibit 567 was introduced, Lax was asked if he waived privilege by providing the document to Plaintiff.  (Dep. Tr. 97:11-13.)  Lax did not respond for approximately 30 seconds, and Plaintiff's counsel asked if Lax heard the question.  (Dep. Tr. 97:14-18.)  Again, Lax did not respond. There was no indication that Lax's microphone was muted or that he had left the deposition, and questioning continued.  (*Id.*)

Exhibit 570 was identified by Stoia as a privileged document, and Plaintiff's counsel again noted that it was provided by Lax in discovery.  (Dep. Tr. 125:2-4.)  Lax did not say anything.

The issue of privilege was not raised when Exhibits 568 and 569 were introduced, but Plaintiff's counsel identified and described those documents on the record.  (Dep. Tr. 107:10-23; 111:1-15.)  Again, Lax did not assert privilege. [6]

## IV.    Plaintiff's Motion and Lax's Clawback Request

On September 17, 2021, Plaintiff filed the Motion, asking the Court to declare that Lax waived attorney-client privilege with regard to the Deposition Emails and that the crime-fraud exception applies to Lax's communications with the Porzio Firm related to the 2010 ABC.  (Pl. Mem. at 1-2; Letter dated Aug. 12, 2022 ("Clarification Letter") at 1, Dkt. 317.)

On October 19, 2021, Lax sent Plaintiff's counsel an email, with the subject line, "Request for return of emails." In it, Lax stated, "According to your filing you're in possession of privileged emails

---

[6] At oral argument, Lax confirmed that, although he was able to and did in fact speak at points during the deposition, he did not speak when he learned that Plaintiff had possession of the Deposition Emails.  (Oral Arg. Tr. 64:9.) Lax first stated that, because he was muted, his "gasping" reaction was not heard.  (*Id.* 62:24.) He then clarified that he was not prevented from speaking but chose to stay silent because he did not want to "make it worse" for himself and believed that "this has to be decided by the courts."  (*Id.* 63:2-3.)

– pls send back to sender as soon as possible Thanks. Moshe Lax." ("Clawback Correspondence,"
Ex. A to Pl. Reply at 4 (all references to ECF pagination), Dkt. 279-2.) Plaintiff's counsel asked Lax
to clarify which filing he was referring to, and Lax stated that he was referring to Plaintiff's
Memorandum in Support of the Motion. (*Id.* at 3-4.) Plaintiff's counsel then asked Lax to identify
the documents by Bates number or exhibit number. (*Id.* at 3.) Lax apparently did not reply to this
email, and on October 25, 2021, Plaintiff's counsel again asked Lax to specify which documents he
believed to be privileged. (*Id.* at 2-3.) Lax repeated his request that "all those documents that you're
referring to in the motion" be returned. Plaintiff's counsel asked if he was referring to the Deposition
Emails (*Id.* at 1-2.) Lax responded, "Yes indeed but if you have more I would like to get those too."
(*Id.* at 1.) Plaintiff's counsel then stated that it would sequester the Deposition Emails pending a ruling
on this Motion, inform the parties of Lax's privilege claim, and instruct them to sequester, return or
destroy all copies. (*Id.* at 1.) Plaintiff's counsel also asked Lax to identify any additional documents
that he produced over which he was asserting privilege. (*Id.*) Lax did not identify any additional
documents.

On October 28, 2021, the Court heard the parties on the Motion and set a deadline for Lax to
file a written response. (Minute Order dated Oct. 28, 2021.) Lax filed a Memorandum of Law in
Opposition to the Motion on December 8, 2021. (*See* Def. Opp. Mem.) Oral argument was heard on
January 25, 2022. (*See* Oral Arg. Tr.)

## DISCUSSION

## I.  WAIVER OF ATTORNEY-CLIENT PRIVILEGE

### A.  Legal Standard

The attorney-client privilege protects communications between privileged persons made in
confidence for the purpose of obtaining or providing legal assistance. Restatement (Third) of the Law
Governing Lawyers § 68 (2000). The purpose of the privilege is "to encourage full and frank

communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "The party invoking the privilege … has the burden to show that the privilege has not been waived." *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80, 86 (S.D.N.Y. 2019) (citing *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. 2015)).

"As a general rule, the voluntary production of a privileged document waives any claim of privilege with respect to that document." *United States v. Rigas*, 281 F. Supp. 2d 733, 737 (S.D.N.Y. 2003); *see also Schaeffler v. United States,* 806 F.3d 34, 40 (2d Cir. 2015) ("the privilege is generally waived by voluntary disclosure of the communication to another party").

If production was inadvertent, however, there is no waiver if the privilege holder "took reasonable steps to prevent disclosure" and "promptly took reasonable steps to rectify the error." Fed. R. Evid. 502(b). The "inadvertent production of a privileged document does not waive the privilege unless the producing party's conduct was 'so careless as to suggest that it was not concerned with the protection of the asserted privilege.'" *SEC v. Cassano,* 189 F.R.D. 83, 85 (S.D.N.Y. 1999) (citing *Aramony v. United Way of Am.*, 969 F. Supp. 226, 235 (S.D.N.Y. 1997)). In this Circuit, a flexible four-factor test is employed to evaluate the producing party's conduct. *SEC v. Cassano,* 189 F.R.D. at 85. To determine whether a production was a waiver or a mistake, courts in the Second Circuit consider "[1] the reasonableness of the precautions to prevent inadvertent disclosure, [2] the time taken to rectify the error, [3] the scope of the discovery and the extent of the disclosure," and "[4] the overreaching issue of fairness." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985).

### B.  Analysis

Lax argues that his disclosure of the Deposition Emails was inadvertent and should not waive privilege.  (Def. Opp. Mem. at 4.)  Plaintiff contends that even if disclosure was inadvertent, Lax failed to make reasonable efforts to prevent and rectify the disclosure.  ("Pl. Reply" at 1-4, Dkt. 279-1.)

### i.    Reasonableness of Precautions to Prevent Inadvertent Disclosure

"The mere fact of an accidental disclosure does not automatically render the precautionary measures unreasonable at the time they were performed."  *United States v. Rigas*, 281 F. Supp. 2d at 739; *see also In re Nat. Gas Commodity Litig.*, 229 F.R.D. 82, 86 (S.D.N.Y. 2005).  "Generally, precautions will be reasonable if the procedure followed in maintaining the confidentiality of the document [is] not ... so lax, careless, inadequate, or indifferent to consequences as to constitute a waiver."  *Berall v. Teleflex Medical Incorporated*, No. 10-CV-5777 (LAP), 2021 WL 5989936, at *4 (S.D.N.Y. Dec. 17, 2021) (citing *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96CIV.7590(DAB)(JCF), 1997 WL 736726, at *5 (S.D.N.Y. Nov. 26, 1997)).  "[T]he reasonableness of a party's actions to protect privileged information should be measured in light of the risks *foreseeable* to that party at the time the precautions were taken."  *United States v. Rigas*, 281 F. Supp. 2d at 739 (emphasis in original).

Lax states that he "reviewed carefully on his own thousands of electronically personal and attorneys e-mails, worked very closely with Interactive documents co. and Ms. Larson to have it done right and deliver in set time frames."  (Def. Opp. Memo. at 4 (all errors in original); *see also* Pl. Reply at 2.)  He does not describe, however, how he conducted that review or what efforts he made to prevent the inadvertent disclosure of privileged documents.  He appears to have undertaken this important review by himself, without engaging the assistance of any vendor[7], attorney or other professional, despite being sued individually and as co-executor of his father's estate, which faces massive potential liability in this case.  (*See* Am. Compl. ¶ 41 (as of April 25, 2018, Lax's father's estate

---

[7] The role of Innovative Discovery, the vendor hired by Plaintiff, was purely administrative.

had federal tax liabilities of $61,559,044.81).)  Lax has not indicated that he is indigent.  (*See* Minute Order dated Oct. 28, 2021 (when urged by the Court "to retain counsel if he truly believes that he is facing criminal liability….Lax stated that he does not want to pay a high retainer fee.")) Lax's indifference to the consequences of inadvertent disclosure weighs against the reasonableness of his preventive measures.  *Cf., In re Nat. Gas Commodity Litig.*, 229 F.R.D. at 86 (finding reasonable precautions taken where two experienced attorneys conducted "page-by-page" document review); *Aramony v. United Way of Am.*, 969 F. Supp. at 235-237 (finding that document-by-document review conducted by four attorneys and three paralegals over an eleven-week period constituted reasonable precautions).

Lax does not state that he implemented any specific measures to safeguard against inadvertent disclosure.  *See, e.g., Prescient Partners,* 1997 WL 736726, at *5 (finding reasonable precautions had been taken where attorney personally reviewed and color-coded documents, instructed paralegal to remove privileged documents marked with yellow stickers, and paralegal erroneously failed to follow the instruction).

Based on the lack of detail regarding his review of the documents, as well as his own statements, it appears that Lax may have expected Plaintiff to conduct his privilege review for him. During oral argument, Lax stated that he believed that Plaintiff had taken it upon itself to review his documents for privilege.  When asked if he thought that Plaintiff would review his documents for privilege, Lax replied in the affirmative, stating, "Yeah, and Ms. Larson…quoted that that's the ethical thing to do….They will review all documents…which I give them, that's anyway the case, which they do….And when they see a privilege, they will let me know about it and return it as the ethical rule actually written had actually done." [8]  (Oral Arg. Tr. 48:10-24 (all errors in original).)  Lax also claims

---

[8] Lax does not identify which ethical rule creates such an obligation. Fed. R. Civ. P. 26 (b)(5) requires that when *notified* of a disclosure, the party receiving information subject to a claim of privilege must "promptly return, sequester, or destroy the specified information," "must not use or disclose the information until the claim is

that there was an agreement with Plaintiff, such that "if some privileged documents do get presented to [Plaintiff] they will comply with [Fed. R. Evid.] Rule 502b and return it immediately and destroy any copy." (Def. Opp. Mem. at 2.) However, the Court finds that no such agreement existed, and Plaintiff never agreed to conduct Lax's privilege on his behalf.

Even granting Lax leeway as a *pro se* litigant, the Court finds that he had no reasonable basis for believing that Plaintiff would undertake privilege review for him. The two discovery stipulations which Lax signed explicitly state that Lax would conduct a privilege review of his own documents and produce a privilege log. (First Discovery Stipulation ¶¶ 1-2; Second Discovery Stipulation ¶¶ 4-5.) He apparently understood his obligations because he did produce a privilege log. (Oral Arg. Tr. 58:14-15, 61:13-17.)

A party asserting privilege has the burden to show that he acted reasonably to prevent inadvertent disclosure. Here, Lax's actions evince a degree of indifference and carelessness that weighs in favor of finding that the privilege was waived.

### ii. Time Taken to Rectify the Error

"Inordinate delay in claiming the privilege can prejudice the adversary and may be deemed a waiver." *Prescient Partners*, 1997 WL 736726, at *6 (citation omitted). "The period after the producing party realizes that privileged information has been disclosed is the relevant period for measuring whether the privilege has been waived." *Aramony v. United Way of America,* 969 F. Supp. at 237. "Inadvertent disclosure has been held to be remedied when the privilege is asserted immediately upon discovery of the disclosure and a prompt request is made for the return of the privileged documents." *United States v. Rigas*, 281 F. Supp. 2d at 741 (citation omitted); *see, e.g. In re Nat. Gas Commodity Litig.*, 229 F.R.D. at 88 (finding no waiver where counsel asserted the privilege and requested the return of

---

resolved," and "may promptly present the information to the court under seal for a determination of the claim." This rule does not require that a receiving party conduct a review for the producing party's privilege.

documents via telephone and email on the same day they learned of the inadvertent disclosure); *Prescient Partners*, 1997 WL 736726, at *6 (finding no waiver of privilege where Plaintiff's counsel contacted Defendant's counsel the day after learning of the inadvertent disclosure and demanded return of the documents); *Aramony v. United Way of Am.*, 969 F. Supp. at 237 (finding no waiver where counsel requested return of the privileged material within twenty-four hours of learning of the disclosure); *Georgia-Pacific Corp. v. GAF Roofing Mfg. Co.*, No. 93 CIV. 5125 (RPP), 1995 WL 117871, at *2 (S.D.N.Y. Mar. 20, 1995) (finding no waiver where counsel initiated clawback of documents two business days after learning of inadvertent disclosure).

Lax was made aware of the inadvertent disclosure of the Deposition Emails as early as June 16, 2021, during the Porzio Firm deposition. Lax understood that his attendance at the deposition was required to permit him to make timely objections, including those related to privilege. (Def. Opp. Mem. at 2.) He was present at the deposition, made aware of each deposition exhibit and its contents, and given an opportunity to object. Nevertheless, he did not assert privilege or state that he was requesting the return of the disclosed documents during the deposition. His purported reliance on Stoia to assert privilege on his behalf is unfounded as Stoia repeatedly made clear that he did not represent Lax. (*See* Dep. Tr. 12:8-10, 38:5-9, 39:13-15.)

Lax also did not make a "prompt request" for the return of the documents after the deposition. *United States v. Rigas*, 281 F. Supp. 2d at 741. He failed to take any steps to claw back the Deposition Emails for more than four months, making his request for the first time on October 19, 2021 after Plaintiff filed the Motion. Courts have found delays of much shorter duration to be inordinate. *See Jacob v. Duane Reade, Inc.*, No. 11 CIV. 0160 JMO THK, 2012 WL 651536, at *5 (S.D.N.Y. Feb. 28, 2012) (finding waiver where counsel allowed a witness to be deposed about inadvertently produced documents and did not raise an objection or request their return for more than two months); *LaSalle Bank Nat. Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, No. 04 CIV. 5452 (PKL), 2007 WL 2324292, at *5

(S.D.N.Y. Aug. 13, 2007) (finding delay warranting waiver where counsel identified a document as privileged during deposition, permitted some questioning, and did not request its return until a month later); *S.E.C. v. Cassano*, 189 F.R.D. at 86 (finding the time taken to rectify the disclosure was "excessive" where counsel waited twelve days after learning of disclosure to inspect the document in question, determine it was privileged, and request its return).

Lax contends that he was first "made aware- thru the [M]otion that [Plaintiff] did not adhere to the 502 rules and ignored my objection which was made thru attorney Stoia's objections of privilege on the documents and realiz[ed] that the burden is on myself to ask for its destruction…." (Def. Opp. Mem. at 4.)  This statement is inconsistent with the transcript evidence, which shows extensive discussions about the Deposition Emails on the record on June 16, 2021 and numerous opportunities given to Lax to assert privilege on his own behalf rather than, as he would have it, through Stoia, who did not represent him.  It is also inconsistent with Lax's statement at oral argument that he learned of the inadvertent disclosure of the Deposition Emails at the Porzio Firm deposition.  (Oral Arg. Tr. 49:14-21.)

Even from the time of the Motion's filing on September 17, 2021, Lax waited another month to request return of the documents on October 19, 2021.  (Clawback Correspondence at 4.)  A delay of a month is still too long.  *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, No. 96 CIV. 2064 (RWS), 1996 WL 668862, at *5 (S.D.N.Y. Nov. 19, 1996) (finding waiver where counsel asserted work product privilege immediately upon learning of disclosure but waited a month before requesting return of documents).  And after making a general request for the return of privileged emails, Lax waited an additional six days before responding to Plaintiff's inquiry as to which documents he was requesting. (Clawback Correspondence at 1-2.)

Lax fails to adequately explain why he delayed four months, or even one month, before requesting the return of the Deposition Emails.  His inordinate delay in making that request weights in favor of a waiver of the privilege.

### iii.   Scope of Discovery and Extent of Disclosure

"Courts generally decline to find waiver when 'a relatively small number of privileged documents were disclosed in comparison to the total number of documents produced.'"  *Rigas*, 281 F. Supp. 2d at 740 (quoting *Asian Vegetable Research and Development Center v. Institute of International Education*, 1995 WL 491491, at *7 n.6 (S.D.N.Y. 1995) (finding that twenty privileged pages among 75,000 total pages produced is a "relatively small" number)); s*ee also Prescient Partners*, 1997 WL 736726, at *7 (finding that 117 pages of privileged material out of 12,612 total pages produced did not counsel in favor of waiver); *Stoner v. New York City Ballet Co.,* No. 99CIV.0196(BSJ)(MHD), 2002 WL 31875404, at *2-3 (S.D.N.Y. Dec. 24, 2002) (finding that 15 inadvertent disclosures among 1,000 documents, although "not inconsiderable," does not indicate insufficient precautions).

While the record does not specify the exact number of emails produced to Plaintiff, Lax makes reference to his review of "thousands of electronic emails."  (Def. Opp. Memo. at 2, 4.)  Because the relevant number is of documents produced, not documents reviewed, the Court cannot ascertain whether the number of Deposition Emails was large or small relative to the number of documents produced.

### iv.   Overreaching Issues of Fairness

The consideration of fairness generally balances the prejudices to each party of restoring or waiving the privilege, balancing "the degree to which the contents have been disseminated and the receiving party's reliance thereon" against "the harm to the client who suffers the waiver of privilege due to inadvertent error." *In re Nat. Gas Commodity Litig.*, 229 F.R.D. at 89**.** It is generally inappropriate to find that there has been a waiver of privilege absent any prejudice to the moving party. *Prescient*

*Partners*, 1997 WL 736726, at *7 (quoting *Aramony v. United Way of America*, 969 F. Supp. at 237).  Wide dissemination of the documents, especially in situations where some parties have reviewed the documents while others have not, is an indicium of unfairness.  *United States v. Rigas*, 281 F. Supp. 2d at 741-742.  The fact that the privilege itself deprives parties of powerful evidence does not constitute unfairness.  *See Prescient Partners*, 1997 WL 736726, at *7 (internal citation and quotation marks omitted).

Plaintiff argues that restoring privilege is unfairly prejudicial because it relied on and used the Deposition Emails during the Porzio Firm deposition, and the Deposition Emails "have been considered for use at summary judgment, mediation, and trial proceedings."  (Pl. Reply at 4.)  Plaintiff's evidence of its reliance on the Deposition Emails is not extensive, but there is nevertheless some unfairness to Plaintiff to the extent that it relied on the Deposition Emails in the four months before Lax requested their return.  *Compare U.S. v. Hatfield*, No. 06-CR-0550 (JS)*, 2010 WL 183522, at *9 (E.D.N.Y. Jan. 8, 2010) (finding that where the movant delayed at least 360 days after production before asserting the privilege and "to the extent that this delay caused the Government to rely on these privileged documents in preparing its prosecution, suppressing them now (just a few weeks before trial) would prove grossly unfair") *with In re Natural Gas Commodity Litigation*, 229 F.R.D. at 82 (finding no unfairness from returning documents when receiving parties had not used or relied on the documents).

On the other hand, Lax does not identify any unfairness to himself resulting from a waiver of the privilege.  Although he is generally entitled to privacy for communications with counsel, he is also obligated to protect that confidentiality, and "[t]here is no reason why [his] carelessness should be disregarded."  *SEC v. Cassano*, 189 F.R.D. at 86.

Because Lax's attempts to prevent and rectify inadvertent disclosure of the Deposition Emails were inadequate, his delay in initiating a clawback request was inordinate, and there is unfairness to

Plaintiff because it relied on the documents in the months before Lax requested their return, the Court finds that Lax waived attorney-client privilege with regard to those documents.

## II.    CRIME-FRAUD EXCEPTION

### A.  Legal Standard

Communications otherwise protected by the attorney-client privilege "are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984). While the attorney-client privilege assures that "clients are free to 'make full disclosure to their attorneys' of past wrongdoings," the reason for that protection "ceases to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*." *United States v. Zolin*, 491 U.S. 554, 562-63 (1989) (citations and alterations omitted) (emphasis in original). "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Zolin*, 491 U.S. at 563 (citations omitted).

In this Circuit, the moving party must show by probable cause that the defendant communicated with his attorney in furtherance of a crime or fraud. *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d. Cir. 1994). "[T]he probable cause necessary to sustain the exception is not an overly demanding standard." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 CIV. 4978(LMM)HBP, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999). A finding of probable cause requires that "a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039. The party seeking the exception must first demonstrate that there is probable cause to believe a crime or fraud has been attempted or committed and, second, demonstrate that the communications were in furtherance of the crime or fraud. *United States v. Tucker*, 254 F.

Supp. 3d 620, 622 (S.D.N.Y. 2017) (citing *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1038). There is an emphasis on intent, so "[i]t is therefore relevant to show that the wrong-doer had set upon a criminal course *before* consulting counsel." *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014).

The communications must have been made with intent to further a criminal act, and not merely be related to a crime. *Id.* (internal citations omitted). "Facially legitimate conduct may constitute an action taken in furtherance of fraud in appropriate circumstances." *U.S. v. Levin*, No. 15 CR. 101 KBF, 2015 WL 5838579, at *4 (S.D.N.Y. Oct. 5, 2015). The crime-fraud exception applies even if the attorney is unaware that the advice sought is in furtherance of a crime or fraud. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1038. The crime need not be completed to trigger the exception. The communications must only have been made with the intent to further a crime or fraud. *Zolin*, 491 U.S. at 570.

### B. Analysis

Several aspects of the 2010 ABC support a finding of probable cause that a crime or fraud was committed. (*See* Pl. Mem. at 9-10; Am. Compl. ¶¶ 58-179.)

Prior to the 2010 ABC, Lax communicated to family members an intent to shield assets of Dynamic Diamond Corp. from the IRS. He attached a memo from an attorney of the Porzio Firm, supporting formation of a new corporation. (*See* Lax Memo.)

Approximately five months later, Dynamic Diamond Corp. changed its named to White Coat, Inc. and, within a week, underwent the ABC, with Lax's brother-in-law Martin Ehrenfeld acting as Chief Restructuring Officer. The company's assets were immediately sold to the similarly named Diamond Dynamics LLC, owned by Lax's wife. (Am. Compl. ¶¶ 105-110.) This set of transactions contains "hallmarks of fraudulent activity," due both to the speed at which it occurred and the close

family relations of those involved. [9]  (*See* Pl. Mem. at 10-11.)

Plaintiff also points to Lax's invocation of his right against self-incrimination as evidence that the advice sought from the Porzio Firm was obtained to further a crime or fraud.  (Pl. Mem. at 10.)  During his deposition, Lax asserted the Fifth Amendment privilege against self-incrimination in response to "nearly every question asked."  (Minute Order dated Oct. 28, 2021; *see* "Moshe Lax Dep. Tr.," Dkt. 252-1.)  At the urging of the Court, Lax subsequently retained counsel for the limited purpose of advising him on his criminal exposure and submitted an annotated deposition transcript identifying questions that posed a risk of self-incrimination.  (*See* "Annotated Dep. Tr.," Dkt. 270-1.)  Among the questions Lax refused to answer were those relating to Dynamic Diamond Corp., the name change to White Coat Inc., the 2010 ABC, and advice provided by the Porzio Firm. (*Id.* 103:16-114:9.)

While Lax's invocation of his right to remain silent cannot be used against him in a criminal prosecution (*see* Def. Opp. Mem. at 8), the Supreme Court has held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).  Thus, in this civil action, an adverse inference may be drawn from Lax's refusal to testify in response to questions about the 2010 ABC.

Lax argues that Plaintiff has not demonstrated that the 2010 ABC is anything other than a typical ABC.  (**Def. Opp. Mem. at 7.**)  However, Lax has not identified a "benign purpose" for the 2010 ABC.  *United States v. Spinosa*, No. 21 CR 206 (PAE), 2021 WL 2644936, at *8 (S.D.N.Y. June 28, 2021) (finding the crime-fraud exception applied where defendant could not identify "the benign

---

[9] During this litigation, Ehrenfeld was ordered to, but did not, comply with Plaintiff's document subpoena and deposition subpoena.  As a result, the Honorable I. Leo Glasser found Ehrenfeld in contempt of court and imposed a $500 daily fine for each day until Ehrenfeld fully complies.  (*See* Contempt Order dated July 29, 2022, Dkt. 308.)

purpose" for retaining a law firm that advised her on submitting allegedly fraudulent benefits claims forms).  Hypothetical descriptions of why an entity might use an ABC do not constitute an explanation of the manner in which this particular ABC was effectuated.  *See United States v. Fama,* 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged, however, does not negate probable cause").

A prudent person would have a reasonable basis for suspecting that a crime or fraud had been perpetrated when Dynamic Diamond Corp. changed its name to White Coat, Inc., then used the ABC proceeding to transform itself into Diamond Dynamics LLC.  *See, e.g. U.S. v. Levin*, 2015 WL 5838579, at *4-5 (finding probable cause where evidence of criminal scheme included audio recordings of defendants discussing changing the name of a business entity to avoid disclosure requirements, testimony of a cooperating witness that purpose of name change was to disguise scheme, and descriptions of documents from privilege logs).

Furthermore, a prudent person would also have a reasonable basis to believe that Lax's communications with the Porzio Firm about the 2010 ABC were in furtherance of a fraudulent transaction.  In his communication to family members about avoiding payment of its obligations to the IRS, Lax attached a memo from a Porzio Firm attorney, providing advice that "in some way a new corporation needs to be formed rather sooner than later." (Lax Memo at 1.)  It is reasonable to infer that Lax sought that advice to further his fraudulent scheme.  While communication with *an* attorney about *an* ABC proceeding could be facially neutral, there is probable cause based on the particular circumstances here that Lax sought legal advice to enable him to hide and transfer assets by forming a new corporation through the ABC process.

Plaintiff has demonstrated probable cause that a crime or fraud was attempted or committed and that the communications with the Porzio Firm were in furtherance of that crime or fraud.

Accordingly, the crime-fraud exception applies to communications between Lax and the Porzio Firm regarding the 2010 ABC.

In addition to the Deposition Emails—where privilege was already waived through Lax's inadvertent disclosure—Plaintiff also contends that the scope of communications under the exception should include "advice given in relation to the structuring of the ABC, the entity name-change, and the identity of the decision-making parties involved." (Clarification Letter at 1.)  Plaintiff states that if the motion is granted, a deposition of the Porzio Firm by written questions limited to this narrow area of inquiry is appropriate.  (*Id.*)  The Court agrees. *See, e.g. Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420 (S.D.N.Y. 2013) (ordering production of communications between defendant and his attorneys related to effectuating four allegedly fraudulent transactions); *S.E.C. v. Collector's Coffee Inc.*, 338 F.R.D. 309 (S.D.N.Y. 2021) (permitting supplemental deposition questions of defendant's counsel related to defendant's efforts to cause her counsel to provide false statements regarding fabricated documents).

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's Motion to Declare Waiver of Attorney-Client Privilege and that the Crime-Fraud Exception Applies.  The Court declares that Lax waived attorney-client privilege related to the five Deposition Emails and that the crime-fraud exception applies to Lax's communications with the Porzio Firm related to the 2010 ABC. Plaintiff is granted leave to conduct a deposition of the Porzio Firm by written questions on these issues.

**SO ORDERED:**

*Peggy Kuo*
PEGGY KUO
United States Magistrate Judge

Dated:   Brooklyn, New York
              December 29, 2022

21